## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| MAUREEN EPPS, | : | |
| DIANE CLAUSSEN and | : | |
| GERALDINE WRIGHT | : | |
|     Plaintiffs | : | **C.A. NO. 3:01 CV 2156 (AVC)** |
| | : | |
| VS. | : | |
| | : | |
| GERALD MISTRETTA and | : | |
| THE BOARD OF EDUCATION FOR | : | |
| THE TOWN OF EAST LYME | : | |
|     Defendants | : | **NOVEMBER 26, 2003** |

## MEMORANDUM IN OPPOSITION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The plaintiffs, Maureen Epps, Diane Claussen and Geraldine Wright, hereby

submit this Memorandum in Opposition to the Motion for Summary Judgment filed by

the defendants, Gerald Mistretta ("Mistretta") and the Board of Education for the Town

of East Lyme (the "Board") dated September 5, 2003.  In support of this Memorandum,

the plaintiffs submit herewith the Affidavits of the plaintiffs and a Local Rule 56(a)(2)

statement.

## I.    BACKGROUND

The plaintiffs have brought this action against their former employer and its

principal claiming a violation of their constitutional rights to associate as members of a

union and speak out on matters of public concern under the First Amendment to the

Constitution of the United States and as protected by 42 U.S.C. Section 1983.  (Amended

Complaint, Count One).  The defendants' claim they are entitled to Summary Judgment

on the Section 1983 claim because: (1) under the doctrines of governmental and qualified

immunity the Section 1983 claims against the Town and Mistretta are barred; (2) the

plaintiffs' have failed to exhaust their administrative remedies under the collective

bargaining agreement; and (3) the plaintiff's claim under Section 1983 fails because the

plaintiffs' speech at issue relates to personal matters not governed by the First

Amendment to the United States Constitution.

In making these arguments, the defendants have provided limited information

regarding the plaintiffs' work history, the protected speech in which they engaged,

Mistretta's actions toward the plaintiffs, and the retaliation to which they were subjected.

A complete and thorough discussion of these issues, provided below, will show that there

are genuine issues of material fact that preclude the grant of the defendants' Motion for

Summary Judgment. In short, the defendant's papers are legally and factually flawed.

The background facts giving rise to this litigation are as follows.

## PLAINTIFFS GERALDINE WRIGHT AND DIANE CLAUSSEN

### *Background*

Ms. Wright has worked with children with learning disabilities for approximately

18 years at the high school level and 6 years at the elementary level. After obtaining her

Masters Degree in Learning Disabilities from the University of Connecticut she began

working for the Town in 1985 as a teacher for learning disabled students ("LD students")

at the East Lyme High School in a resource room setting. (See Wright Statement,

attached hereto as **Exhibit 1**). Ms. Claussen has been employed by the Town since 1988

as a special education teacher trained in assisting the learning disabled. She also holds a

Bachelors and Masters Degree in education and has significant experience teaching the

LD students. (See Exhibit 4, Claussen Dep. Transcript, pp. 22, 23). During the eighties

and even during the nineties, Ms. Wright and Claussen successfully taught the LD

students for the Town. In fact two of their students had received the Governor's Award for students with disabilities and the program they used was nominated for a national award. (See Wright Stmt. attached hereto as **Exhibit. 1**, p.1). Ms. Wright and Ms. Claussen were passionate about their work and committed to providing the best services possible to their students. Defendant Mistretta was the principal of the school during their entire tenure.

### Mistretta's View of Special Education Department

In or about 1990, the Town instituted a policy known as "site based management." Under this policy, the principals were given complete control over all aspects of the schools, including the special education program of which Ms. Claussen and Ms. Wright were a part. (Mistretta Dep. Transcript, attached hereto as **Exhibit 5**, p. 13). Prior to 1990, the Department was under the control of its Director. This Department provided assistance to children who needed special assistance and were learning disabled, developmentally delayed and emotionally disturbed. Under Mistretta's control, changes were gradually made to the special education program not in the best interest of the students. He also frequently made derogatory comments about the Department referring to it as the "God-damned special education department" and saying things like "Special ed is draining regular ed dry, and I'm going to stop it." Based on his decisions and comments, it became clear to the Department, including Ms. Claussen and Ms. Wright, that the Program was not a priority for him. Under Mistrettas's control, caseloads increased, budgets decreased and tutors were replaced with aides and funds allocated to the special education program were funneled into other departments, those

that were a priority for Mistretta.[1] (Wright St., **Exhibit 1**; Wright Affidavit filed herewith).

During 1996 and 1997, Mistretta changed assignments in the special education program that left LD students without proper assistance and supervision. He assigned special education teacher to teach classes in the regular education system leaving LD students without proper instruction. Because of the demanding nature of special education, teachers were provided tutors and aides to assist in the teaching process. Often, the tutors and aides were taken away without consideration for the affect of the decision on the students. When the decisions adversely affected the LD students, Ms. Wright and Ms. Claussen voiced their concerns to Mistretta and advocated for the students. (See November 7, 1996 Memorandum from Wright to Mistretta, attachment to Wright Stmt., **Exhibit 1**). In response to voicing their concerns and advocating for their students, Mistretta would say things like "either do it… or I'll find someone else to do it" or "how would you both like to go to the Middle School." It was generally known throughout the school that teachers who made Mistretta unhappy were transferred to the Middle School. (Wright Stmt., **Exhibit 1**, p. 2).

### *The Budget Discrepancy*

In the fall of 1997, the special education teachers, including Ms. Wright, were advised that the budget for the program would be cut from $1400 to $700. However, in the spring of 1998, in reviewing the special education budget that was presented to the school Board, Ms. Wright noted that the Board was advised that the budget was $1400 not $700. At a meeting held by Mistretta and attended by teachers, Ms. Wright raised

---

[1] Individuals hired as tutors generally had a college degree and were often trained in some area of education while aides were not required to have a college education or any special training.

questions regarding this discrepancy. Ms. Wright was concerned that her students were
not receiving the benefit of money earmarked for the needs of the learning disabled.
After raising this concern, Mistretta became outright hostile toward Ms. Wright. (Wright
Stmt., **Exhibit 1**, pp. 2, 3; Wright Affid.)

***Mistretta's Threats in September, 1998***

The day before school was to begin in September of 1998, members of the
Department learned that as a result of the assignment decisions made by Mistretta,
several LD students would be left without proper instruction from September of 1998
until January of 1999. The problem occurred because their LD instructor was assigned to
teach a freshman academy class when her six LD students would otherwise receive
instruction form her. From September through December, these students would have to
rely exclusively on an aide with no Special Education experience for assistance. (See
October 26, 1998 Memorandum from to all Special Education Teachers, attachment 4 to
Wright Stmt., attached hereto as **Exhibit 1**). The LD teachers thought this was not an
acceptable situation. They met in early September to discuss this matter and find a way
to help these students obtain training from a Special Education specialist. The
Department decided that it was in the best interest of these LD students for the special
education teachers to take turns teaching the freshman academy class so that the LD
instructor assigned to those students would have some time to spend with her LD
students. (Wright Stmt, **Exhibit 1**, pp. 2, 3; Claussen Stmt., **Exhibit 2**, p. 1)

On or about September 8, 1998, the Curriculum Instructional Leader ("CIL")[2] for
the Department presented the suggestion to Mistretta. The suggestion was met with
anger and rage by Mistretta. The CIL reported back that Mistretta referred to the

---

[2] The CIL is an individual who acts as the spokesperson for the Department.

