| ACCOUNT NUMBER / DESCRIPTION | Expended 1995-96 | Budget 1996-97 | ...osed Budget 1997-98 | $ Differ Current/ Proposed | %Differ Current/ Proposed |
|---|---|---|---|---|---|
| 001-10-510-1220-4 HS-SELF CON/SE-TRANS REIMB | 125.62 | 371.00 | 381.00 | 10.00 | 2.70% |
| 001-10-611-1220-4 HS-SELF CON/SE-INST SUP | 976.55 | 1031.00 | 762.00 | 29.00 | 2.81% |
| 001-10-641-1220-4 HS-SELF CON/SE-TEXTBOOKS | 631.45 | 741.00 | 762.00 | 21.00 | 2.83% |
| TOTALS- FUNCTION 1220 Self Contained Special Ed: | 86084.79 | 66743.00 | 102129.00 | 35386.00 | 53.02% |
| 001-10-111-1240-4 HS-SP NDS/SE-REG SAL | 55900.00 | 57205.00 | 58020.00 | 815.00 | 1.42% |
| 001-10-129-1240-4 HS-SP NDS/SE-TUTOR SAL | 18837.56 | 31912.00 | 32870.00 | 958.00 | 3.00% |
| 001-10-611-1240-4 HS-SP NDS/SE-INST SUP | 517.36 | 752.00 | 773.00 | 21.00 | 2.79% |
| 001-10-641-1240-4 HS-SP NDS-TEXTBOOKS | 144.07 | 295.00 | 303.00 | 8.00 | 2.71% |
| TOTALS- FUNCTION 1240 Special Needs Special Ed: | 75398.99 | 90164.00 | 91966.00 | 1802.00 | 2.00% |
| 001-10-111-1242-4 HS ALT ED-REG SAL | 59668.31 | 67190.95 | 69227.95 | 2037.00 | 3.03% |
| 001-10-126-1242-4 HS-ALT,ED-OTH INS SAL | 9663.95 | 4682.00 | 4825.00 | 143.00 | 3.05% |
| 001-10-323-1242-4 HS ALT ED-PUPIL SERV | 0.00 | 15820.00 | 16263.00 | 443.00 | 2.80% |
| 001-10-433-1242-4 HS ALT ED-REP/MAINT | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| 001-10-611-1242-4 HS ALT ED-INSTR SUP | 0.00 | 1500.00 | 1542.00 | 42.00 | 2.80% |
| 001-10-641-1242-4 HS ALT ED-TEXTBOOKS | 0.00 | 400.00 | 411.00 | 11.00 | 2.75% |
| 001-10-642-1242-4 HS ALT ED-TEXTBOOKS | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| TOTALS- FUNCTION 1242 Special Needs Alternative Ed: | 69332.26 | 89592.95 | 92268.95 | 2676.00 | 2.99% |
| 001-10-111-1260-4 HS-LRNG DISAB-REG SAL | 94604.54 | 95969.00 | 98072.50 | 2103.50 | 2.19% |
| 001-10-126-1260-4 HS-LRNG DISAB OTH INST SAL | 1304.63 | 0.00 | 0.00 | 0.00 | 0.00% |
| 001-10-129-1260-4 HS-LRNG DISAB-TUTOR SAL | 49813.37 | 26102.00 | 26885.00 | 783.00 | 3.00% |
| 001-10-611-1260-4 HS-LRNG DISAB-INST SUP | 1180.38 | 1387.00 | 1426.00 | 39.00 | 2.81% |
| 001-10-641-1260-4 HS-LRNG DISAB-TEXTBOOKS | 127.80 | 302.00 | 310.00 | 8.00 | 2.65% |
