**EXHIBIT 2**

My name is Diane Claussen and I have worked as a learning disabilities teacher in East Lyme for 20 years. I have been at the high school since 1988. The following is a recounting over the past several years of actions and decisions of Gerald Mistretta which have not been in the best interest of special education students and have done harm to them ant to their programs.

1.    The day before school started in September 1998, a colleague in the special ed. department, Alison Moger, was told by Mr. Mistretta that she had to teach Freshman Academy which would take her out of her room Block 4 an entire semester. The concern was that she already had 5 students scheduled into that block and these students would, in her absence, be left with a new, inexperienced instructional aide. As the teacher, she would have no contact with these students for half a year, which simply was not in the best interest of those students. We offered, as a department, to rotate teaching the Freshman Academy class so that out colleague could at least see her Block 4 students some of the time. This idea was initially present to GGM by our Curriculum Instructional Leader, Cheryl Race, on the afternoon of September 8, 2000, and his response, in front of the secretaries in the office was that he was tired of dealing with our **"God-damned special ed. department.** The next morning at 7:15, as we arrived in the building, the learning disabilities teachers (Geri Wright, Alison Moger and myself), our CIL, and two of the assistant principals, were called into the conference room for an unscheduled meeting. Mr. Mistretta was standing up, leaning toward us on his hands, his face red and his voice angry and intimidating. He said among other things, **"This (LD) program is not working, and you** *will* **have different assignments. We are going to look at different models and you can be sure this is going to change. You are very inflexible. I have given you professional leeway and now it has come back to bite me in the ass. I'm sick of you second-guessing me. I have a statutory responsibility to make building assignments. If I hear one negative comment from a parent, you will be considered insubordinate. If I hear anything outside of this meeting, you will be considered insubordinate and you'll be out of here!! "**

      No one dared say anything. We left the meeting demoralized and in shock that we had been spoken to this way. We genuinely had been concerned for the students involved and were advocating for them and their teacher. We felt we had gone through the proper channels and were not out of line in speaking up as we did and certainly did not expect this kind of response from the principal for doing so.

2.    Mr. Mistretta's threat to change our assignments happened. Our entire department was reorganized the following spring. On April 28, 1999 Mr. Mistretta announced the "new plan". He leaned back in his chair and with a smile on his face, and opened the meeting with, **"I have a new idea for the program and you may look at me and say, "What is he fucking crazy? "** The comment was inappropriate and set the tone for the whole meeting, not to mention the fact that it could have been overheard by students because of where we met. He was proposing that resource rooms teachers, counselors, school psychologists and assistant principals would all be divided up into grade level "teams", a massive reorganization that would affect the majority of the special ed. students. Resource rooms would now be by grade-level, and they would be non-categorical. This was significant change, one Geri Wright and I had argued against for years. There would no longer be a separate learning disabilities program and another program for students whose presenting problems were more emotional in nature. *In a non-categorical*

*resource room organized by grade level, the mix of students and the numbers on a caseload can vary a great deal from grade to grade.* Furthermore, the needs of a learning disabled student are quite different from a student whose problems are primarily emotional in nature or the needs of a higher functioning special needs student. Finally, the special ed. staff who would be manning these resource rooms did not have the same level of expertise in dealing with all these different student needs. *This meant that several of the resource rooms would now be taught by teachers lacking specific expertise in working with learning disabled students and/or would not have the training to teach self-advocacy skills. This was a very important aspect of the change that should have been addressed, and it was not at all.*

During this meeting, when Geri Wright asked if we could meet as a team to discuss pros and cons of this change to keep what was working and not change for the sake of change, GMM responded with, **"You can discuss it but this is where we're going."**

Approximately 111 students were to receive resource room support the following September. This change was made after most annual review PPTs had already been held, and parents and students expected to have the same program and the same teacher the next year. We asked Mr. Mistretta at this meeting to notify special ed. parents in writing of these changes; he said he would, but he never did.

3.    On two occasions, Mr. Mistretta was given an opportunity to at least ease the transition from the old model to this one. Our department met, and by carefully looking at numbers and possible scenarios, proposed some ideas that we felt *would make the transition be the least disruptive to the greatest number of students.* (See **Memo 1**, Special Education Department Proposed Staffing and Rationale) Since both Geri and I previously had had all of the L.D. students anyway, if we both kept all of our 11th and 12th graders, out of the 54 juniors and seniors, only 11 coming from other programs would be new to us. Alison Moger would have the sophomores, 9 of whom she already had on her caseload, and the freshman class would be new to whoever took them anyway. Dave Sdao and Wally Christensen seemed a good choice for the freshman as Dave had taught C-level classes before and Paul was involved in a pilot program that we had planned to institute that following September to incorporate co-teaching special ed. with regular ed. C-level freshman teachers. *GMM's response to that department memo was, "Nice try but it's not going to happen."*

I also presented a list of concerns to Mr. Mistretta on 5/18/99 when I met with him as part of the new 11-12 team. (See **Memo 2**, "My Concerns") He did address them, but I felt his responses to my concerns were perfunctory and that he did not take them seriously. At one point in the meeting, I said that I wanted to go on record as saying that I felt it was in the best interest of the students that Geri and I remain together on the 11-12 team for the following year to transition the students out of the learning disabilities program, and I stated that this was too much change, too fast. Mr. Mistretta leaned across the table, with a smirk on his face in what I perceived as a threatening tone, and said, **" And I want to go on record as saying, if I hear any negative comments you've made to parents, I will consider it insubordination. Do you understand me?"**

4.    The sweeping changes that were made by Mr. Mistretta's decision to re-organize by teams, has had a tremendous impact on the students involved. *The severing of relationships that had been formed with their resource room teachers and the sense of loss and abandonment that they*

*feel when they had to change teachers should have been of primary importance.* A striking example in that first year of the change was a student who was quite traumatized by being moved from the special needs program to a non-categorical resource room. She was fearful and frequently was seen crying in the halls; she felt so out-of-place and uncomfortable about having to go to the newly formed 12th grade resource room and a new teacher her senior year that she simply refused to go. She eventually had to be assigned one of the special needs instructional aides who she knew, to work with her. There are some students who have had to adjust to at least 3 different teachers since they came the high school because of the addition of the other L.D. teacher and then again because of the reorganization.