Department once again as the "god-damn special education department." (Claussen

Stmt., **Exhibit 2**, p. 1) The next day, Mistretta held a meeting with the LD teachers (all

female), including Ms. Wright and Ms. Claussen, and threatened anyone who challenged

his decisions. In particular, he stated:

> This program is not working, and you will have different assignments. We are
> going to look at different models and you can be sure this is going to change.
> You are very inflexible. I have given you professional leeway and now it has
> come back to bite me in the ass. I'm sick of you second-guessing me. I have a
> statutory responsibility to make building assignments. If I hear one negative
> comment from a parent, you will be considered insubordinate. If I hear anything
> outside of this meeting, you will be considered insubordinate and you'll be out of
> here.

**Id**.

Thus, in September of 1998, Mistretta made it clear that he would not look

favorably on anyone expressing a viewpoint at odds with his even when the expression

was made to further the interest of the students. In retaliation for making a suggestion

regarding a schedule change in the best interest of the LD students, Mistretta threatened

to make changes in the Department that would mean less flexibility for the teachers.

After this point, it became clear that the Department was a target for Mistretta.

### *The Retaliatory Conduct Beginning in September of 1998*

By the end of September of 1998, Mistretta instituted policies and practices

designed to retaliate and harass certain instructors. For example, he took away Ms.

Wright's tutor and replaced her with an inexperienced instructional aide ignoring Ms.

Wright's requests for appropriate help. He began walking past Ms. Wright's classroom

several times a day to let her know he was watching her. Mistretta also instructed Ms.

Wright's CIL to advise Ms. Wright that he was "checking on" and "watching" her.

(Wright Dep. Test., attached hereto as **Exhibit 3**, pp. 121, 154).  Mistretta also began questioning Ms. Wright's decisions regarding her students.

Beginning in September, Mistretta made the Department teachers submit to him a copy of their schedules.  He advised them that if they sought to make any modifications to the schedule, they would need his approval.  Ms. Wright was told that she needed to personally "check-in" with Mistretta if she was going to be late, even if she had made arrangements for coverage.  He also instituted new restrictions and rules regarding PPTs.  Prior to September of 1998, these rules did not exist.  More importantly, these new rules and restrictions did not apply to teachers outside of the Department.  (Wright Dep. Test., **Exhibit 3**, p. 154-157).

### The SAT Incident

In the fall of 1998, Mistretta also directed a memorandum to be sent to Ms. Wright implying that she did not fully cooperate when certain SAT testing materials had been lost, a claim that was absolutely false.  Prior to 1998, Ms. Wright had the task of giving SAT tests to certain special education students.  In 1998, it was decided that individuals outside of the Department would give the tests to the students and deliver the materials to the Department.  Somehow, in the delivery process, the materials got misplaced.  Ultimately, the materials were found in Ms. Claussen's room on a storage table under certain books.  Ms. Claussen had no idea how they got there and she was not expecting the materials to be delivered to her.  Ms. Wright was not involved in giving the tests; she did not have any responsibility for securing the materials; nor were the materials found in her office.  (Wright Dep. Test., **Exhibit 3**, pp 98-102, p. 157).

Nonetheless, Mistretta directed a Memorandum to be sent to Ms. Wright and Ms. Claussen advising them to "check [their] rooms more carefully upon being informed that such an important item is missing" and implying that they were somehow at fault. (See Defendants' Exhibit 21 – and attachment 5 to Wright Stmt, **Exhibit 1**). The memorandum was surprising given that they did carefully search their offices when the tests were missing. Interestingly, in an apparent attempt to portray Ms Wright in a negative light, while the defendants discuss the SAT incident in their summary judgment papers attaching the January 27th Memo critical of her, they do not mention or provide the court with a copy of the Memorandum plaintiffs' wrote in response thereto showing they were not at fault and that they did make a careful search. The individual who sent this Memorandum to Wright advised her that Mistretta instructed him to do so. (See Memorandum from Wright and Claussen, attachment 6 to Wright Stmt, **Exhibit 1**). In fact, when Ms. Wright discussed the Memorandum with Mistretta she specifically asked him to place the Memorandum with his Memorandum of January 27th. Later, she learned that while the January 27th Memorandum was put in her personnel file, her Memorandum explaining the history with regard to the SAT scores was not. This was the first time in Ms. Wright's tenure with the school that a document showing her in a negative light was placed in her personnel file. (Wright Dep. Test., **Exhibit 3**, pp. 98-102).

Mistretta's threats and retaliation continued during the remaining part of 1998 and 1999. In March of 1999, after Ms. Wright's aide left, Mistretta ignored Ms. Wright's requests for a replacement, relegating her to using different substitutes. She once again had to fight to ensure that her students had proper instruction from a qualified person. In a face-to-face discussion with Mistretta regarding the need to hire someone to replace the

aide, he physically turned his back to her letting her know that she would continue to be

punished.  (Wright Stmt., **Exhibit1**,; Claussen Dep. Test., **Exhibit 4**, pp. 61-63, Wright

Dep. Test., **Exhibit 3**, pp. 102, 103).

### *The Restructuring of the Special Education Department*

Ultimately, Mistretta carried out his threats to reorganize the Department and

change the teachers' assignments.  On or about April 28, 1999, Mistretta announced that

he intended to reorganize the entire Department.  When making the announcement, he

said some of you might say "what is he fuckin crazy?"  He stated that the reorganization

would provide closer bonds between the faculty and the students and promote more of a

team environment.  At no time did any member of the administration state that the

reorganization was necessary under the IDEA or that it had been determined that the

School's special education program was not in compliance with the Act.  This claim was

made for the first time after this litigation commenced.  (Wright Dep. Test., **Exhibit 3**,

pp. 104, 105).  At the meeting, Ms. Wright asked if the Department could discuss the

pros and cons of this change to which Mistretta responded, "you can discuss it all you

want but this is where we're going." (Wright Dep. Test., **Exhibit 3**; Claussen Stmt.,

**Exhibit 2**, p. 2).  After announcing his plan for the reorganization at the April meeting,

Mistretta stated to those present:

> If I hear any negative comments from parents about these changes I will consider
> you insubordinate.  And don't think I won't know who said them.  When I get
> parents in here, I get them to puke their guts out.

(**Exhibit 1**, p. 6)

While he claimed to be making the reorganization to create a "team approach"

and "closer bonds" between the students and faculty, it became abundantly clear by his

actions that the so-called reorganization would actually be used to destroy bonds between teachers and students and further the campaign of harassment and retaliation against the Department, and in particular Ms. Wright and Ms. Claussen. The defendants claim in their papers that the entire Department was in favor of the new program with the exception of Ms. Wright and Ms. Claussen. The fact that the teachers did not voice concerns regarding the reorganization does not mean that they agreed with the manner in which Mistretta made assignments pursuant to it.