| TOTALS- FUNCTION 1260 Learning Disabled: | 147030.72 | 123760.00 | 126693.50 | 2933.50 | 2.37% |
| 001-10-111-2122-3 HS-COUNSEL SERV-REG SAL | 209239.62 | 218128.00 | 223682.00 | 5554.00 | 2.55% |
| 001-10-112-2122-3 HS-COUNSEL SERV-NC SAL | 46331.40 | 47227.00 | 49737.38 | 2510.38 | 5.32% |
| 001-10-122-2122-3 HS-COUNSEL SERV-PT NC SAL | 0.00 | 1632.00 | 1680.00 | 48.00 | 2.94% |
| 001-10-125-2122-3 HS-COUNSEL SERV-SUPPL SAL | 0.00 | 1885.79 | 1950.00 | 64.21 | 3.40% |
| 001-10-130-2122-3 HS-COUNSEL SERV-OT NC SAL | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| 001-10-321-2122-3 HS-COUNSEL SERV-INST SERV | 845.00 | 2500.00 | 5140.00 | 2640.00 | 105.60% |
| 001-10-326-2122-3 HS-COUNSEL SERV-DATA PROC SERV | 2102.84 | 10766.25 | 12582.00 | 1815.75 | 16.87% |
| 001-10-433-2122-3 HS-COUNSEL SERV-REP/MAINT | 411.65 | 0.00 | 424.00 | 424.00 | 100.00% |
| 001-10-440-2122-3 HS-COUNSEL SERV-RENTAL | 0.00 | 2305.00 | 2370.00 | 65.00 | 2.82% |
| 001-10-532-2122-3 HS-COUNSEL SERV-POSTAGE | 2391.00 | 6503.00 | 6685.00 | 182.00 | 2.80% |
| 001-10-550-2122-3 HS-COUNSEL SERV-PRINTING | 3179.00 | 4000.00 | 5633.00 | 1633.00 | 40.83% |
| 001-10-611-2122-3 HS-COUNSEL SERV-INST SUP | 784.00 | 770.00 | 792.00 | 22.00 | 2.86% |
| 001-10-612-2122-3 HS-COUNSEL SERV-DIR INST SUP | 128.15 | 110.00 | 113.00 | 3.00 | 2.73% |
| 001-10-619-2122-3 HS-COUNSEL SERV-OTHER SUP | 419.68 | 444.00 | 456.00 | 12.00 | 2.70% |
| 001-10-641-2122-3 HS-COUNSEL SERV-TEXTBOOKS | 396.60 | 415.00 | 427.00 | 12.00 | 2.89% |
| 001-10-692-2122-3 HS-COUNSEL SERV-PROF MATERIALS | 810.64 | 1030.00 | 1059.00 | 29.00 | 2.82% |
| 001-10-693-2122-3 HS-COUNSEL SERV-A-V MATERIALS | 291.03 | 0.00 | 322.00 | 322.00 | 100.00% |
| TOTALS- FUNCTION 2122 Counseling Services: | 267330.61 | 297716.04 | 313052.38 | 15336.34 | 5.15% |
| 001-10-111-2126-3 HS-CWE-REG SAL | 55026.20 | 55689.00 | 88620.00 | 32931.00 | 59.13% |
| 001-10-321-2126-3 HS-CWE-INST SERV | 0.00 | 0.00 | 0.00 | 0.00 | 0.00% |
| 001-10-514-2126-3 HS-CWE-PUPIL TRANS | 0.00 | 0.00 | 103.00 | 103.00 | 100.00% |
| 001-10-532-2126-3 HS-CWE-POSTAGE | 236.00 | 236.00 | 243.00 | 7.00 | 2.97% |
| 001-10-550-2126-3 HS-CWE-PRINTING | 400.00 | 0.00 | 411.00 | 411.00 | 100.00% |
| 001-10-580-2126-3 HS-CWE-TRAVEL | 800.00 | 860.00 | 884.00 | 24.00 | 2.79% |