It is ironic that Mr. Mistretta's said purpose behind this restructuring was to have every student have a connection in the building; yet, in order to do this it was necessary to for 72% of the resource room students to change to a new teacher, students who were among the most vulnerable and high-risk in the building. . What is even more disturbing, is that Mr. Mistretta *would not listen to reasonable options* that would have decreased the number of students affected significantly. This change was made without input from the majority of the special ed. staff affected and even after the fact, he seemed impervious to our concerns. It was as if our expertise and experience seemed to count for nothing.

5.    Crucial components of what was perceived as an excellent L.D. program are no longer in place. The self-advocacy program we had developed which was nominated last year for a national award, for all intents and purposes, was no more.

Having freshman students write their own classroom modifications with the resource room teacher is probably *the* most important first step in teaching self-advocacy skills. *Even with increased support staff, the 9th grade resource teachers that first year of the change reported that they "just didn't have time to lay the groundwork of the self-advocacy curriculum".* This is primarily because working with *all* freshman is quite different than having only a percentage of them on one's caseload. They are very labor intensive. *Neither of the 9th grade resource room teachers with this year's freshman class have been trained in self-advocacy skills, nor do they have the specific expertise of working with learning disabled students, nor do they really have experience diagnosing learning disabilities. So now we have two 9th grade level resource rooms coming up through the ranks who have been short-changed because they are working with teachers who simply don't have some of the skills and training they should have.* Another important aspect of this self-advocacy program was the mentoring which can take place when various have grade levels are mixed in the resource room like we had in the past. *The 9th graders now have no upperclassmen to provide models for them and the upperclassmen no one to share their knowledge with and mentor.*

Pat Phillips, the special ed. administrator who did all the annual review PPTs last year, told me, that I was the only teacher whose students were revising and/or writing their classroom modifications in their own words and coming to their annual review meetings with them. *After only one year of the new model, and this is really significant, the majority of the regular ed. teachers in the building are getting a cookie-cutter checklist for a student's modifications rather than one written by the student in his or her own words.* At a faculty meeting in November, the questions and concerns and anger surrounding classroom modifications are clearly a direct result of the much more ambiguous checklist, which doesn't give any rationale for why a certain modification is allowed.   Teachers are frustrated and this is directed at the resource room teachers and Special Ed. in general. *For so many resource room students to not have the benefit*

3

*of working with someone skilled in teaching them self-advocacy skills is a tremendous loss considering that it was one of the best program for special ed. students in the state.* We've had many people visit from other schools who were very impressed with how our L.D. program when we were categorized and had an up and running self-advocacy program.

6.    Since the change in models there is not consistency among the grade level resource rooms as to goals and objectives and there is growing concern that the department is becoming more and more fractured.

Geri Wright and I have put together, as our growth plan, a self-advocacy curriculum that we have recently presented at a SERC workshop. In February, we will begin presenting this to our department and certainly this is a step in making our department more cohesive and the resource rooms more consistent. However, it is more than giving out information. *The goal of teaching self-advocacy skills is to move away from a strictly tutorial model to helping students become independent learners who have learned compensatory strategies.* Teaching a student to be a self-advocate *requires a philosophical approach that is student centered.* Right now what is happening in the resource rooms varies greatly from teacher to teacher and students are not getting what they need. Not only do some of the teachers not have expertise in working with L.D. students but they are not trained in self-advocacy. And, even if teachers *are* trained and *want* to implement the self-advocacy curriculum, under the present model, there is not sufficient time to teach the skills.

The resource rooms are becoming more and more a tutorial model, which is something Geri and I worked for fifteen years to get away from because it is not in the best interest of the students. Colleges and employers want students who can speak and act in their own best interests. *To some resource room teachers, students' grades are the major measure of success, not the development of self-advocacy skills per se and teaching compensatory strategies.* There have been teacher complaints that students' work is being done for them in the resource room, classroom modifications are clearly an issue of concern for many teachers, as well as students taking exams in the resource room. Our credibility as a department is being eroded by the lack of cohesiveness and continuity across the grade level resource rooms. We now have large, generic resource rooms, rather than more specialized programs, and the teachers running them have not necessarily been assigned based on what their best at.

7.    There are other problems with this model.

The caseload size, for example, is predetermined by how many special ed. students are in that grade level. Freshman teachers, not only have all freshman, but often they require more support that upperclassmen. With a strong self-advocacy program in place, often seniors are "as needed" by mid-year.