Prior to the reorganization, the Department consisted of resource rooms categorized by the specific needs of the students. The Department was divided into three groups: The Therapeutic Program, which consisted of students who were severely emotionally disturbed and suffered from conditions such as schizophrenia, severe depression, and obsessive compulsive disorder; The Special Needs Program, which consisted of children who were developmentally delayed and Autistic students; and The Resource Rooms for students who suffered from learning disabilities, ADHD and other health impairments and some emotional difficulties. Because of their specialized training, Ms. Claussen and Ms. Wright were assigned to teach in a resource room for the LD students. Their classes consisted of students of all different grade levels that were mostly learning disabled. Under the old structure, teachers specializing in certain specific needs were assigned resource rooms for students with those specific needs. Under this program, older students were able to mentor the younger ones and teachers were assigned students they were qualified to teach. In addition, the teachers were able to teach the same students for all four years at the high school, enabling them to give the students

continuity and specialized instruction and to have opportunities to develop relationships with parents. (Claussen Dep. Test., **Exhibit 4**, pp. 67-70).

The reorganization required resource room teachers, counselors, school psychologists and assistant principals to be divided up into grade-level "teams." The students then would be grouped solely by their grade-level (i.e. placing all freshmen together) without consideration to their specific need. (See Claussen Stmt., **Exhibit 2**; Clausen Dep Test., **Exhibit 4**, pp. 67-69, 115-117). Thus, the resource rooms could consist of students who had varying degrees of disabilities and special needs. The end result was that teachers were forced to teach students they were not necessarily qualified to teach. Another disadvantage to the reorganization was that there was less opportunity to provide equal number of students to all of the teachers resulting in some teachers having more students than others. **Id.** Thus, there were definite disadvantages to the new program. The Department members recognized these issues but realized there was nothing they could to eliminate these inevitable problems. Instead, they decided to concentrate on arriving at ways to implement the program that would make the transition for their existing students smoother, particularly the sophomores and juniors since they had already had the same teacher for two or three years and had formed bonds with them.

After Mistretta's announcement, the teachers of the Department, including Ms. Claussen and Ms. Wright, met to discuss the best way to transition the students into the reorganization. All of the teachers had the same concern – to find a way to implement the reorganization so it was least disruptive for their students, particularly the students who would be juniors and seniors the following September. After meetings and careful consideration, the Department came up with a proposal for the reorganization and

11

submitted it to Mistretta. [See **Exhibits1 and 2**; Memorandum sent from the Department to Mistretta proposing staffing, attachment to Claussen Stmt.). Under the plan, it was proposed that Ms. Claussen and Ms. Wright would teach the juniors and seniors, respectively. This made sense because of the 54 juniors and seniors being placed, Ms. Wright and Ms. Claussen had already taught 43 of them. Ms. Wright had 14 juniors she had taught since their freshmen year and felt it was in their best interest if she continued to teach them their senior and final year at the school. They would also be able to continue working together. The proposal also included assignments for the other teachers in the Department. Mistretta's response to the proposal was "Nice try but its not going to happen." (**Exhibit 2**, p. 2). He did not provide any explanation for his refusal. He did not care that the proposed assignments were in the best interest of the students.

In May, 1999, Ms. Claussen personally met with Mistretta to request that she and Ms. Wright be assigned the 11th and 12th graders, respectively, the following year as part of the reorganization. She explained in detail why this assignment made sense and that it was in the best interest of the students. Mistretta dismissed Ms. Claussen's concerns and let her know he did not care about her opinions. At one point Ms. Claussen stated that she "wanted to go on record as saying that she felt it was in the best interest of the students if Ms. Wright and she remain together on the 11th and 12th graders team for the following year to transition the LD students." In response to Ms. Claussen's requests and concerns, Mistretta stated in a threatening tone "And I want to go on record as saying, if I hear any negative comments you've made to parents, I will consider it insubordination. Do you understand me?" (**Exhibit 2**, p. 2).

12

Under the guise of the reorganization, Ms. Wright was assigned the freshman class, and taken away from the fourteen juniors she had taught since their freshmen year and Ms. Claussen was assigned the seniors. Although one of the chief purposes of the so-called restructuring was to provide the students consistent contact with the same faculty during their four years (this component was already in existence under the old plan) (Mistretta Dep. Test., **Exhibit 5**, pp. 50, 51), Mistretta refused to allow Ms. Wright to be a resource to her juniors. Mistretta made this decision knowing this would cause a great deal of heartache for Ms. Wright and the students. More importantly, there was no non-retaliatory justification for refusing the teachers' proposal since the proposed assignments therein did not run afoul of the stated purpose of the reorganization and were in the best interest of the students. Obviously, Mistretta made the decisions regarding the assignments to retaliate and punish certain teachers. (Claussen Dep. Test., **Exhibit 4**, pp. 121, 122). In fact, he admits that one of his objectives was to prevent Claussen and Wright from teaching together. (Mistretta Dep. Test., **Exhibit 5**, p. 71). One student actually cried when she learned that Ms. Wright would no longer be her teacher. Parents also expressed their dissatisfaction with this decision. (See December 7, 1999 letter from Maryann Lidestri to Mistretta, attachedment 7 to Wright Stmt., **Exhibit 1)**. Ms. Wright and Ms. Claussen were crushed by Mistretta's decision.

During the spring of 1999, Mistretta continued to send intimidating messages to Ms. Wright. For example, in a panel interview with a potential candidate, Mistretta, while staring at Wright, asked the candidate how she would handle a difficult teacher who did not want to implement a program she wanted to implement. After the candidate answered the question, he stated, still staring at Wright, "you know how we handle

teachers who don't co-operate? We fire them." (Wright Dep. Test., **Exhibit 3**, p. 158).
Unable to endure the stress caused by Mistretta's actions toward her and the symptoms
caused by her chronic Lyme disease, Ms. Wright decided to take a leave of absence
during the academic year 1999-2000. (See **Exhibit 1**)  She did not mention the emotional
stress component requiring her to take the leave of absence fearing further retaliation
from Mistretta.  During the leave, Ms. Wright was diagnosed as having post-traumatic
stress syndrome.  (Wright Affidavit filed herewith)

### Ms. Wright's Leave and Return To The School

During the winter of 2000, Ms. Wright was asked by the CIL if she wanted to
return to the school.  At that time, a new part-time position to instruct the LD students
was available and Ms. Wright agreed to return to the School in that position.  In the
summer of 2000, she learned that the position had been given to another teacher, one who
had no experience and was not trained in teaching the learning disabled.  Mistretta
advised Ms. Wright that there was an opening in the Therapeutic program, the part of the
Department that was for severely emotionally disturbed students.  Since Ms. Wright was
not trained in handling such students, it was not in the best interest of the students for her
to have this position.  After some urging from Ms. Wright, she was offered a part-time
position in the Special Needs program, the part of the program that took care of children
who were developmentally delayed.  However, Mistretta refused to give the LD position
to Ms. Wright even though she was far more qualified for the position.  The posting and
selection process set forth in the collective bargaining agreement were also not followed
in assigning the other teacher to the LD position. (See July 26, 2000 letter from Ms.
Wright to Mistretta, August 15, 2000 Memorandum from Ms. Wright to Mistretta,

attachments to **Exhibit 1**).    Immediately after Ms. Wright complained to the Union

about this action, Mistretta assigned seven LD grade-eleven students to her in addition to

the special needs students. (See August 23, 2000 Memorandum from Ms. Wright to Jack

Penders, attachment to **Exhibit 1**, Pars. 5-16). Ms. Wright was forced to file a grievance.