*(handwritten margin notes:)* self contained = for 5-6 kids

LD for 75 kids

We never got all $1426.00 only 1/2 of it.

TO:    Diane, Gosia, Geri, Jeff , Alison, Dave, Wally
FR:    Cheryl *Race*
RE:    Budgets
DT:    11/16/98

*This was I after I questioned our budget The*

I spoke to GMM about moving monies from 611 to 612.

He is allowing that _____80_____% of your 611 budget be moved into 612.

Please make sure you make a note of this and that you also allocate where you plan on using these funds  (i.e.:  books on tape, games, etc....).  The plans for where you are going to use the money should be decided by this Friday and put into my mailbox.  I will hand them all in together.

I have attached what you have already allocated for your convenience.

Let me know if you have any questions.

Hope the money helps!!!

Memo

Diane ( # 4 )

TO:    All Special Ed. Teachers
FR:    Cheryl   Race
RE:    Lunch Department Meeting
DT:    10-26-98

There will be a lunch department meeting tomorrow 10-27-98 at 10:35a.m.  The purpose of this meeting is to brainstorm ideas on how to assist Alison Moger and her tutor during Block 4.

Problem:  Alison teaches Freshmen Academy block 4.
          Keri (tutor) is currently working with 6 students alone.

Geri Wright's aide had to leave her program to help the tutor. This ff Geri - without coverage for when she had to do PPT's which were only allowed (by JM) during This time

in A Moger's Room

January 27, 1999

TO:    Diane Claussen

FROM: David W. Miko

RE:    Missing SATs

Thank you for your cooperation during our exhaustive search for the missing SAT package. Although Mr. Evers, Mr. Mahon, and Mr. Mistretta, are aware of the circumstances leading to the SATs being detoured to your area, it is imperative that you check your room(s) more carefully upon being informed that such an important item is missing.

Please note that if we had been unable to locate this SAT package, every student who took the SATs at East Lyme High School on Saturday, January 23, 1999, would have had his/her examination voided.

Hence, we feel lucky and relieved to locate these items.

dh

cc: Gerald Mistretta

The SAT's were never in my room. This letter was, according to Mr. Mistretta, not going in my file. It is in my file and my letter in response is not. (although he said he would put that letter where this one went.)

Dr. Miko said, JM had told him to to This.



To: Dave Miko
From: Diane Claussen and Geri Wright
Date: February 5, 1999

This letter is in response to your memo regarding the missing SAT package. Having been responsible for giving many untimed SAT's over the years, Geri and I can appreciate the gravity of the situation when these tests were misplaced

We have handled the rather complicated and time-consuming task of sending in applications for and giving the untimed SAT's to our students for many years and have always maintained the utmost professional manner in handling these. The number of students taking the SAT's with modifications has grown to quite a large number (some of which we do not even see in our programs). Therefore, this year, the task of organizing and administering SAT's with modifications was turned over to the college coordinator (Tim Evers) and the SAT coordinator (Scott Mahon).

It seems the problem was with how this SAT package was handled once it was delivered to the building. It is very disconcerting to think that a package of highly sensitive materials could be delivered to a building and the teacher not notified. It was then placed in the wrong room behind other articles on a storage table.

We would be happy to meet with you, Scott, Tim and the office and any people who are involved in handling incoming mail and packages to talk about developing a procedure for handling sensitive documents/packages when they come into the building. It is imperative that something like this doesn't happen again.

cc: Gerald Mistretta

My response to the SAT letter.





December 7, 1999

Mr. Gerald Mistretta
East Lyme High School
Chesterfield Rd
East Lyme, CT 6333

Dear Mr. Mistretta,

I am writing this letter to express my concern over the loss of a wonderful teacher, Gerry Wright. I do not know all the particulars of why she left, but I know this is a great loss to our school system. I do understand that you are trying to initiate a system that encourages continuity. An example of that is, the same guidance counselor for their four years, while at East Lyme High School. What a great way for the counselor to get to know our kids well; therefore, to better serve them. The same holds true for the learning resource center. Some kids are dependent on this service and my daughter, Lauren Lidestri, is one example. If Gerry had stayed at the high school this year, it is my understanding that she would not have had the seniors. Lauren has been with Gerry since she was a freshman. Why would this happen if you are promoting a continuity of care program and designed this system for specific purposes; unless the reason for Ms. Wright leaving was a personal one between the two of you.

Lauren was diagnosed with ADHD the summer before entering the high school. That explained many of her frustrations to us. Knowing about this gave us the opportunity to help her in ways that we were unaware of before her diagnosis. At that time in our lives, I was taking care of a terminally ill brother and my mother with Alzheimers Disease. All of these situations helped to contribute to Lauren's difficulties. Gerry Wright was the first teacher in our school system that did not make moral judgements against Lauren. She saw through Lauren's outward appearance and recognized the bright, witty, and caring person that Lauren is. Gerry is Lauren's connection to East Lyme High School. She was a constant source of encouragement, support, wisdom, connection, and love, for both Lauren and me.

I and I did not have an opportunity to discuss this with you. Students who had been with Gerry for three years could have graduated with her, and given the opportunity for closure and a feeling of great reward. If it were not for this wonderful teacher, Lauren may not have made it through high school, let alone be applying for college next year.

Sincerely,


Maryann Lidestri

cc: Dr. John Reynolds
    Superintendent of Schools
    Ms. Gerry Wright



semester should focus on generalization of strategies taught, in the context of support for regular classes.

We also saw the need to change the sequence of and time spent on some of the strategies taught, e.g. more time for writing and the inclusion of notetaking and test taking earlier in the year. We added for the upcoming year, Strategies II, which is a review/continuation of the program this year, and Stategies III, a one quarter course we are offering juniors and seniors next year, if appropriate, to focus on getting ready for college and/or post high school. Attached are I.E.P.'s for these two programs.