When all students are grouped by grade level, it presents major problems with scheduling, especially if there are a lot of C-level students who can only be in the one block a class is offered. This means the resource room is jammed packed some blocks, too few kids, others. *Even with more staff, when there are 8-10 kids in a small room, (and the special ed. rooms themselves are another issue altogether!) the quality of help students are getting is compromised. Many are ADHD and very distractible, and now there are more students whose behavior is the issue and if the teacher does not have expertise in working with a learning disabled student, they often are not given the specialized 1-1 help they may need.*

4

Also, because students are by grade level, the modification to be able to take tests and exams in the resource room can become a nightmare when 6 or 7 kids have the same class. Because so many students have the same classes, having enough taped books of novels the students are assigned available, is a problem, and sometimes the pressure is tremendous on the resource room teachers when so many students have a major assignment due at the same time. Junior year is usually when triennial testing needs to be done. This year there are 38 freshman with 1.5 teachers; consider what this is going to mean if at least 3/4's of these students all need an educational evaluation in their junior year. Teachers will spend more time testing than working with students.

*This model by its very nature, lends itself to inequities.*

**7.  A change for 504 students**

In February of 2000, Mr. Mistretta announced that 504 students could no longer get services in the resource rooms. It was politically motivated (Salem was not paying E.L. for their 504 students, as they are not considered Special Ed. per se but can receive services ), and as a result of his decision, several students were abruptly "cut loose". There were concerns expressed by several of us as to the legality of doing this. Mr. Mistretta's response was, **Well, I guess they'll (the parents) just have to sue us."** This is a rather disturbing statement given the seriousness of legal rights of parents of special ed. students, not to mention the impact on the students who suddenly lost the support they were receiving in the resource room. One particular example was one of my students who was coming in for minimal support, but it was working. It gave him a place to get help with organization and it gave him a structured place to do homework in the school day. When she had to let him go, he commented that Mr. Mistretta didn't want him to be in resource anymore. His grades dropped drastically and he almost failed 2nd semester English last year. *We had something in place that was working and he fell through the cracks because according to the building principal (not the law), this student couldn't access a resource room.* This year there is a Student Study Center available for all students for extra help, but that was not the case last year when this decision was made.

**8.  A program that could have greatly impacted the C-levels in a positive way, was lost in the reorganization.**

For two years before the reorganization of our department in the spring of 1999, we had been preparing for a particularly difficult incoming freshman class. It was anticipated that there would be greater number than usual of C-level students who were going to need a great deal of support from the resource room to be successful. So, Geri Wright, Paul Christensen and myself, as our growth plan, developed a model for the C-level that would incorporate co-teaching with a regular ed teacher using an integrated curriculum. It was felt that this would improve the overall instruction in these classes for all students, both regular and special ed, and support could be provided in the classroom setting. We went to workshops, read current literature and research, and put together a pilot program and presented it to GGM, who gave us the go ahead. *We got together a team of teachers to co-teach, and we were going to implement the program the following September. Parents had even been told at the 8th grade PPTs that this program was going to be in place for their child the next year. It never happened. It was another thing, a good thing that would have benefited kids, but it was deemed important enough to salvage and was not given administrative support.* Both the of the freshman resource room teachers that

next year tried to go into some of the C-level classes to co-teach, but had to give it up simply because they didn't have the time to do it, and the things like compatible scheduling and teacher assignments that were in place in June of 1998, had all been changed by GMM by September. It is important to note that many of the special ed. instructional aides are this year, are not necessarily giving direct support help in the resource rooms, but are often doing bathroom duty or are placed in C-level classes. There is no question that having a special ed. teacher co-teaching and/or planning lessons with a regular ed. C-level teacher would have been far more beneficial to all students, than to have a para-professional sitting in a classroom taking notes! My CIL recently said to me, "The C-level classes are a mess and the aides are just not working out."

I believe that the special ed. department has been treated very badly, that we have had sweeping program changes forced upon us without input. I believe my colleagues have suffered and more importantly, students have suffered a direct result of these changes. I have tried to speak up for them and as a result of exercising my right to freedom of speech in their behalf, I have a letter in my file from Mr. Mistretta ( see Memo 3, October 12, 2000), in which he states that he "would be willing to investigate a transfer to another building." Over the past two years I have been told I would be considered insubordinate if I did not keep silent, I have been retaliated against for speaking out for my students, and I have had to hear over and over again from my colleagues, "It won't do any good to say anything because he isn't going to change this model." At the end of the year last year, the special ed. department, on its own, evaluated the new model after one year. We could come up with only two "pros"; however, there were *ten* issues we felt needed to be worked on (See Memo 4, 6/5/00). And yet in spite of evidence to the contrary, Mr. Mistretta continues to maintain that this new model is working well and "the present philosophy will continue until a better method is found to service our students."

The bottom line is that students who do not have the benefit of having teachers who work in an environment where the healthy exchange of ideas and a respect are the order of the day are not getting what they deserve.

Diane Claussen
Special Education Teacher
East Lyme High School
January 20, 20001

I want the truth to come out.  I want to be able to tell my story.  I want all of you to read every word I wrote in my statement because it represents hours of trying to put on paper the frustration and anger and sense of loss that I have felt these past few years because of the actions and decisions of Gerald Mistretta.  I have seen good programs and departments weakened and even destroyed by these decisions, I have seen colleagues nearly broken by the stress they are working under, some of whom retire earlier than they want to because they cannot stomach what's happening in our building.   But most of all, I want you to hear how students have been affected.  I believe passionately that the special ed. department has been treated very badly, that we have had sweeping program changes forced upon us, in part out of retaliation for speaking out to Mr. Mistretta and students have suffered as a direct result of this.