The grievance was settled in favor of Ms. Wright in September. (See Grievance

Procedure Form and Resolution of Grievance dated September 13, 2000 attachments to

**Exhibit 1**). . However, Mistretta delayed implementing the resolution until months later.

As per the Resolution, Ms. Wright would be transferred to the LD position as soon as the

school hired a tutor for the special needs students.  As of December, no tutor had been

hired.  Ultimately, Ms. Wright was transferred to the LD position as per the settlement

and an aide, not a tutor, was hired for the special needs students.  (**Exhibit 1**).

At the opening day faculty meeting in September, 1999, Mistretta introduced all

returning teachers with the exception of Ms. Wright, again letting her know the

retaliation and inappropriate behavior would continue. (**Exhibit 1**, p. 3).

### *The Punitive Work Load Assigned to Claussen*

The reorganization caused ongoing problems and the hostility from Mistretta

toward the Department continued.  On or about September 27, 2000, plaintiffs Wright

and Claussen along with two other teachers of the Department met with their union

representative to discuss some of their ongoing concerns regarding the reorganization and

problems in the Department caused thereby.  Ms. Claussen was vocal during this meeting

and expressed her concerns regarding the negative impact on the students caused by the

reorganization.  The morning after this meeting, the CIL of the Department was

summoned to Mistretta's office via the intercom at 7:15 in the morning.  When the CIL

met with Mistretta, he was visibly angry and upset. In this meeting, he advised the CIL to increase Ms. Claussen's work-load so that she would now be responsible for annual review testing the entire 11th grade in addition to the testing of the 12th graders, running the 12th grade Resource Room, and creating a self-advocacy curriculum for each grade level, 9-12. When giving her the news, the CIL actually stated to Ms. Claussen "What did you do wrong?" (Claussen Dep. Test., **Exhibit 4**, pp. 10-94, 100, 124-130, 162, 163). At this time, Ms. Wright and another LD teacher were already assigned the juniors and they were responsible for conducting their testing. Accordingly, it was unnecessary to assign this task to Ms. Claussen. (Wright Affidavit).

### *The Accusations Regarding A Lighter Work Load*

After questioning Mistretta's motive in assigning the testing of the 11th graders to her, on October 10, 2000, as per Mistretta's instructions, the CIL wrote a memo to Ms. Claussen stating that she had been assigned the testing because she had a "lighter case load" than the other teachers, something she had not been previously advised and which was not factually correct. (See Defendants' Exhibit 38). On October 11, 2000, Ms. Claussen wrote a memo explaining that she did have a full-time teacher's workload and that the implications to the contrary were without merit. (See Defendants' Exhibit 39). In the memo, she went over her caseload and reminded Mistretta that while other teachers with more students had a full-time tutor and an aide working with them, she only had a part-time tutor assigned to her. She also had certain obligations with respect to the eighth graders. She again voiced her concerns about the program assignments that were not in the best interest of her students – "It is not in the best interest of my students for me to be out of the room that often, and I must as their teacher speak out against this."

(Defendant's Exhibit 39, Par. 5).  Interestingly, the accusations regarding a lighter

caseload were not made until Ms. Clausen attended a union meeting where criticisms of

Mistretta's reorganization and the negative impact caused thereby on the students were

discussed.  In fact, Ms. Claussen had fewer students the prior school year and no one had

raised concerns as to her workload.  (See Claussen Affid filed herewith).

On or about October 12, 2000, Ms. Claussen met with Mistretta and the CIL to

register her complaint regarding the punitive workload.  After hearing Claussen's

concerns, Mistretta reduced the punitive workload but sent her a Memorandum

mischaracterizing her statements at the meeting and suggested that she might be happier

if she sought "a transfer to another building."  (See attachment 4 to Claussen Stmt.,

**Exhibit 2**, p. 4).  Given Mistretta's threats in this regard and history of transferring

teachers to the Middle School as punishment, Ms. Claussen became even more concerned

about potential recriminations and retaliation from Mistretta.

### *The Fall of 2000*

In the fall of 2000, Mistretta continued his attack on the Department. After a 14 million dollar renovation of the School, much of the Department was assigned the least desirable classrooms in the building. Moreover, the Special Education Department was the only department at the school that was not given a separate departmental office. Ms. Wright's classroom had no windows. Once again, Mistretta made his feelings toward the Department and its faculty quite clear. One student from the Therapeutic Program said to Ms. Wright "can you believe this… we are supposed to be the depressed kids in the building and look at the rooms they give us." (Wright Dep. Test., p. 52; Wright Stmt., p. 9).

### The Complaint To The Superintendent of Schools

Finally, in January of 2001, the plaintiffs, together with several other teachers, brought their complaints to the superintendent of schools, Jack Reynolds. In addition to the retaliatory actions described above, the teachers complained that Mistretta engaged in illegal hiring practices by making hiring decisions based on gender and age;[3] he routinely used profanity; he habitually screamed loudly at the teachers; and he punished them if he thought they challenged his authority regardless of their motives in so doing. After doing a cursory investigation, Mr. Reynolds concluded that Mistretta was a wonderful principal. It became apparent that there was no recourse for this policy at the school allowing Mistretta to retaliate against faculty for speaking on matters of public concern and contacting the union. (See Claussen Affidavit).

### Present Status of Wright and Claussen

Again, needing to separate from the stress and retaliation caused by Mistretta, in the fall of 2001, Ms. Wright accepted a transfer to the elementary school. This is a part-

---

[3] He was heard saying things like "I need a man for that job" or "I need someone young in that position."

18

time position that requires her to travel to four schools.  Ms. Claussen continues to teach

in the Department.  Mistretta resigned in June of 2003.  (See Affidavits of Claussen and

Wright)

### PLAINTIFF MAUREEN EPPS

Ms. Epps is a certified teacher in the areas of math and Spanish.  She was

employed by the Town for approximately 23 years as a Spanish teacher until her

constructive discharge  in 2001.  At that time, she was a member of the School's Foreign

Languages Department.  As Ms. Claussen and Ms. Wright, she was retaliated against by

Mistretta after filing a grievance against him. In or about April of 2000, Ms. Epps made a

timely request for a personal day.  She was entitled to five under her contract with the

School.  It was school policy that a teacher give at least three days notice prior to using a

personal day and that a personal day not be used for shopping or looking for another job.

She gave timely notice of her desire to take a personal day.  The request was refused by

Mistretta.  He stated that she could not use a personal day when she was scheduled to

cover certain exams, which were not even for her students.  Ms. Epps was frustrated by

Mistretta arbitrarily denying her a personal day, although she entitled to take such days

under the contract.  Ms. Epps spoke to her union representative about this.  He advised

her that although she was correct and Mistretta could not refuse her timely request for a

personal day, she should not file a grievance because Mistretta "would make her life

miserable" if she did.  Ms. Epps decided not to file a grievance.  (See Affidavit of

Maureen Epps submitted herewith).