The release time to evaluate and write up the stategy curriculum, with Dr. Phillips was essential; however, overall we found that implementing a new curriculum, at best, is challenging, but we were also "creating" as we went along. We did not have one book or source to draw from, but had to integrate many sources and ideas. Our increased caseloads, no tutor at all until March, scheduling constraints which caused overcrowding of certain periods, as well as a duty period, only added to our dilemma of "too little time, too much to do". Changes in curriculum and levels have also impacted our program, in that the need for support and flexibility to work with students who come to the resource room to take tests, has increased for many L.D. students. We gave new meaning to the word "teamwork". If we had not been able to work together as well as we did, if our teaching styles and philosophy had not been as ~ Pat compatible, if the adminstration had not been as supportive ← Phillips as it has been, if our sense of humor and wonderful students hadn't been there to bolster us up, there is no doubt that the program would not have grown as it did, in spite of the difficulties.

Diane Claussen & Geri Wright haved worked together as a team successfully for years. — Yet Mr. Mistretta has said we are "counter productive."

2000 3:05PM    FROM EAST LYME HIGH SCH 860 739  241

P. 4



Geraldine Wright
5 Harbor Court
Noank, CT 06340

July 26, 2000

Dear Mr. Mistretta,

There are two new .5 positions at East Lyme High School beginning this school year. One is the position that you offered me, the .5 special needs resource room. The other is the .5 grade 9, L.D. resource room. I am writing this letter as notification of my request to be placed in the .5, grade 9, L.D. resource room position. It is necessary for me to request this position at this time since it was not offered to me when it became available. This is especially surprising since you were aware that I would be returning from a medical leave of absence.

Of the positions, the L.D. position is the one for which I am most qualified. This is a specialized field for which I have my Masters Degree and 20 years experience in testing, diagnosing, and treating students with this type of disability. I love this field, and I have been very successful with this program in the past. I believe this is the right choice for me and *especially* for the students of East Lyme, for they stand to benefit most from my expertise.

Our contract concerning teacher assignments states that assignments will be made only after every effort has been made to meet the reasonable requests and desires of any teacher concerned, and that the welfare of the students shall be the prime concern. I believe this is a reasonable request and I believe that for the welfare of the students, I am the best person for this job.

Sincerely,

Geraldine Wright
Learning Disabilities Specialist

#9

Geraldine Wright
5 Harbor Court
Noank, CT 06340
August 15, 2000

Dear Mr. Mistretta,

I am outlining the events of the last few months concerning my teaching assignment for the coming school year.

Last winter, I was asked by Wally Christiansen through Diane Claussen if I would be interested in a .5 grade 9 LD resource room position, working with Dave Sdao, on my return from my leave of absence. I said yes.

In early May, at a meeting in your office, I was offered by you, a 1.0 Therapeutic Program position and told it was the only opening.

In June, in a phone conversation with you, I again requested the .5 grade 9 LD resource room position. You offered me a Special Needs position and told me you were not sure if it would be 1.0 or .5. However, I again requested in a letter the .5 grade 9 LD resource room position.

On July 26, I met with you in your office to discuss the many reasons why I am best qualified for the .5 grade 9 LD resource room position (these are listed on the next page). You said that you "agreed with me 100%", that I was best qualified for this position, and that you were assigning me the .5 grade 9 LD resource room position.

On July 28, I sent you a letter confirming our conversation. I did not receive a response from you, so I sent another letter on August 10, registered mail, return reciept and signature requested.

On August 13, I received a call from you telling me that you are changing my assignment again, assigning me to the .5 Special Needs program and Ms. Race to the .5 grade 9 LD resource room position. The reasons for this, you said, were because you have many "personalities" to deal with, and that since Ms Race doesn't work well with the other teacher who is in the Special Needs program, she (Ms. Race) would be placed in the .5 grade 9 LD resource room position and I would be moved to the .5 Special Needs program.

I have spoken to Mr. Penders about grieving this assignment, and he spoke to you yesterday. Per that conversation you told him there may be some restructuring in about a week, at which time I may be placed back in the .5 grade 9 LD resource room position.

Since Ms. Race is better qualified for the Special Needs program and I am far better qualified for the LD resource room position, I again request the .5 grade 9 LD resource room position.

The current contract states: assignments will be made only after every effort has been made to meet the reasonable requests and desires of any teacher concerned, and that the welfare of the students shall be the prime concern.