We should not have to be here today.  I think it is a given that one should should not be threatened or yelled at or spoken to with foul language.  I should not have to work in a building where it is a sick joke that to speak up to Mr. Mistretta is to risk being "sent to the middle school" as punishment.  Retaliation has been used as a method of keeping people silent and compliant. Many believe that to speak out to change things "won't do any good" which lends itself to feelings of powerlessness and frustration.  I want to work in a school where the principal would never speak to me disrespectfully.  I want to work in a school where I can offer my opinion based on years of experience, and feel I was listened to and not have to fear retaliation if what I said ran counter to the principal's opinion.  I would like to have freedom of speech back.

I want Mr. Mistretta to know the harm he has done.  Whether or not he meant to hurt people, he has.  I personally have seen a colleague, one of the best special ed. teachers in the building, so demoralized by Mr. Mistretta's actions that she honestly questioned whether or not she should even teach any more.  I have felt such a sense of loss for the callous dismantling of our L.D. program, that I have been grieving—there is no other word for it.   I have seen students suffer from a real sense of abandonment because they no longer could have the same resource room teacher; I have seen students denied the quality of programming they deserve because the teachers that has been assigned to them, don't have the skills and expertise they should have.  Students have been hurt and more than anything  that is why I am here.  I have done nothing wrong except to speak up when I felt that decisions were not being made in the best interests of students

Diane Claussen
January 20, 2001

My Concern:

1. The advisor-advisee program is a really good idea. However, spec ed already has that component and it is very successful. Students have a safe haven in resource room and have developed a strong, trusting relationship with resource room teachers who have had them since freshman year. Parents rely and trust these teachers. To sever that abruptly with large numbers of spec ed students would not be in their best interest and puts the spec ed teachers in a position of having many students they don't know & many parents as well.

2. 105 resource room kids at least to start year (not including 3 new referrals coming up this year). Will make caseload high to start year with, mixing LD with SED type kids will make it more difficult to manage classes, esp. if teacher doesn't know a lot of the kids. Some parents will not be happy about the mix — especially since this was not talked about at their student's annual review. Will be very impt. to have a tutor assigned to each program ie, someone well qualified and better pd., as staffing needs for non-categorical programs are different! Must be sure kids don't get shortchanged because of inadequate staffing.

3. "...children with emotional problems are seen to be ill served by changing and frequently turbulent structure of educational settings." Decision on next years assignment, a high percentage of resource rm. circulation could be having to adapt to a new teacher next year. It's critical to minimize numbers of kids affected.

4. Where do we stand re: C-level, integrated curriculum, that we've told 8th grade parents about ____ IEP's

5. Configuration of team will change every year as ___ sped counselor will move on at years end. Would it be better to have 9-10 team, 11-12 team that remain stable - have kids move to 11-12 team after sophomore year.

6. How ___ Phillips ___ ____ in to ___ ____?

## Special Education Department Proposed Staffing and Rationale

Memo #2

Jard yr
t's
5 Salem kids
24-31

### Resource Rooms

**9th Grade Teacher:** Dave / Wally 2.6 teacher

Support staff:

Heather-tutor
Jeannie - aide

**Rationale:**
These 2 would be a good team
Dave has experience as a C. level
teacher. Wally has been to a number of incoming 8th
C. level meetings already be cause of C. level Pilot Prog

24
───
6 total
9-10

**10th Grade Teacher:** Alison

Support staff:

Keri - tutor

**Rationale:**
Had 9 total freshman this year
who will be moving up to gr. 10. Has
L.D. experience this past year - done a gd job
Would have 6 new students

17
───

**11th/Grade Teacher:** Diane / Kerri
12th

Support staff:

aide

**Rationale:** Diane: Can be on 11-12 team, keeping present caseload
adding Dave's Kids

**★** Should at least for next year, split
jr. srs to ease transition of 54 students
total, only 11 students (Dave's, Paul's) would

33-
───
i total
11-12

**12th Grade Teacher:** Diane / Kerri

Support staff:

aide

**Rationale:**
be new to them. The other 44 are  already know
students they have worked with also,
they both have had experience working
with SED type kids. Kerri had many who ended
up in language in all ed. Also if did
by gr. level, case
loads would be
very inequitable

★ this would be the
least disruptive
to greatest # of
students

el 105
111

### Special Needs Teacher:

Diane

Support staff:

Kim - tutor
MR experience

**Rationale:**
Has expertise - needed

### SED Self-Contained Teacher:

Jeff

Support staff:

Laura - tutor

**Rationale:**
Knows most of the students already
Did his practice teaching in that prog
last year.

### Alt. Ed. Teacher(s):

Cheryl + 2 reg. ed teachers

Support staff:

Ray - tutor

**Rationale:**

Administrative degree - could suspend,
do PPT's without
involving building administration

Memo #3

**MEMO TO:** G. Mistretta, Principal

**MEMO FROM:** P. Christensen, Special Education CIL

**DATE:** June 5, 2000

**RE:** Proposed improvements to teaming approach involving special education department

        In discussing our department's accomplishments, goals, and needs for our end of the year report in our last two department meetings issues arose that we felt could be addressed with the following proposed solutions. These suggestions adhere to the teaming philosophy established this year and we feel will strengthen the overall program.

### ISSUE #1

- Triennials typically occur in junior year and with the large number of students in grade levels it will be difficult for the school psychologist and resource room teacher to complete all the testing.