A month later, Ms. Epps once again submitted a timely request for a personal day.

Again, Mistretta refused the request although he did not have the right to do so under the

Ms. Epps' contract. (Mistretta Dep. Test., **Exhibit 5**, p. 129). Ms. Epps had given timely notice and she was taking the day to attend a special school event with her son. Mistretta told her she could not take the personal day because she was giving her students a final exam in Spanish on the day she was to be away. She had made arrangements with another member of the faculty to cover the second hour of the testing period. Notwithstanding these circumstances, Mistretta stated it was inappropriate for her to be off. Mistretta admits that he was wrong to refuse her request and that under her contract she was entitled to take the personal day. (**Id**). Ms. Epps' spoke to the union about her grievance on a Friday. The following Monday morning she was paged to call Mistretta's office through the intercom system at 7:20 a.m. When she met with Mistretta at lunch, he told her she would no longer be the CIL for her Department. (See Epps Dep., pp. 155-156, attached hereto as **Exhibit 6**). When she asked why she was being removed as CIL, Mistretta said he sought to take the Foreign Languages Department in a different direction. He made sure after this incident that Ms. Epps would not be CIL again. (Epps Affd.)

As of the spring of 2000, Ms. Epps had been a Liaison / CIL for the Foreign Languages Department for ten years. She had never received any criticism for her performance as Liaison or CIL for her department. As of September of 2000, the Assistant Principal was the acting CIL. (See Epps Affd.)

When Ms. Epps returned to school in September of 2000 after the summer break, it was clear Mistretta had not forgotten the grievance and continued the campaign of retaliation against her. The following spring when the position of CIL opened again, Ms. Epps expressed her desire to once again assume the position of CIL. She was the only

person who wanted the position and applied for the position posting, and since she was

not aware of anything she had done wrong as CIL, she saw no reason why she should not

again be the CIL for her department.  In all prior years, her position as CIL was renewed

without any questions.  Even though she was the only applicant to the posted position, the

School went outside of her department and advertised to get names of applicants for the

CIL position and she was told that a CIL would be selected only after a formal interview

process.  This was contrary to what had occurred throughout the school and even in her

department prior to the spring of 2001.  It had been generally the policy of the school that

when only one person in a department sought the CIL position, that person was given the

position.  After filing a grievance against Mistretta in the spring of 2000, these rules

changed, at least as they applied to Ms. Epps.  (See Epps Affid).

        In an obvious attempt to mislead the court, the defendants recite the accusations

made against Ms. Epps regarding claims, which even if true, are not relevant to this case.

One of the claims defendants make concerns Ms. Epps' alleged involvement in advising

students to sign up for classes they did not intend to take (Defs.' Mem. of Law, p. 4).  In

discussing this issue, the defendants fail to mention Ms. Epps' explanation showing that

the accusations were unfounded.  (See Epps Dep. Test., pp. 38-43, attached hereto as

**Exhibit 6**).  The defendants also discuss in their papers certain accusations made against

Ms. Epps later in the spring of 2001.  Ms. Epps adamantly denies such accusations.  More

importantly, even if they were true, which they are not, such accusations are irrelevant

since the retaliatory conduct against Ms. Epps occurred in May of 2000, a year before

any such allegations surfaced.  As noted above, she was removed as CIL in the spring of

2000 after she filed a grievance.  The accusations against her were made in April of 2001.

Mistretta refused to believe Ms. Epps side of things in response to the accusations and wrote a letter to the Superintendent recommending her termination. Before the School could act upon Mistretta's recommendation, Ms. Epps resigned. (Epps Affd.)

Before Ms. Epps filed the grievance, she was given the CIL position without having to submit to any formal interview process. Once she filed a grievance against Mistretta, the process for becoming a CIL dramatically changed for her. It was clear she was a target. She was removed as the CIL and new rules were put in place to ensure that she would not be CIL again. When allegations were made against her by a student teacher, Mistretta chose to believe the student teacher instead of Ms. Epps, a teacher who had been with the School for 23 years and who had a near flawless record. Mistretta made sure he accomplished his objective, which was to punish anyone who challenged him in any way regardless of their motives. (Epps Affid.)

Ms. Epps is no longer a teacher in the East Lyme school system. She resigned in the summer of 2001 after Mistretta recommended that she be terminated. She is currently employed as a Spanish instructor in another school system.

## II.    ARGUMENT

### A.    The Summary Judgment Standard.

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains

an issue of fact to be tried.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548,

2552, 91 L.Ed.2d 265 (1986).

On a motion for summary judgment, all reasonable doubt as to the existence of a

genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533

F.2d 429, 432 (9th Cir.1976).  Where different inferences can be drawn, summary

judgment is inappropriate.  *Sankovich v. Life Ins. Co. of N. America*, 638 F.2d 136, 140

(9th Cir.1981).  See also *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct.

2505, 2512, 91 L.Ed.2d 202 (1986)."[S]ummary judgment is a drastic remedy and must

be exercised with extreme care to prevent taking genuine issues of fact away from juries."

*Wabun-Inini v. Sessions*, 900 F.2d 1234, 1238 (8th Cir.1990).  The Second Circuit has

repeatedly emphasized that summary judgment is not appropriate in cases where an

employer's intent is at issue.  The logic behind these decisions is that employers rarely

publicize their illegal intent, which therefore must be ascertained through circumstantial

evidence and evaluation of witness credibility.  In *Chertkova v. Connecticut General Life

Ins. Co., 92 F.3rd 81* (2d. Cir. 1996), the Second Circuit, citing previous cases, declared

that:

> In prior cases, we have also emphasized that trial courts must be especially
> chary in handing out summary judgment in discrimination cases, because
> in such cases the employer's intent is ordinarily at issue.  See, e.g., *Gallo*,
> 22 F.3d at 1224; *Montana v. First Fed. Sav. & Loan Ass'n*, 869 F.2d 100,
> 103 (2d Cir.1989).  Since it is rare indeed to find in an employer's records
> proof that a personnel decision was made for a discriminatory reason,
> whatever other relevant depositions, affidavits and materials are before the
> district court must be carefully scrutinized for circumstantial evidence that
> could support an inference of discrimination.  See *Chambers v. TRM Copy
> Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir.1994).

*Chertkova*, 92 F.3rd at 87. In the present case, factual issues exist regarding the defendants' motives in making certain decisions that were not in the best interest of the students.

### B.    Governmental Immunity.

In support of its Motion for Summary Judgment, the Board claims that it is entitled to summary judgment under the doctrine of governmental immunity. (Defs.' Mem. of Law, pp. 23, 24). Although the defendant does not cite the statutory basis for this claim, it is apparent that by reference to the cases cited, that defendants are claiming protection under Connecticut General Statutes § 52-557n. This argument is without merit.