Geraldine Wright

Jack Reynolds

August 23, 2000

Dear Jack, (Penders)

I have thought about our discussion regarding my position which was described to you per phone conversation, yesterday, by J. Mistretta. There are issues surrounding the assignment that are not in the best interest of students:

1. There are two new .5 positions at the high school in special-ed. One is an .5 LD resource room Grade 9 and one is a .5 special needs resource room grade 9.
2. Mr. Mistretta offered me a .5 special needs position with 3 students.
3. After discussing with Mr. Mistretta my qualifications, he agreed my expertise is better placed in the LD resource room and gave me that assignment.
4. A full time position became available in special needs due to a resignation, and Mr. Mistretta placed me back into the .5 position of special needs, (August 14) even though he agreed that my area of expertise is in LD resource room. He said he wanted me there because of personality issues.

Please refer to my previous letter to Mr. Mistretta for dates and details on these past events.

5. On August 14, I went to my union representative and said I wanted to grieve this decision because I am clearly more qualified for LD (15 years in this position) grade 9 resource room .5 position and the person who he gave this position to someone who has had no experience in this field.
6. After my union representative spoke to Mr. Mistretta , he then said he may move me back but would have to wait a week to fill some positions (also, Mr. Mistretta was going away for the week).
7. Upon his return and filling the Special Needs 1.0 position he changed my assignment again. Now, my assignment is to be the .5 Special Needs grade 9 and then he added 5- 6 more students to the program from the 11th grade LD resource room program.
8. Clearly, Mr. Mistretta added students to this assignment in retaliation for going to my union with a disregard with whether this is good for the students.
9. Last year the entire special ed department was reorganized by Mr. Mistretta and he said from now on students would be placed in their respective resource rooms by class, this would form teams with other support personnel that would only work with that one class. Even though I had more students entering into the senior class than any other teacher, I was not given this assignment, he assigned me to grade 9. I lost 14 students that I had had for three years. It was heartbreaking, for me and my students and their parents. I believe this was done to me in retaliation because of an earlier incident. Mr. Mistretta was angry with the LD teachers in the beginning of the year (September 98) because we tried to advocate for some special ed students who were left in a resource room with only an aid because the teacher was told she had to teach a freshman academy class for an entire semester. The special ed teacher who was

*[handwritten margin notes, right side:]* after going to my union to grieve getting the 5 sp needs job He ADDED 6 kid to the assignm from a different program.

The school Board allotted $$ for a full time spec

*[handwritten bottom:]* needs teacher - He gave me that job

their case manager could not work with these students, it was even hard for her to meet them. We tried to come up with a different plan on her and her students behalf. He called us into a meeting the next morning and was furious that we were trying to find a different solution. He said ...."**I have given you professional leeway and it has come back to bite me in the ass.**" This is when he told us our positions would change next year, and *threatened* us with **insubordination** if we spoke about the meeting. We were scared and shocked. I documented this with you per phone call. Sure enough, my position was changed the following year when I lost all of my senior LD students and was assigned grade 9. We tried to get him to do his reorganization with a plan that would allow him to keep as many kids with their original LD teacher so not many would have to lose their support person. His response at that time was, "nice try, but it's not going to happen."

10. **Mr. Mistretta makes decisions about assignments that are clearly not in the best interest of students but does so in retaliation.** This new assignment (the addition of 7 LD grade 11 students to be added to the the Special Needs grade 9 students) he has given me this on August 22, was as a direct result of my going to the union.

11. The parents of these special needs students went to the PPT meetings and were told this program would provide self contained Language Arts and Math, and a social skills group. These students have never been in a regular class without an aide. Originally this position was even proposed as a full time position because these students would also needs support throughout the day. Now MR. Mistretta is proposing these 9th grade students will be mixed with much *older* students in their support program, students with very different needs and the teacher is only there half a day.

12. Did Mr. Mistretta add these grade 11th LD students to this assignment so he could call it an LD resource room so he could say I am qualified to do it? What about the needs of the students? Is it workable to have these students with a half time teacher? Who will deliver the support program to the 11 graders if the teacher is teaching Language Arts and Math. How will all of the students be scheduled in one half a day? These logistics need to be thought out before the opening of school. Clearly if Mr. Mistretta had placed me in the Grade 9 LD resource room, where I am qualified to be and where he said I would be placed, this situation one week before the opening of school would not exist.

13. The special need students need to be with their peers. They are the only students in the building not placed by grade level. This is discriminating to them.