### PROPOSED SOLUTION

- Divide number of students to be tested equally among resource rooms so that in no one year would a special education teacher have an inordinate amount of testing. Or reduce testing by hiring at a per hour rate a half time teacher, if willing, so that testing can be done during 2nd half of day. School psychologists will need to complete some during the summer at a per hour rate and maybe investigate possibility of having outside psychologist test some students.

### ISSUE #2

- It does not feel as if we are a team, as we do not meet regularly. It feels more as if we are compartmentalized than teamed.

### PROPOSED SOLUTION

- Utilize initiative meeting time at least once a month where grade level administrator, special education resource room teacher, counselors, and school psychologists can discuss students and case reviews can be presented. This is a model that Dick Otto had advocated for many years ago. These case reviews could help all teachers by providing possible solutions for students that they are having difficulty with and it would create a feeling of a team.

## ISSUE #6

- Losing of important staff members in resource room in order for them to have a duty at times impacting the delivery of service to our students.

### PROPOSED SOLUTION

- Assign resource room staff to duties but allow resource room teachers to have some say in when I.A.'s are used for this duty. Presently, D. Miko assigns I.A.'s but consideration is not taken into number of students in resource room for block I.A. is at duty. If this were done there would not be as much scrambling of special education staff as there is now and would ensure proper coverage for both the resource room and the duty assignment.

## ISSUE #7

- Ineffectiveness of SST.

### PROPOSED SOLUTION

- SST teams need to communicate regularly amongst each other to ensure that programs are not being overfilled, i.e. Alt Ed. Also, Alt. Ed. and therapeutic programs established criteria for entrance must be adhered to. A regular education or CIL should be included in SST. A secretary in SST would be helpful in that they could review previous minutes, take minutes, and prepare proper documents -- as Fran Rinoski had done in previous years. Options at SST are presently limited, but should be expanded with the addition of the learning center next year. We realize that SST is not a special education body, but we do feel its impact and feel these proposed solutions would clean SST up.

## ISSUE #8

- Lacking amount of technology in resource rooms because now with grade level team approach when one student has a paper or project all students in the resource room do. Presently there are not enough computers in the resource rooms.

### PROPOSED SOLUTION

- Provide resource rooms with at least two computers each.

# EAST LYME HIGH SCHOOL

Memo #



Principal: Gerald M. Mistretta
Assistant Principals:
   David W. Miko
   Patricia Phillips
   Lawrence Roberts

30 Chesterfield Road
P.O. Box 210
East Lyme, CT 06333-0210
(860) 739-6946
Fax (860) 739-1241

MEMO TO: Diane Claussen
FROM: Gerald M. Mistretta
RE: Meeting of October 12, 2000
DATE: October 12, 2000

This memo will confirm our meeting of October 12, 2000. At that meeting attended by Paul Christensen, your Curriculum and Instructional Leader, you, and me, we discussed a number of issues.

In regards to testing eleventh graders, we concluded that you would be responsible for the testing of three eleventh graders during the first semester.

A discussion was held about the size of your workload. It was your contention that eighteen or nineteen students was a full time workload. Paul and I explained to you that all other special education resource room teachers had the full time equivalent of approximately thirty students. This constitutes the reality of a full time load for special education resource room teachers at ELHS. While it may not be the ideal, it is the way the high school functions.

We also discussed your responsibility for eighth grade PPTs during the second semester. I informed you that if staffing remained constant you would be part of the team from the high school that will be attending all of the eighth grade PPTs. Please let me make this last point perfectly clear. At this point in time I am assigning you to the incoming ninth grade PPT team during the second semester.

During the meeting you also asked to discuss the present teaming situation at the high school. You expressed your dissatisfaction with the teaming philosophy and also expressed that you were not happy to provide services to students in a teaming philosophy. I explained to you that while I was quite willing to listen to your suggestions, the present philosophy would continue until a better method was found to service our students. I also suggested that if you were not happy performing your assigned duties at the high school I would be willing to investigate a transfer to another building. If you disagree with any of the above please feel free to write me a memo.

Diane, in closing I believe you are a valuable staff member at this high school. I want you to be comfortable in your assignment and work as part of the full organization. I will be happy to discuss any problem that you perceive to be obstructing your ability to do your assigned tasks. However, please be aware that I expect you to perform your tasks as a <u>full time</u> teacher in a professional manner.

Cf: Paul Christensen, CIL

**EXHIBIT 3**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

MAUREEN EPPS,                          :
DIANE CLAUSSEN, AND                    :
GERALDINE WRIGHT                       :
Plaintiffs                             : Civil Action Number
                                       : 3:01 CV2156 (AVC)
vs                                     :
                                       :
GERALD MISTRETTA AND THE               :
BOARD OF EDUCATION FOR                 :
THE TOWN OF EAST LYME                  :
Defendants                             :

----------------------------------------------------
                Deposition of: GERALDINE WRIGHT
----------------------------------------------------



    Taken before Teri A. Dougan, Notary
Public/Stenographer for the State of Connecticut,
at the office of MADSEN, PRESTLEY & PARENTEAU, LLC,
111 Huntington Street, New London, Connecticut
06320, on February 26, 2003, commencing at
approximately 10:10 a.m.




                    Teri A. Dougan
                    Court Reporter
                    LIC. #00217

A P P E A R A N C E S:

For the PLAINTIFFS
JACQUES J. PARENTEAU, ESQUIRE
MADSEN, PRESTLEY & PARENTEAU, LLC
111 Huntington Street
New London, Connecticut 06320


For the BOARD OF EDUCATION
KEVIN R. BRADY, ESQUIRE
HALLORAN & SAGE LLP
225 Asylum Street
Hartford, Connecticut 06103


For GERALD MISTRETTA
FRANK J. SZILAGYI, ESQ.
SILVESTER AND DALY
72 Russ Street
Hartford, Connecticut 06106

1   so I came up with--we came up with some suggestions

2   and I gave it to my CIL.