As indicated by *Bonamico v. City of Middletown*, 47 Conn. App. 758, 761 (1998), § 52-557n(a) provides for immunity based upon negligent acts or omissions. The statute does not protect the municipality from all tort liability as the defendants suggest. In fact, wanton and willful conduct, or conduct that is engaged with intent to injure, is specifically excluded from the immunity conferred by the statute for discretionary acts. On the other hand, the legislature has specifically waived governmental immunity for the state and its political subdivisions for conduct that violates Connecticut General Statutes § 31-51q, the statute relied upon to hold the East Lyme Board of Education liable in this case. *Skinner v. Angliker*, 211 Conn. 370, 378 (1989). As an employer, the Board of Education has no right to claim immunity in the face of § 31-51q claims.

### C.    The Qualified Immunity Defense.

In support of his Motion for Summary Motion, defendant Mistretta claims that he is entitled to qualified immunity because his actions in reorganizing the Department were

"objectively reasonable." (See Defs.' Mem. of Law, pp. 24-26).[4] There is no support in the cases cited by defendant for the proposition that defendant Mistretta's conduct is objectively reasonable if his motive was to retaliate against the plaintiffs for exercising their right to speak out on matters of public concern affecting the education of special education students.

First, in making this argument, the defendants have completely misconstrued the plaintiffs' claims. The claim against Mistretta does not stem solely from Mistretta's decision to reorganize the Department. (See Background section above). Rather, it is based on a campaign of harassment and retaliation directed at the members of the faculty over the course of several years for speaking out on matters related to the students and attending union meetings and /or filing grievances. Second, even if this case were based just on Mistretta's decision to reorganize the Department, which it is not, there are genuine issues of material fact regarding that reorganization that would preclude the grant of summary judgment.

As noted above, prior to the reorganization, Mistretta threatened the LD teachers with changes to their assignments because he felt he had given them too much "flexibility" and that it had come back to "bite him in the ass." While he claimed to be reorganizing the Department to create a team-approach and bonds between the students and the faculty, he ignored all attempts made by the Department to make the transition smoother for the students and not destroy the bonds that had already been formed. He intentionally made assignment decisions that were not in the best interest of the students and designed to separate the students from their teachers, particularly Ms. Wright. He

---

[4] Since the defendants do not mention the claims of Ms. Epps in their discussion regarding the doctrine of qualified immunity or state that the doctrine applies to her claims, it is assumed that they are not relying such doctrine with respect to her claims.

ignored the recommendations of the special education teachers even though such recommendations were in the best interest of the students. Finally, although the defendants now claim that the reorganization was put in place because of the mandates of the IDEA, at the time of the reorganization no one in the administration of the School made this claim or mentioned the IDEA. (See discussion in Background section above). Nor have the defendants pointed to the alleged section of the IDEA that required the reorganization or the destruction of the existing program in a manner that made the transition for their students more difficult. The IDEA certainly did not require Mistretta to ignore the suggestions made by the teachers of the Department to make the transition smoother for students. The defendants have not, nor could they, provide a legitimate explanation for making assignments pursuant to the so-called reorganization that were not in the best interest of the students.

In support of the qualified immunity defense, Mistretta claims that he had the support of the *entire* special education department in connection with the reorganization. This is not an accurate statement. In an atmosphere where teachers are routinely threatened, retaliated against and harassed, the fact that teachers did not oppose the plan is beside the point. More importantly, the fact that teachers made a proposal regarding assignments shows that they did have concerns about the way the reorganization would be implemented. As noted above, the Department had meetings as a whole and proposed assignments to Mistretta, not just Ms. Wright and Ms. Claussen. The proposal included assignments for all of the teachers, not just Ms. Claussen and Ms. Wright. By making this proposal, the teachers demonstrated that they did have concerns about assignments

26

under the reorganization and made suggestions to alleviate some of their concerns.  Of

course the suggestions made the teachers were completely ignored by Mistretta.

These factors raise genuine issues of material fact as to Mistretta's motives in

implementing the reorganization and making assignments under the guise of such

reorganization.  Mistretta's Motion for Summary Judgment based on the doctrine of

qualified immunity must fail.  See Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003).

**C.    The Defendants' Claim That The Court Lacks Jurisdiction Because
Plaintiffs Failed To Exhaust Remedies Available Under the Collective
Bargaining Agreement Is Without Merit.**

Defendants claim that plaintiffs have failed to exhaust their administrative

remedies under the collective bargaining agreement.  As support for this argument,

defendants point to the allegation in paragraph 27 of the complaint that the unfair labor

practice complaint filed on behalf of plaintiff Diane Claussen is still pending.  Defendants

conclude that since plaintiffs have "failed to exhaust their administrative remedies

regarding their claims before the Connecticut State Labor Board ... this Court lacks

jurisdiction over the Plaintiffs' claims." (See Defs.' Mem. of Law, pp. 26, 27).

Defendants are incorrect to claim that this Court lacks subject matter jurisdiction.

The exhaustion of remedies under a collective bargaining agreement is not required for

claims that are brought pursuant to a state statute or under the federal or state constitution

under Connecticut General Statutes §31-51bb.[5]  "Plainly, therefore, an employee who

does *not* exhaust the grievance procedures established in a collective bargaining

agreement may pursue a cause of action in the Superior Court if the cause of action is

---

[5] Section 31-51bb states: "No employee shall be denied the right to pursue, in a court of competent jurisdiction,
a cause of action arising under the state or federal constitution or under a state statute solely because the
employee is covered by a collective bargaining agreement. Nothing in this section shall be construed to give an
employee the right to pursue a cause of action in a court of competent jurisdiction for breach of any provision of
a collective bargaining agreement or other claims dependent upon the provisions of a collective bargaining
agreement."

premised on an independent statutory claim. To hold otherwise would be to deny such an employee the right to pursue a statutory action solely because of the existence of a collective bargaining agreement." *Genovese v. Gallo Wine Merchants, Inc.*, 226 Conn. 475, 481-82 (1993). See *Bigio v. Montagna*, 2003 WL 22333197 (Conn. Super.) (apply § 31-51bb to § 1983 claim); *Hankard v. Town of Avon*, 2000 WL 1207312 (Conn. Super.) (applying § 31-51bb to whistle-blower statute § 31-51m) *Cassotto v. Winchester Board of Education*, 13 Conn. L. Rptr. 4, 1994 WL 669533 (1994) (rejecting claim that plaintiff was required to exhaust remedy before State Board of Mediation and Arbitration in action brought pursuant to Connecticut General Statutes § 31-51q). *Hunt v. Prior*, 236 Conn. 421 (1996), although decided after the enactment of § 31-51bb does not hold otherwise as the facts in that case relate to the failure to exhaust the remedies under the collective bargaining agreement for non-statutory and non-constitutional claims.

The failure to exhaust administrative remedies does not apply to actions brought under 42 U.S.C. § 1983. *Patsy v. Board of Regents of Fla.*, 457 U.S. 496, 516 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); "As a general matter, exhaustion of state remedies, whether administrative or judicial, is not a prerequisite to maintaining an action under § 1983" *Nussle v. Willette*, 224 F.3d 95, 97-98 (2d Cir. 2000), citing, *Patsy*. Although Congress may carve out a special exemption to this general rule, defendants have not pointed to any exception. Therefore, this Court has jurisdiction to consider plaintiffs' claims brought under the state and federal constitutions and under Connecticut General Statutes §31-51q.