14. If these students can be mixed into an LD resource room (as proposed by adding grade 11 LD students) they should be allowed to be with their class just like the rest of the grade 9 students. This is far more socially appropriate for them

15. I would be happy to work with the LD grade 11 LD students, I realize the case load of the grade 11 is quite high, and there is only one teacher. (The other grade levels, grade 9 and grade 10, that have high case loads are assigned 1.5 teachers each . Grade 12 has a smaller case load so only has 1.0 teacher)

16. Mr. Mistretta did not make this new assignment with a the prime concern for students in mind.



(#11)

# *East Lyme Public Schools*

P. O. Box 176 • East Lyme, Connecticut 06333 • (860) 739-3966 • (860) 739-1215

SUPERINTENDENT OF SCHOOLS
John F. Reynolds, Ed. D.

*Jack's R. response to my*
*August 23, rd letter to*
*Mr. Penders, never*
*mentioning Mr. Mistretta's*
*language to me.*

MEMO TO:   Geraldine Wright
FROM:   Jack Reynolds, Superintendent of Schools
RE:   2000-01 Assignment
DATE:   August 25, 2000

I have reviewed your assignment with Mr. Mistretta.  I have also read your fax of 8/23/2000.  It is my opinion that the assignment given to you by Mr. Mistretta is appropriate and in the best interests of students.  It is my expectation that you will continue to fulfill your professional obligation to your students as directed by the building principal.

Obviously, I am always willing to talk with you about any situation regarding your students.

JR:bc



ATTACHMENT TO APPENDIX II

East Lyme Public Schools

GRIEVANCE PROCEDURE FORM

Grievance Statement of Geraldine Wright

a.  **The nature of the grievance:**  After being assigned a position for which I requested and for which I have 15 years experience, (.5 L.D. resource room grade 9) I was reassigned on August 13 to a .5 position working with 3 special needs students, and my L.D. position was given to a person with no L.D. experience. After speaking with my union about a grievance, my assignment was again changed on August 21, and approximately 7 L.D. students, grade 11, were *added* to the 3 special needs students, making me now responsible for 10 students in two different programs in half a day.  Neither of these positions were posted, and no interviews were conducted.

b.  **The nature and extent of my distress:**  I believe that in making this assignment, Mr. Mistretta did not make every effort to meet my reasonable requests and desires; the interests and welfare of the students were not his prime concern; and his decision was retaliatory and the hiring process was not followed.

c.  **The results of previous discussions:**  The results of my previous discussions and correspondence with Mr. Mistretta did not result in being assigned to the position of .5 Grade 9 Learning Disabled Resource Room position at East Lyme High School.  Therefore, the remedy requested for this grievance is that I be immediately placed in the grade 9 or grade 11 resource room position and/or any other remedy deemed appropriate.

d.  **The portion of this Agreement which the teacher feels has been violated:**  I believe Mr. Mistretta's decision to be in violation of ARTICLE IV., Section C (Teacher Assignments) and/or any other pertinent provisions of the Agreement between the East Lyme Board of Education and the East Lyme Teachers' Association.

# EAST LYME HIGH SCHOOL





Principal: Gerald M. Mistretta
Assistant Principals:
    David W. Miko
    Patricia Phillips
    Lawrence Roberts

30 Chesterfield Road
P.O. Box 210
East Lyme, CT 06333-0210
(860) 739-6946
Fax (860) 739-1241

## RESOLUTION OF GREVIANCE
## GERALDINE WRIGHT
Meeting on September 13, 2000 @ 10:30 a.m.

At a meeting with Principal Gerald M. Mistretta, Curriculum Instructional Leader Paul Christensen, ELTA Representative G. Michael Devanney, and Geraldine Wright, on September 13, 2000 at 10:30 a.m. it was resolved that:

1. Geraldine will remain in her present position as case manager of two special needs students as well as sharing Alison Moger's caseload, until additional staffing is hired.

2. When staffing is hired, there will be a transition of the two special needs students to another member of the staff and Geraldine will become .5 in the 11th grade resource room. She and Alison Moger will split the 11th grade load. Paul Christensen will assign Geraldine's students. Geraldine will be in the resource room blocks 1 and 2 as well as blocks 5 and 6.

_____
Geraldine Wright

_____
Gerald M. Mistretta, Principal

_____
Paul Christensen
Curriculum Instructional Leader

_____
G. Michael Devanney
ELTA Representative

TO: J. Mistretta

FROM: Geraldine Wright

RE.: Grievance Resolution

DATE: October 13, 2000

I would like to know the status of the hiring of a tutor for the special needs students, which was part of the resolution of my grievance of September 13, 2000. Until this position is filled, I cannot take on the full responsibilities of the 11th grade resource room assignment.