3       Q.   Who was that at that time?

4       A.   At that time, Paul Christensen.  And it

5   was, you know, a well intentioned memo that was

6   pleasantly toned.  It wasn't angry.  It wasn't

7   disrespectful.  It just tried to solve the problem

8   more equitably.  And Mr. Christensen came back to

9   me and said that his response was "tell them they

10  are moving and remind them that I'm the principal".

11      Q.   I want to back up a second.  Can you tell

12  me who the parent was that initially raised the

13  issue with you?

14      A.   It was not my program.  I don't know, but

15  supposedly they came in for parent night and saw

16  this situation and the kids were complaining.  I

17  came in one morning and I passed one of the

18  students sitting outside the hallway.  And I said

19  "how are you doing?"  And he said" can you believe

20  this.  And we are supposed to be the depressed kids

21  in the building and look at the room they give us."

22      Q.   Can you tell me who the employee was that

23  you just referred to when you sought out on going

24  on his advice?

25      A.   I can, but I don't want to get him in

1    Q.    Do you know whether at that time the budget

2    allowed for the hiring of a tutor?

3    A.    Mr. Mistretta had a budget for a full-time

4    teacher in that position.

5    Q.    Do you know whether or not the budget

6    allowed at that time for the hiring of a tutor?

7    A.    I believe that that budget came out of the

8    special needs.  The hiring of a tutor or an aide

9    was going to come out of the monies that were given

10   to Mr. Mistretta that came from the Board of Ed

11   that was due to go to a 1.0 special needs teacher.

12   Q.    So you don't know whether the position was

13   budgeted for the position of a tutor?

14   A.    No.

15   Q.    Mrs. Wright, was there an incident

16   regarding SATs around February of 1999 that you can

17   recall?

18   A.    Uh-huh.

19   Q.    And what can you tell me about that

20   incident?

21   A.    Prior to that year Diane and I had always

22   given our students SATs in group settings on

23   Saturdays, sometimes even during the week we would

24   take--if it was a large group, 12 kids, over to

25   another building where we would give untimed SATs

1    that they could also receive them on tape.   We did

2    that for years.  And it is a quite delicate

3    important aspect of the process in terms of getting

4    tapes in and having them locked up, make sure that

5    the kids are all given the correct modifications

6    and paperwork.  And it had gotten to the point

7    where it became quite a large group of kids that

8    were taking SATs, and at that point in time the

9    school had hired a college coordinator and SAT

10   coordinator.  And so in the beginning of the year

11   we gave them the responsibility of signing kids up

12   that needed modification for SATs.  They took that

13   task over.  One of my students came to me that week

14   and said, "Mrs. Wright, they don't have my tapes."

15   I said, "what do you mean they don't have your

16   tapes?"  "They can't find them.  The tapes have

17   never come in." And so I went to the SAT

18   coordinator and I said, "what do you mean the tapes

19   have not come in?  You are supposed to check and

20   call, and if they are not in the building at least

21   a week before you are going to give the test, you

22   have to call and find out where they are."  And he

23   hadn't done that.  And so he finally called and

24   supposedly they had been shipped to the high

25   school.  And so now we had an exhausted search go

1     on in the high school to find the SAT tapes that

2     were missing.  And they ended up being found in

3     Diane's room on a table on top of which a whole

4     bunch of stuff had been piled up, kids' notebooks,

5     and no one knows how they got there.  I believe

6     that the tapes had been delivered into the

7     building.  They went from the English department to

8     the office and back to the English department and

9     back to the office and somehow ended up being

10    delivered to Diane Claussen's room unbeknownst to

11    her where they sat and no one knew they were

12    there.  I received a letter in my mailbox the next

13    day and it sounded somewhat of a reprimand for not

14    looking hard enough in my room for SATs.  And I

15    felt that was the beginning of a paper trail that

16    Mr. Mistretta was trying to start on me.

17       Q.   Was that letter put in your file by Mr.

18    Mistretta?

19       A.   I wrote a letter the next day, a retort to

20    that, because I felt it needed to be explained.  I

21    didn't want that in my file.

22            ATTORNEY PARENTEAU:  Can I have that

23    question read back?  That only calls for a yes or

24    no.

25            MRS. WRIGHT:  I don't remember the

1    question.   Could you repeat the question?

2    BY ATTORNEY BRADY

3       Q.    Did Mr. Mistretta put that letter in your

4    file?

5       A.    Yes.

6       Q.    Did David Miko send you a memo regarding

7    this incident?

8       A.    Yes.

9       Q.    Was it David Miko that informed you by

10   sending you a memo that he was concerned about the

11   location of the SATs?

12      A.    Yes.

13      Q.    What affirmative steps did you do when you

14   learned the SATs were missing to locate them?

15      A.    I looked in my room.  Dr. Miko came in and

16   asked that we look in our rooms, so I looked all

17   over my room and said why--I wouldn't have them.  I

18   didn't do anything to apply for them.  I didn't--I

19   don't know why they would be in my room.

20      Q.    Did you assist Diane Claussen in attempting

21   to locate the missing SATs?

22      A.    I'm sure she looked in her room.  I didn't

23   look in her room.

24      Q.    Did you assist Diane Claussen in locating

25   the missings SATs?