> **D.**  **There Are Genuine Issues Of Material Fact Regarding The Plaintiffs' Retaliation Claims That Preclude The Grant Of Summary Judgment In This Case.**

It is well established that a public employer cannot retaliate against an employee for the exercise of the employee's first amendment free speech rights. *Rankin v. McPherson*, 483 U.S. 378, 383-84 (1987). The defendants argue that the plaintiffs' claims must fail because: (1) the speech at issue is not protected by the First Amendment because it does not involve matters of public concern: (2) even if it did, there is no genuine issue of material fact that they have not suffered any adverse employment consequences as a result of such speech; and (3) plaintiff's Epps and Wright cannot sustain their burden of proof on their constructive discharge claims. (See Defs. Mem. of Law, pp. 27-35).

Under Connecticut General Statutes Section 31-51q, any employer, including the State, "who subjects any employee to discipline or discharge on account of the exercise by such employee of guaranteed rights . . . shall be liable for damages, including punitive damages, and reasonable attorney's fees." The rights guaranteed by this statute are those contained in the First Amendment to the United States Constitution and enumerated sections of Article First of the Constitution of the State of Connecticut.

The statute does not specifically mention whether retaliation for invoking the protection of the statute is prohibited, however the Supreme Court has referred to retaliatory discharge for exercising rights guaranteed by the statute. *Daley v. Aetna Life and Casualty Co.*, 249 Conn. 766, 776, 734 A.2d 112, 120, so it would not be inconsistent to recognize a cause of action for retaliation under the statute.

Not every work place dispute about working conditions translates into a question of constitutional concern. *Cotto v. United Technologies Corporation*, 251 Conn. 1, 17 (1999). The statute applies only to expressions regarding public concern that are

motivated by an employee's desire to speak out as a citizen. *Id. citing Connick v. Myers,*
461 U.S. 138, 146, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) and *Daley v. Aetna Life &
Casualty Company* , 249 Conn. 766, 783-784, 734 A.2d 112 (1999)  The Supreme Court
described Connecticut General Statutes 31-51q as "a remedial statute ... [which] deserves
a generous construction that implements its purpose at one of the important places, the
private workplace, in which those rights may be impaired." *Cotto v. United
Technologies,* 251 Conn. at 8-9.

It is a question of law whether the subject matter expressed falls into the protected
status of a matter of public concern. *Daley v. Aetna Life & Casualty Company,* 249
Conn. 766, 782, 734 A.2d at 123 (1999).  However, the jury must determine, as a matter
of fact, if the speaker's motivation was to discuss a topic of public concern, and this
question is to be determined by looking to the content, form and context of the particular
expression and/or association in question[6]. Mixed motivation to speak on matters of
public concern is still protected by the statute. *Daley v. Aetna Life & Casualty Company,*
249 Conn. at 782, 734 A.2d at 123.  A person who is motivated by both personal and
civic concerns, however, is not denied the protections of § 31-51q as a matter of law."
*Cotto v. United Technologies,* 251 Conn. at 47 (Katz, J., dissenting), citing *Daley v.
Aetna Life & Casualty,* 249 Conn. at 786; 734 A.2d at 125.

---

[6]The analysis under Connecticut General Statutes § 31-51q mirrors the "*Pickering* balancing test",
*Pickering v. Bd. Of Ed. Township High School Dist.*, 205, 391 U.S. 563, 568 (1968), although the
Connecticut Supreme Court has not decided to apply the *Pickering* balancing test to actions under § 31-
51q. *D'Angelo v. McGoldrick,* 239 Conn. 356, 363, 685 A.2d 319 (1996). Section 31-51q addresses the
points raised by the *Pickering* test by reference to conduct which substantially and materially affects the
workplace. *Daley v. Aetna Life & Casualty Company* has delineated the *Pickering* factors by reference to
*Schnabel v. Tyler,* 230, Conn. 735, 646 A.2d 152 (1994) (civil rights action under 42 U.S.C. §1983 for
retaliation based upon exercise of First Amendment rights). Thus, for purposes of analyzing the plaintiffs'
first amendment and statutory claims there is no material difference.

Speech recognized as raising matters of public concern includes statements relating to the quality of teachers in the public schools, *Mazurek v. Wolcott Board of Education,* 815 F. Supp. 71, 76 (D. Conn. 1993); *Lees v. West Greene School District.,* 632 F. Supp. 1327, 1332 (W.D. Pa. 1986) (quality of education in public schools is a matter of substantial public concern), speech related to teaching methodology, *Silva v. University of New Hampshire,* 888 F. Supp. 293 (D.N.H. 1994) (preservation of academic freedom is a matter of public concern.), as well as complaints raising the safety of the public, *Lowe v. Amerigas, Inc.,* 52 F. Supp.2d 349, 359 (D. Conn. 1999) (public safety in the improper storage of a hazardous substance such as propane a matter of public concern).  Plaintiffs raised matters of public concern related to the teaching and safety of special educations students.

To establish a *prima facie* case of retaliation, the public employee must prove that: "(1) his speech can be fairly characterized as constituting speech on a matter of public concern; and (2) [his] speech was at least a substantial or motivating factor in the [transfer].... If the employee proves these two elements, the burden then shifts to the employer, who may still avoid liability by proving either that: [1] He would have made the same decision in the absence of the protected conduct; or (2) the employee's conduct interfered with the [government agency's] effective and efficient fulfillment of its responsibilities to the public..." *Angelo v. McGoldrick,* 239 Conn. 356, 362, 685 A.2d 319 (1996). (Citations omitted). "However, even if the Pickering balance is resolved in the employer's favor the employee may still demonstrate liability by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of disruption." *Lewis v. Cowen,* 165 F.3d 154, 163 (2nd Cir. 1999).

1.    **The Speech At Issue Involves A Matter of Public Concern.**

As explained in the Background section above, plaintiffs Claussen and Wright were passionate about their work and routinely advocated for their students to ensure that they received a quality education. As a result, they often had to voice concerns regarding ineffective staff, lack of funding and assignments that's left LD students without proper instruction and supervision. These statements were not welcome by Mistretta and often resulted in hostile comments like "how would you like to go to the Middle School." Ms. Wright raised questions regarding funds ($700.00) that were missing from the budget of the Department. She did so because she was concerned that her students were not receiving the benefit of money earmarked for the needs of the LD students.

The Department, including Ms. Wright and Claussen participated in a meeting in 1998 to find a solution when they learned that LD students would not have instruction from their LD teacher for months. They participated in this meeting because it was best for these students to have access to their teacher. That proposal was met with threats from Mistretta. He made it clear that he did not want anyone "second guessing him" and that any comments he perceived as being negative would be considered insubordination."

Mistretta assigned a punitive workload to Ms. Claussen and accused her of having a less than full-time workload the morning after she attended a union meeting and made comments regarding the negative impact of the reorganization on the students. After Ms. Epps filed a grievance with the union, she was removed as the CIL of her department.