I know there are at least two qualified applicants who are interested in this job and who are ready and willing to apply. They both come highly recommended. I also know that the money is already budgeted for this position.

One of the reasons I filed a grievance was because I felt that the special needs students needed a person who was available to them all day to co-ordinate programs and to ensure they receive the help they need. Presently, I only see these students one block, which is during their English block, (6). This is also when the Grade 11 resource room also needs me to help with students in their program. The tutor needs to be hired as quickly as possible so this situation can be resolved for the sake of the students.

This tutor was to be presented at a board of Ed meeting early October. I believe that date has passed. I would like to be apprised of the present status of this situation and the approximate date of the completion of this resolution.


Thank you.

Geri Wright


Cc:    P Chritensen
       J. Penders
       M. Devanney
       J. Reynolds



An aide was hired for This position on Dec. 4th.

TO Paul
Christianson &
J. Mistretta                    · early Oct.
                                   2000

#15

Suggestions:

← The Therapeutic Program

In order to make the move of Liana's program beneficial in the long run, room options other than the two rooms upstairs could be considered. Parents were not happy with the two room arrangement earlier and we need, at this point, to avoid any further complaints. Also two rooms make it difficult for Liana and her tutor to be out of her program for PPT's, conferences, lunch, or plan. Other options might be:

- The periodical/copy room upstairs. Large room, it has a chalk board and peg board, sink (none of which are being used) right across from Dr. Miko, part of the main stream of the students…this way, the kids are not isolated. Also, this space is right across from the 9/12 conference room for use when needed by that program. Periodicals & copy machine could move to the Wise room or Geri's or Cheryl's classrooms.

- The teachers lunch room… down stairs, suggested by Larry Roberts. A large room, with windows, only used during lunch, and occasionally during the day. It is also in the mainstream of the building, which would benefit the kids. It would also only be moving one person instead of moving three people.

- Many of the department offices are huge, and would also be quite appropriate for the therapeutic program, (such as the room the therapeutic program had last year, that is now the English office).

All involved will be happy to move to wherever, as long as it is in the best interest for the students. These suggestions might help.

Writen by
G. Wingit, L. Hiatt, Grace

This went to our Curriculum Instructional header to be addressed to Mr. Mistretta - We were told in response - "They are moving - and remind them that I am the principal."

*I called Uoyd to talk to him about rooms
& he said to fax him info — which I did.*

**TO: L. Johnson**

**FROM: G. Wright**

#16

**Date October 11, 2000**
**Re: Room assignments**

This letter is to make you aware of a situation in the special education department regarding room assignments.

When the therapeutic program was moved, Cheryl Race and I had to relocate to a room with no windows and only one exit. According to the Fire Marshall, a classroom either has to have windows or two doors .This is for safety reasons, if the only entry is blocked by fire, people cannot get out. Having a classroom in this room is not legal or safe.
The therapeutic program was moved, because of parent complaints, to two small rooms. However, dividing the students into two rooms is hard for supervisory reasons, and keeping them all in one small room (for teaching courses, group therapy, etc) is also difficult because of space. This is not the ideal environment for them.

Because of this move, the special ed department now has no room, again, to test students. Many times I have wasted valuable teaching time trying to find a room not being used to test students. This is a major part of our program, and there should be a distraction free space that we could have access to on a sign up basis.  Before Cheryl and I had to move, our rooms were being used for testing while we were not there (both being part time). We have requested this year after year.

The special ed department does not have an office. Pat's room is taken most of the time for PPT's.  We have a staff of 11 teachers and 11 support teachers and we need an office for personal phone calls to parents ( so we are not talking to parents in front of students) and other private phone calls,  meetings with other members of the department and could use it at times for testing and writing reports. We have not had an office for many years and it was the hope that after the addition this situation would be rectified. We are the only department of our size without an office.

The department offices of other departments are not small rooms. They *are full size classrooms, with windows.* This seems unfair and inequitable since the therapeutic program, a program in which some of the students are self contained in the room the *entire* day, are in very small rooms. The students should be our highest priority.

Since all other departments have full size departments, which the teachers frequent during lunch, the teacher's lounge (a full size classroom with windows) seems underutilized. Again this seems a shame when there are students in need of space, and teachers teaching in rooms without windows.