1      A.    No.

2      Q.    At some point did Mr. Mistretta suggest a

3    reorganization of the special education department?

4      A.    Yes.

5      Q.    Do you know when that was?

6      A.    It was May of--end of April.  Maybe May of

7    1999.

8      Q.    And what was the reorganization to be?

9    What was the outcome of that?

10     A.    What do you mean "the outcome"?

11     Q.    What was the reorganization?  Can you

12   describe it for me?

13     A.    He was going to make noncategorical

14   classrooms, noncategorical resource rooms and

15   divide them up by grade level.

16     Q.    And did you have a problem with this

17   reorganization?

18     A.    I asked if we could discuss it as a team

19   and keep some of the components that we knew were

20   working.  And he said "you can discuss it all you

21   want, but this is what we are doing".

22     Q.    Do you know when that was?

23     A.    That was, I believe, the end of April,

24   early May when we had the first meeting.  That was

25   the meeting where he introduced the concept by

1    leaning back in his chair and saying "I have a new

2    idea and you may ask, what is he, fucking crazy" to

3    the entire department.

4        Q.    What did you think was wrong with the

5    reorganization, if anything?

6        A.    I wasn't opposed to change as much as I was

7    the way it was being done.

8        Q.    Did you know that the change was to bring

9    the special education department in compliance with

10    the law?

11            ATTORNEY PARENTEAU:  Object to the form.

12            ATTORNEY SZILAGYI:  What was the question?

13            ATTORNEY PARENTEAU:  Do you know that the

14    change was to bring the program in compliance with

15    the law.

16            ATTORNEY BRADY:  I think I said whether.

17

18            (Whereupon the reporter read

19            back the previous question.)

20

21            ATTORNEY PARENTEAU:  I object to the form.

22    You can answer.

23            ATTORNEY SZILAGYI:  You can answer.

24            MRS. WRIGHT:  I can answer?

25            ATTORNEY PARENTEAU:  If you can.

104

1          MRS. WRIGHT:  Could you repeat it one more

2    time?  Did I know that the restructuring was to

3    bring us into compliance.  Is that what you are

4    asking me?

5    BY ATTORNEY BRADY

6        Q.   Did you know whether the reorganization was

7    to bring the special education department in

8    compliance with the law?

9          ATTORNEY PARENTEAU:  Object to the form.

10          MRS. WRIGHT:  I can object to the form?

11          ATTORNEY PARENTEAU:  No.

12          MRS. WRIGHT:  No.  You're objecting to the

13    form?

14          ATTORNEY PARENTEAU:  I am.

15          MRS. WRIGHT:  I can answer still.

16          ATTORNEY PARENTEAU:  It preserves my

17    objection about the question to a later date, but

18    you can answer it if you understand it.

19          MRS. WRIGHT:  Okay.  I did not know that.

20    BY ATTORNEY BRADY

21        Q.   At any point did you learn that the purpose

22    of the reorganization was to bring the special

23    education department in compliance with the law?

24          ATTORNEY PARENTEAU:  Object to the form.

25          MRS. WRIGHT:  Not until I read his

1   deposition.  That was the first I ever heard we

2   were not in compliance.

3   BY ATTORNEY BRADY

4       Q.   Did you agree with--strike that.  After

5   reading Mr. Mistretta's deposition, did you agree

6   with him that the special education department

7   prior to the reorganization was not in compliance

8   with the law?

9       A.   No.

10      Q.   Why not?

11      A.   He based it on something called "least

12  restrictive environment" and we were in compliance

13  as far as I knew and as far as my supervisor, both

14  people who have doctrines in special education knew

15  we were in compliance with least restrictive

16  environment.

17      Q.   What does least restrictive environment

18  mean?

19      A.   It is part of the IDEA that speaks to the

20  fact that Special Ed students need to be educated

21  with nondisabled students as much as they can.

22  Services should be on a continuum of least

23  restrictive to most restrictive continuum.

24      Q.   Prior to Mr. Mistretta implementing the

25  reorganization of the special education department,

1   hostile work environment because I spoke up for

2   kids.  I pointed out when kids' IEPs weren't being

3   made. I wasn't receiving enough support when my

4   budget money had been taken away.  And as a result

5   of that, even though I ran a very successful

6   program, I was made to feel that I was constantly

7   being watched.  As a matter of fact, he even sent

8   the CIL to my room to tell me that I was being

9   watched and that I was being checked on because my

10   tutor was helping another resource room teacher

11   because another resource room teacher's

12   program--because that resource room teacher was

13   taken out of her program and told to teach in a

14   different program, regular ed program, and so I let

15   my tutor go over and help this other tutor and I

16   was told I could not do that because I had not had

17   his authority.  And then a month later we had to

18   have a meeting to find somebody to come and help

19   this teacher because--so he was basically creating

20   a situation for me where I could do no right.  He

21   would walk by my room constantly.  He used, you

22   know, inappropriate language to scare me.  He

23   threatened me with insubordination to keep quiet

24   twice.  He told me if after a meeting, if I said

25   anything to anybody about this meeting I would be

154

1    targeted me.  He took my tutor away and gave me the

2    aide instead.  This was the first year I had a

3    tutor in I don't know how many years.

4        Q.    This is in the fall of 1998?

5        A.    Correct.  He took the tutor away.  He gave

6    me the aide.  When the aide quit in March he turned

7    his back on me literally when I went downstairs to

8    ask him to put an ad in the paper for an aide.