These and other statements set forth in the facts section above demonstrate plaintiffs' Claussen and Wright engaged in speech regarding matters of public concern. Statements made to further the interests of the students are certainly related to matters of

32

public concern. In addition, an individual's ability to voice concerns at a union meeting or file a grievance are protected by the Constitution. Accordingly, such rights are enforceable under Section 1983.

The defendants' claims, therefore, that the plaintiffs did not allege matters of public concern are without merit. Moreover, this argument raised by the defendants does not address the plaintiffs' claims that the defendants violated their rights to associate as members of a union. Thus, even if defendants can demonstrate that the plaintiffs did not engage in matters of public concern, which they cannot, the defendants' Motion for Summary Judgment must still be denied.

### 2.    The Plaintiffs Have Suffered Adverse Employment Consequences And The Defendants' Claims To The Contrary Are Without Merit.

The defendants' also claim that the plaintiffs cannot meet their burden of establishing that they were subjected to any adverse employment consequences. This claim is absolutely false.

As noted above, Ms. Wright was subjected to constant threatening messages from Mistretta. He told her she was being watched. She was required to "check-in" with him if she were going to be late. She needed his permission to make any minor changes in assignments with respect to aides and tutors. He caused a document showing her in negative light to be placed in her personnel file. (Defendant's <u>Exhibit 21</u>). He ignored her requests for assistance. She was often the only teacher in the Department without an aide or tutor. He made an assignment decision under the guise of the reorganization and took her away from the 14 juniors she had been with since their freshmen year even though it was in their best interest that she continued to be their teacher. He made her life so intolerable at the School that she was required to take a leave of absence and later

diagnosed as suffering from post-traumatic stress syndrome. After returning from her leave, he refused to give her the LD teacher position even though she was the most qualified person for that position and it was in the best interest of the students for her to have that position, requiring her to file a grievance. Immediately after Ms. Wright complained to the Union about this action, Mistretta assigned seven LD grade-eleven students to her in addition to the special needs students as a punitive workload. (See Paragraphs 5 through 16 of an August 23, 2000 Memorandum from Ms. Wright to Jack Penders attached to her Statement, **Exhibit 1**). Finally, in the fall of 2001, she transferred to another school taking a job testing elementary school students, even though this job does not pay the salary she received as a full-time LD teacher. She left because she could no longer endure the stress caused by Mistretta. Even though Mistretta is no longer the principal of the School, the problems he created continue to prevent Ms. Wright from returning to a position as a full-time LD teacher at the School.

Ms. Claussen was given a punitive work assignment after speaking up on matters of public concern at a union meeting. Specifically, at the meeting Ms. Claussen made statements regarding the reorganization and the problems caused thereby with respect to the students. Ms. Epps lost her position as a CIL for the school after she filed a grievance. As a result of Mistretta's retaliatory conduct, she was forced to resign.

Thus, there is ample evidence from which a jury could easily conclude that the plaintiffs suffered adverse consequences for speaking out on matters of public concern. The defendants' claims to the contrary are without merit.

    **3.**    **Plaintiffs Wright and Epps Were Constructively Discharged.**

34

It is well-settled that a "constructive discharge" occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation. *Franco v. Yale University*, 2003 WL 22717654 (2d. Cir.). In order to prove a "constructive discharge", an employee must show that the employer deliberately created difficult and unpleasant working conditions that would compel a reasonable person to resign. *Id.* There is sufficient evidence upon which a fact finder could rely to find that plaintiffs Wright and Epps were constructively discharged, notwithstanding the defendants' claims to the contrary. (Defs. Mem. of Law, pp. 33-35).

As discussed at great length above, Mistretta targeted Ms. Wright, retaliated and harassed her, and made her working conditions difficult and intolerable. The stress caused thereby led Ms. Wright to take a leave of absence and have post-traumatic stress syndrome. The defendants point out in their papers that at the time of the leave, Ms. Wright stated only that she was requesting the leave as a result of her Lyme Disease and not stress. Ms. Wright deliberately did not mention the emotional-distress as she did not want to further anger Mistretta. His continued harassment after her return led her to transfer to another school and leave a job she loved. The defendants' claim, therefore, that the fact of Ms. Wright's continued employment with the Town is fatal to her constructive discharge claim is without merit. The defendants fail to mention that to date Ms. Wright does not have a full-time job working in her field of expertise. She has lost significant amounts in connection with her pension. Prior to her original leave of absence, she was working as a full-time teacher with full benefits. After returning from her leave, she was given a part-time position. Thus, there are sufficient facts from which a jury could conclude that Ms. Wright was constructively discharged.

Ms. Epps worked for the school for 22 years with a flawless record. After she filed a grievance against Mistretta for not letting her take a personal day when she was entitled to do so by contract, a series of bizarre events occurred leading her to resign. First, she lost her position as CIL. Second, new rules were put in place regarding the selection process for CIL in her Department. Third, she is accused of encouraging students to sign up for classes they did not intend to take, and Mistretta completely ignores her explanation and her 22 years of flawless service and reprimands her. Finally, he took the word of a student teacher when she made accusations incriminating Epps.

**E.      The Defendants' Claim That Plaintiffs Must Prove An Established Policy Of Punishing Employees For Exercising Their First Amendment Rights In Order To Prevail Under § 1983 Is Misplaced As Plaintiffs Are Not Asserting a § 1983 Claim Against the Board.**

In further support of their Motion for Summary Judgment, defendants claim that plaintiffs must "show that an official Board policy of punishing employees for their speech in violation of their First Amendment right[s] caused the alleged adverse employment actions in this case."

Plaintiffs have named the Board of Education as a defendant in this case because it was the employer of the plaintiffs. Connecticut General Statutes § 31-51q holds employers liable, including "the state and any instrumentality or political subdivision thereof" for conduct that violates the statute. Plaintiff has not attempted to allege a policy, custom or practice engaged in by the municipality – the Town of East Lyme or the Board of Education. Plaintiff is not attempting to hold the Board of Education liable under § 1983. It is plaintiffs contention that defendant Mistretta has violated their rights under the first amendment as an official of the state. Therefore, the defendants' argument regarding the Board's liability is not applicable to the facts in the complaint.

36

Wherefore, for all the foregoing reasons, plaintiffs respectfully request that the defendants' motion for summary judgment be denied.

PLAINTIFFS
MAUREEN EPPS, ET AL

By: _____

Jacques J. Parenteau, ct 09771
Heena Kapadia
Madsen, Prestley & Parenteau, LLC
111 Huntington Street, P.O. Box 1631
New London, CT  06320
Telephone: (860)442-2466
E-Mail: jparenteau@mppjustice.com

## <u>CERTIFICATION OF SERVICE</u>

       This is to certify that a copy of the foregoing was mailed, postage prepaid, this 26th day of November, 2003 to the following counsel and pro se parties of record:

James M. Sconzo, Esq.
Kevin Brady, Esq.
Halloran & Sage LLP
One Goodwin Square
Hartford, CT 06103

Frank Szilagyi, Esq.
Silvester & Daly
72 Russ Street
Hartford, CT 06106

Paul H. Gamache, Esq.
Siegel, O'Connor, Schiff & Zangari, P.C.
150 Trumbull Street
Hartford, CT 06103

                                                          _____
                                                 Jacques J. Parenteau