I believe our special ed students should be given the same priority regarding room safety, aesthetics, and function, as the rest of the students in the school. As far as I know it is only the special ed department that has classes in rooms without windows. If children *are* our top priority, why are the special ed students put into small, or windowless, and illegal classrooms, while offices and lounges for teachers are full size classrooms with windows.

I feel it is would be unethical of me to know this information not try to solve the problem. I am responsible for the students I work with when they are in my room. I cannot take a chance and hope that a situation will not occur where an alternative exit had to be available and it was not.

We approached Jerry Mistretta with possible other solutions before the move last Friday, however he said he was not considering these other solutions and the move would happen over the weekend. I was told by my CIL that Mr. Mistretta wanted me to know that he is the building principal.

Solutions????:

Make the windowless classes department offices.
Give the therapeutic program a full size class room. (a department office, or the teachers lunch room).
Give the two small rooms back to Geri and Cheryl so their rooms can be used for testing when they are not there.

I will work anywhere, in any room. I am flexible and amenable to any solution, as long as it is in the best interest of my students.

Thank you,

Geri Wright

*[handwritten: The department has been dealing with many problems due to lack of support from The administration & lack of supervision.]*

# SPECIAL ED. MEETING
## March 4, 1999
### SUMMARY

In attendance:  A. Moger, D. Claussen, G. Wright, J. Provost, J. Londregan, L. Roberts  *[handwritten: #17]*

The special lunchtime meeting brainstormed issues of concern to be prioritized and examined at subsequent meetings.  The preliminary list includes the following:

(1)  The rigidity of the PPT schedule has been intrusive.  The department has rarely been able to meet as a full department as a result.  There is strong sentiment that the department is losing its sense of "team" and coherence.  [ generally, there is concern about the time constraints imposed by the present PPT schedule ]

(2)  There is confusion about the criteria for each discrete program:  "*who goes where and why?*"  There is additional concern that whereas historically the department philosophy has been to provide a categorized program of services, there is less distinction now and more drift towards a homogenized model.  Engaging in a full discussion of philosophy, reexamining the programs and clearly identifying the criteria for each program (provided a categorized model is retained) seem like worthwhile activities.

*[handwritten: Which we all agreed was NOT what we wanted.]*

(3)  Collateral to #2, it would be important and useful to create updated program descriptions (see attached SED program description as a potential model).

*[handwritten: — No sp. ed. supervisor]*

(4)  The absence of a "Gatekeeper" to oversee all the functions, processes and procedures of the department was generally deemed a liability.

(5)  Numbers of students in the programs is worrisome.  It was noted that though the number of students enrolled in Special Ed programs has grown consistently since the school was roughly 750 students, the number of full-time Special Ed teachers has not.

(6)  The question of aides v. tutors was raised.  There was concern that, given the pay and the absence of benefits, it is hard to retain good aides; turn-over is high; and the quality of relationships and services for students is greatly diminished.  Tutors, generally, are better trained, stay longer, and can deliver higher quality services to students.

        (a)  Inasmuch as Gerri and Dianne are regularly required to attend PPT's during the 4th and 8th blocks, students assigned to those blocks are receiving most of their support from aides only *on a regular basis.*

(7)   At least as a professional courtesy, some department members felt it was important that Spec. Ed teachers who potentially might be working with a student ought to be invited to the PPT that made the placement decision about the student.

(8)   There is widespread concern that all Special Ed. CAPT preparation commence and be in place in a timely fashion.

(9)   Most of the aforementioned issues all seem to come under the headline of "Systems Thinking".  In general, there is concern, frustration and confusion about the lack of a coherent, logical and simply understood system for all of Special Education.  It was thought that the creation and articulation of such a system would be a great boon to the entire community, not just the Special Education department.

*We were never allowed to have a say in how this system could be changed*

(10)   In a sidebar conversation after the meeting, Dave Sdao expressed his concern that the counseling department and the special education department ought to create a "Non-special Ed. Interventions" checklist that would enable teachers, counselors, and staff to clearly and comprehensively assess what intervention strategies had been employed with a student *before* a student was referred either to SST or PPT.   Employment of such a system would provide for better understanding of the needs of students, would document the school's *due diligence* in *a priori* assessment and, perhaps, preempt glib, unnecessary or careless referrals, labeling or enrollment.

*What was most needed to improve the department was more qualified staffing Sp. ed. supervision & less rigid PPT schedule. Instead — The entire dept. was revamped & we were told what we were teaching.*