9        Q.    This is March of '99?

10       A.    Correct.  He walked by my room all the

11   time.  He had the CIL come to my room to check on

12   me.  It was--

13       Q.    Are you claiming he does not have the right

14   to walk by your room?

15       A.    It was a marked increase in the amount of

16   times that man walked by my room.  I have been

17   there for 15 years.

18       Q.    How often would he walk by?

19       A.    I don't know, but it was enough that I

20   noticed it.

21       Q.    It was increased in the amount of times he

22   walked by?

23       A.    Correct.

24       Q.    Anything else?

25       A.    He hung all our schedules up all around our

1    office, and when I went downstairs to talk to him

2    about a student he demanded that I get the

3    student's IEP and show him where it said that,

4    whatever it was that I was asking about.    I said

5    that is not on an IEP.  And he had his secretary go

6    into the PPT files to check to see if we were

7    telling the truth because he told me some of us

8    lie.

9        Q.    When did that occur?

10        A.    In the fall of '99.

11        Q.    Fall of '99?

12        A.    I'm sorry.  The fall of '98.

13        Q.    Okay.  And you claim that is in retaliation

14    of your speech--

15        A.    It was threatening, correct.

16        Q.    Let me finish.  You claim that is in

17    retaliation for your speech in '98 concerning your

18    budget.  Is that correct?

19        A.    Sure.

20        Q.    Okay.  Anything else?

21        A.    When the other teacher that was teaching

22    the freshmen academy class, when her aide or tutor

23    was having a difficult time with caseload, his

24    suggestion was either I give up the--that we

25    release an aide from our department or switch kids

1    into Diane's and my program.

2        Q.    Are you referring to a document now?

3        A.    I believe that is in my log.  A log that we

4    kept.

5        Q.    But right now are you making reference to--

6        A.    Yes, to my notes.

7        Q.    Can you tell me how we marked that document

8    so the record is clear?

9        A.    Exhibit A.  A couple of times I called in

10   late and I was called down to his office and

11   questioned about it.  That never happened before,

12   nor did it happen to anybody else that I knew.  At

13   one point we were going to turn something into Mr.

14   Mistretta, and his secretary told us we could not

15   talk to him directly or give anything to him

16   directly; we had to go through the CIL.  I was

17   reprimanded for not going to professional

18   development day.

19       Q.    Your claim is that is in retaliation for

20   what you said in 1998 concerning the budget?

21       A.    I believe it was the beginning of

22   retaliation, yes.

23       Q.    When did that occur?

24       A.    The professional development day?

25       Q.    You told me you were reprimanded for not

1    attending it.

2        A.    I believe that was in the winter of 1999.

3    And then the SAT letter which ended up in my file

4    even though he told me it would not end up in my

5    file.  And my answer to that SAT letter was not in

6    my file.

7        Q.    And you claim that is in retaliation for

8    what you said concerning the budget?

9        A.    Absolutely.  I believe that--

10       Q.    Anything else?

11       A.    That spring they were going to hire a new

12   school psychologist.

13       Q.    The spring of what?

14       A.    1999.  And I believe he said he was only

15   interviewing women.  He took out the application of

16   the woman that had 35 years' experience.  He made

17   numerous remarks during those interviews that were,

18   I felt, threatening to me.

19       Q.    Where did the interview take place?

20       A.    The building was under construction so they

21   had partitions in the gym.

22       Q.    Who else was present?

23       A.    At the interviews?

24       Q.    Yes.

25       A.    Chris Mountain.

1      Q.    Chris who?

2      A.    Chris Mountain, the school psychologist,

3   like the mountain.  Mike Sullivan, counselor,

4   school psychologist; myself; Alison Moger; Mr.

5   Mistretta; and I think that is it.  And the

6   candidates.

7      Q.    And the comment he made was what?

8      A.    We all had a question that we asked.  We

9   all asked one question and all asked pretty much

10   the same question each time we had a new candidate.

11      Q.    You asked questions of the person being

12   interviewed?

13      A.    Correct.  And Mr. Mistretta's question to

14   the person each time was, in essence, what do you

15   do if you have a teacher that is uncooperative or

16   you are in a situation and you say you want to do

17   this with the teacher.  And at one point he leaned

18   over and said "you know what we do with teachers

19   that are not cooperative" and he looked at me and

20   he said "we fire them".

21      Q.    Did you get fired?

22      A.    No.  I quit.  I only made--I wanted to make

23   remarks like "you hired her" and "you have two

24   short psychologists".

25      Q.    Who was the other short psychologist?

1                     STATE OF CONNECTICUT

2         I, Teri A. Dougan, Commissioner duly

3   commissioned and qualified in and for the State of

4   Connecticut, do hereby certify that pursuant to

5   notice there came before me on the 26th of February

6   2003 the following-named person to wit: GERALDINE

7   WRIGHT, who was by me duly sworn to testify to the

8   truth and nothing but the truth; that she was

9   thereupon carefully examined upon her oath and her

10  examination reduced to writing under my

11  supervision; that this deposition is a true record

12  of the testimony given by the witness.

13        I further certify that I am neither

14  attorney nor counsel for nor related to nor

15  employed by any of the parties to the action in

16  which this deposition is taken, and further that I

17  am not a relative or employee of any attorney or

18  counsel employed by the parties hereto, or

19  financially interested in this action.

20        IN WITNESS THEREOF, I have hereunto set my

21  hand this 4th day of March 2003.

22

23                Teri A. Dougan, Notary Public
                   My Commission Expires:

24                   March 31, 2005

25