Page 53

1  make a request?
2  A.  It's assigned by the principal.
3  Q.  Is that at the initiation of a teacher
4  request?
5  A.  Sometimes.
6  Q.  When did the East Lyme High School switch
7  to a site-based management approach?
8  A.  I don't know the exact year.
9
10  (Defendants' Exhibit A, Ms.
11  Claussen's complaint, marked for
12  identification)
13
14  Q.  (By Mr. Brady) Showing you what's been
15  marked Defendants' Exhibit A for identification,
16  take a few minutes and look through that and tell me
17  if you recognize that document.
18  A.  Yes, I do.
19  Q.  Is that your complaint in this action?
20  A.  Yes, it is.
21  Q.  Is that the complaint that you testified
22  that you reviewed prior to the deposition?
23  A.  Yes, it is.
24  Q.  Paragraph 7 of the complaint states that
25  commencing in or around 1990 the site management was

Page 54

1  instituted at East Lyme High School. Is that the
2  time you recall when site-based management was
3  instituted?
4  A.  Yes.
5  Q.  Prior to 1990, what type of management was
6  employed in the high school?
7  A.  As I said before, we had the director of
8  pupil personnel, and special education was directed
9  more from his office, a central office, than from
10  the building itself, individual buildings.
11  Q.  Who was the director of pupil personnel
12  prior to 1990 --
13  A.  Dick Otto.
14  Q.  Please let me finish my question.
15  Do you know if Mr. Otto held any positions
16  prior to 1990?
17  A.  Not to my -- I don't know what they were.
18  Q.  Who was the current CIL for the special
19  education department?
20  A.  Paul Christensen.
21  Q.  CIL, can you define that?
22  A.  Curriculum instructional leader.
23  Q.  Do you know when Paul Christensen became
24  CIL of the special education department?
25  A.  He would have taken over in the 1999/2000

Page 55

1  school year.
2  Q.  Who did Mr. Christensen replace as CIL?
3  A.  Actually, Larry Roberts was the assistant
4  principal. He took over for Cheryl Race when she
5  left midyear in 1999.
6  Q.  Mr. Roberts took over for Cheryl Race in
7  1999?
8  A.  Uh-huh.
9  Q.  Prior to that, who was CIL for the special
10  education department?
11  A.  She was the first CIL.
12  Q.  Do you know when she became the CIL?
13  A.  No, I don't. I'm not sure.
14  Q.  Did Richard Otto ever have any control
15  over the special education department?
16  A.  He was our supervisor.
17  Q.  And when was that?
18  A.  Since the time that I was employed at East
19  Lyme High School. I mean, when I came to work at
20  East Lyme, he was the director of pupil personnel.
21  Q.  What were Mr. Otto's responsibilities as
22  director of pupil personnel, if you know?
23  A.  I don't know all of them. He was the
24  person that I would go to if I had any difficulties
25  relating to any, you know, my job. He was my

Page 56

1  supervisor. He oversaw all the aspects of special
2  education for the district.
3  Q.  What were the job responsibilities of a
4  CIL in the special education department?
5  A.  They are somewhat of a liaison person,
6  which is what the position was before. It was
7  renamed CIL, and Cheryl Race took over. It had
8  become more -- they have weekly meetings with the
9  principal and then come back to the department as
10  sort of a go-between, if you will, between the
11  principal and -- they're not supervisors, but really
12  more of a liaison person.
13  Q.  Between the special education department
14  and the principal?
15  A.  All the departments in the building have
16  one.
17  Q.  Does a CIL have any other
18  responsibilities?
19  A.  They organize department meetings. They
20  have an agenda. They would be the person that would
21  go to the principal with concerns from the
22  department.
23  Q.  What types of concerns would you go with
24  to Cheryl Race when she was CIL?
25  A.  One special instance was when as a

### Page 57

1  department we felt that an assignment that -- a
2  special education teacher was in direct conflict
3  with meeting the needs of a block of students that
4  she had, and we met as a department to try and
5  brainstorm how to solve that issue.
6     Q.   When you say meeting the needs of the
7  department, what do you mean by that?
8     A.   Meeting the needs of the student.
9     Q.   As a department?
10    A.   Yes.
11    Q.   And would you meet with Sherry Race alone?
12    A.   No. That would be in a format of a
13 regular department meeting, and then that would be
14 after we got through the agenda we might open things
15 up for any other concerns that we had.
16    Q.   Would those meetings include Mr.
17 Mistretta?
18    A.   No, not department meetings.
19    Q.   What would Sherry Race do as a CIL as a
20 result of teachers bringing the needs of the
21 students to her?
22    A.   I know one instance where she went to Mr.
23 Mistretta and told him what our concerns were.
24    Q.   When was that instance?
25    A.   In September of '98.

### Page 58

1     Q.   And in September of '98 what were your
2  concerns of the students?
3     A.   Allison Moger had been assigned to teach
4  the freshman academy, and that would take her out of
5  her resource room block four every other day. She
6  was a new teacher that year, and these were students
7  that she had never even met with before that were
8  assigned to that block, and she was going to be out
9  of the room, and it was an assignment that was made,
10 like, the first day of coming back to school, so we
11 met as a department to try and figure out some other
12 way to have those students covered by someone other
13 than a brand new instructional assistant. As a
14 teacher, she would not even have contact with those
15 students.
16    Q.   What was Allison Moger's position at that
17 time?
18    A.   She was an LD teacher at that time.
19    Q.   And can you tell me about the freshman
20 academy? What is that?
21    A.   Freshman academy was a program that both
22 Ms. Wright and I taught three or four years. It was
23 designed to introduce freshman, initially anyway, to
24 the various what we call electives or specials. So
25 the kids would rotate through and be exposed to,

### Page 59

1  say, an art teacher giving a little mini-class, and
2  then a new group would come in for the next time
3  they met. You would have art and music, and all of
4  the various elective teachers would teach. We
5  taught one called multiple intelligences, and it was
6  a way of introducing freshman to all the possible
7  electives they might be taking over the next four
8  years.
9     Q.   When you say "we" taught multiple
10 intelligences --
11    A.   Ms. Wright and I taught.
12    Q.   So as a result of teaching the freshman
13 academy, Ms. Moger would be out of her block?
14    A.   Yes.
15    Q.   Which block is that?
16    A.   The fourth block every other day.
17    Q.   So when you met as a department, what did
18 you decide would be an appropriate solution to this,
19 if any?
20    A.   Well, I think first we just voiced our
21 concern about the fact that she had been, you know,
22 basically assigned that at the last minute, and then
23 some of the solutions we thought might work would be
24 for -- obviously, the ideal solution would be that
25 she didn't have to teach the freshman academy class,

### Page 60

1  but that, if necessary, you know, we would try and
2  cover that block for her. I think more to the
3  point, we didn't really know what could be done
4  except that it was really a situation that needed to
5  be remedied in some way. These students were not
6  going to be meeting with a special teacher at all
7  until the middle of the year.
8     Q.   What did Cheryl Race do as a result of
9  that meeting?
10    A.   She went to Mr. Mistretta that after
11 afternoon.
12    Q.   And do you know what she conveyed to Mr.
13 Mistretta?
14    A.   No, I do not. I'm assuming the gist of
15 what was said, but I don't know what she said
16 exactly.
17    Q.   What was the response the department
18 received from Mr. Mistretta?
19    A.   He seemed angry with the department.
20    MR. SZILAGYI:   What was the time
21 frame again?
22    MR. BRADY:   That was September
23 of '98.
24    THE WITNESS:   September of '98.
25    MR. SZILAGYI:   Thank you.

Page 61

1  Q. (By Mr. Brady) Can you explain that?
2  What do you mean he seemed angry with the
3  department?
4  A. Sherry Race relayed to Geri Wright in a
5  phone call that night that he referred to the
6  department in the office in front of the secretaries
7  as the "goddamn special ed department."
8  Q. Do you know what was done as a result of
9  Cheryl Race's meeting with Mr. Mistretta at that
10 time?
11 A. Yes, I do.
12 Q. What was that?
13 A. The next morning we were called in before
14 school had started. The only people that were
15 called in was not the whole department, it was just
16 the learning disabilities teachers; myself, Geri
17 Wright, Allison Moger, Cheryl Race and two of the
18 administrators.
19 Q. Who were the two administrators?
20 A. Dave Miko and Pat Phillips.
21 Q. And what happened next?
22 A. He stood at the head of the table and
23 said -- he clearly was angry, in my opinion. He
24 said that he was tired of us second-guessing him,
25 and he made a comment that the LD programs weren't

Page 62

1  working and that that was going to be changed. He
2  was tired of giving us professional leeway because
3  it came around to bite him in the ass when he did
4  and that if we spoke about the meeting to parents
5  that we would be considered insubordinate and we
6  would be out of there.
7  Q. Do you know why Mr. Mistretta felt that
8  the LD programs -- was it the LD programs or --
9  A. He said the LD programs weren't working.
10 Q. Do you know why they weren't working, in
11 his opinion?
12 A. He didn't say.
13 Q. Did he tell you at any time why they
14 weren't working?
15 A. No, he did not.
16 Q. What types of professional leeway did Mr.
17 Mistretta give you?
18 A. I don't know what he was referring to.
19 Q. And was anything done as a result of that
20 meeting?
21 A. He reassigned the tutor that we were
22 supposed to get that year to Allison Moger's room
23 and gave Geri Wright the instructional aide.
24 Q. And as a result of that change, was
25 Allison Moger's fourth block covered?

Page 63

1  A. It was covered by the tutor, who then went
2  to the CIL and said that she could not handle it
3  because there were six students in there and she
4  couldn't do it by herself.
5  Q. Who was that instructional aide?
6  A. Carrie Yougachini (phonetic) was her name.
7  Q. At that time was Allison Moger teaching
8  freshman academy?
9  A. Yes. That did not change.
10 Q. What was done as a result of Ms.
11 Yougachini complaining to the CIL that she couldn't
12 handle the class?
13 A. Cheryl called a lunch meeting again, and
14 we tried to brainstorm possible solutions. She
15 wanted someone to volunteer to give up one of their
16 support staff to go help cover that program.
17 Eventually, Mr. Mistretta's suggestion -- and I
18 don't know if it came at that meeting or at a later
19 time, but he said that either two of the students
20 would be reassigned to me or Sherry or we would have
21 to give up one of our support staff for that block.
22 Q. And this occurred prior to the
23 reorganization?
24 A. Yes.
25 Q. So what was done at that point?

Page 64

1  A. I don't understand.
2  Q. Were any students reassigned to Geri
3  Wright?
4  A. No. One of the -- I believe that Brian
5  had to go down and cover with Carrie that block so
6  that there were two people in that room.
7  Q. Who's Brian?
8  A. Brian was the instructional aide that had
9  been put in Geri Wright's room.
10 Q. Back up a second. Can you tell me what
11 the self-advocacy approach is?
12 A. It means that you want the students to be
13 able to speak for themselves in terms of what their
14 strengths and weaknesses are and what they might
15 need for any accommodations, not only in an academic
16 setting, but in the world of work. Speaking for
17 oneself.
18 Q. And how is that accomplished?
19 A. I believe that it needs to be done in a
20 very systematic way through direct teaching,
21 constant reinforcement and practice. They have to
22 be given opportunities to find out about their
23 strengths and weaknesses and actually write
24 classroom modifications for themselves in their own
25 words. They're responsible for giving those to the

Page 65

1 classroom teachers, meeting with the classroom
2 teachers if they need to. It's a process that
3 really ideally should continue all the way through
4 their high school years. The goal is to make them
5 independent learners, and that's one of the best
6 ways to do it, in my opinion.
7    Q.   Turn to paragraph 9 of your complaint.
8    A.   Uh-huh.
9    Q.   It says, "Wright and Claussen felt the
10 curriculum for special education students relied on
11 the self-advocacy approach." Is that right?
12    A.   The idea of it was initiated by Dr. Pat
13 Phillips in her doctoral thesis. I believe that was
14 in 1986 that we were a part of -- we were actually
15 part of the study, and over time we really developed
16 it much more into a curriculum that could be used on
17 a daily basis in the resource room.
18    Q.   When you say "we developed," who are you
19 talking about?
20    A.   Geri Wright and myself.
21    Q.   Was anyone else involved in the
22 self-advocacy approach at East Lyme High School?
23    A.   Pat Phillips.
24    Q.   How was Pat Phillips involved in
25 developing the self-advocacy approach at East Lyme

Page 66

1 High School?
2    A.   She was the person who really initiated
3 the whole thing through her doctoral thesis. She
4 was not in the classroom, but she was very
5 supportive of what we did. Whenever she gave
6 workshops, she would usually have us come as well
7 because we were the people who were in the trenches
8 and we were doing it. So she was our mentor in a
9 way.
10    Q.   And when was that program started at East
11 Lyme High School?
12    A.   It's evolved. But I would say in about
13 ten years' time -- Pat's work was done in '86/'87,
14 and I would say for ten years after that it became
15 more a curriculum, per se, than a doctoral thesis.
16 There's quite a bit of difference.
17    Q.   Can you put a specific time period on when
18 the self-advocacy approach was in place at East Lyme
19 High School?
20    A.   I would say in '97/'98 definitely very
21 much a part of it was a driving force in the LD
22 program that Geri Wright and I had.
23    Q.   Did you contribute in any way to Pat
24 Phillips' doctoral thesis?
25    A.   We were two of the teachers that were

Page 67

1 involved in working with her on her research. She
2 interviewed us. We had some of her students that
3 were a part of it. We participated in case
4 reviews. We participated in the group that the
5 students were involved in, learning disability
6 students and counselors, guidance counselors.
7    Q.   Were any other teachers involved, do you
8 know, in preparation of the doctoral thesis?
9    A.   I don't know.
10    Q.   Is it necessary under the self-advocacy
11 approach to have students classified by grade?
12    A.   No.
13    Q.   Why is that?
14    A.   Because it's a process that starts -- if
15 the students come to you in ninth grade, you would
16 start then. If they are identified and come into
17 your program at any time, you would start then. So
18 it's more a process that begins when they become
19 part of, you know, the special ed resource room
20 program.
21    Q.   Can you describe for me the reorganization
22 that took place in 2000?
23    A.   What it entailed?
24    Q.   Yes.
25    A.   We were now going to be noncategorical

Page 68

1 resource rooms by grade level so that there would be
2 a freshman resource room or rooms, one in each grade
3 level.
4    Q.   And can you describe the categories of the
5 special education department?
6    A.   There would be at that time learning
7 disabilities -- again, some of these have changed
8 from socially emotionally maladjusted to severely
9 emotionally disturbed. Other health impaired could
10 be things like attention deficit disorder or if a
11 student has some kind of chronic illness. Then
12 mental retardation would be another category.
13    Q.   How many categories are there?
14    A.   I don't know.
15    Q.   Were there any other changes as a result
16 of the reorganization?
17    A.   The biggest change was that the teachers
18 who had been working with certain students and the
19 parents had come to PPT meetings assuming that the
20 same person would be their special ed teacher the
21 following year. In many cases that was no longer
22 going to be. They would now be with a different
23 person, and they would be in a grade level resource
24 room that was noncategorical. There could be a much
25 wider range of students in terms of their special

Page 69

1  education category.
2  Q. Is that what you're referring to in
3  paragraph 13 of your complaint about five lines down
4  saying, "Reorganization reassignment plan with the
5  resource room students non-categorically restricted
6  by grade"?
7  A. Uh-huh.
8  Q. In paragraph 14 you say, "Defendant
9  Mistretta also refused to allow Plaintiffs Wright
10 and Claussen to work together for at least a year so
11 that the program change would impact a fewer number
12 of students." Could you describe that for me?
13 MR. SZILAGYI: What paragraph are we
14 on?
15 MR. BRADY: Paragraph 14.
16 THE WITNESS: One of the department
17 concerns of Geri Wright and myself was
18 that this reorganization would put a
19 number of students with a new teacher, and
20 so we proposed that at least for this
21 first year of reorganization that Geri
22 Wright would do twelfth graders and I
23 would do eleventh graders. That way about
24 80 percent of the kids would know the
25 resource room teacher that they were

Page 70

1  working with at least for that year to
2  make the transition. We presented this
3  plan because we felt it was certainly
4  better for students to be known by the
5  resource room teacher they were working
6  with and, also, to have someone that they
7  were familiar with rather than a total
8  stranger to them their eleventh and
9  twelfth grade year, and he just said no,
10 he would not consider doing it that way.
11 Q. (By Mr. Brady) Prior to this time, were
12 you specifically paired Geri Wright?
13 A. We had the learning disabilities program.
14 For many years we were the only two learning
15 disabilities teachers in the entire building, and we
16 usually had about 70-plus student between the two of
17 us, so we had the bulk of the special ed students in
18 the building, and our rooms were side by side, so we
19 conferenced with one another frequently, and we knew
20 each other's students.
21 Q. Was that a convenient working relationship
22 for you –
23 A. Yes, it was.
24 Q. Let me finish.
25 Was that a convenient working relationship

Page 71

1  for you and Ms. Wright?
2  A. Yes, it was.
3  Q. Would you work with any other department
4  members at that time?
5  A. We had a close working relationship with
6  the school psychologist and guidance counselors and
7  Pat Phillips.
8  Q. How about other teachers?
9  A. Certainly classroom teachers. We dealt
10 with students from nine through twelve, so we knew
11 pretty much all of the classroom teachers, and we
12 were quite familiar with the curriculum from nine
13 through twelve because we supported those students
14 in those classes.
15 Q. Prior to that time you didn't work as
16 closely with any other teacher as you did with Geri
17 Wright?
18 A. No.
19 Q. Do you know why Mr. Mistretta thought your
20 working with Ms. Wright was counterproductive?
21 A. No, I can't. I don't know.
22 Q. Did Mr. Mistretta ever tell you that
23 working with Ms. Wright was counterproductive for
24 you?
25 A. No.

Page 72

1  Q. Paragraph 14 says, "Defendant Mistretta
2  later stated that by working together the Plaintiffs
3  were counterproductive."
4  A. Uh-huh.
5  Q. Mr. Mistretta never stated that to you?
6  A. He didn't state it to me, no.
7  Q. Do you know if he stated it to Ms. Wright?
8  A. I don't know.
9  Q. Do you know where this comes from that
10 Defendant Mistretta stated later that by working
11 together the Plaintiffs were counterproductive?
12 A. I believe he said it to Pat Phillips.
13 Q. Do you know when he said it to Pat
14 Phillips?
15 A. No, I do not.
16 Q. How do you know he said it to Pat
17 Phillips?
18 A. She told Geri Wright, I think.
19 Q. You talked about PPTs. Can you tell me
20 what those are?
21 A. Planning and placement team meetings.
22 Q. Can you tell me how those worked prior to
23 the reorganization?
24 A. It's a meeting that involves very strict
25 legal guidelines in terms of who has to attend.

Page 73

1  It's the parents at the high school level with,
2  hopefully, the student and special education
3  teacher. It's run by an administrator, and there
4  are teacher reports and at least one classroom
5  teacher present, and it can be to review the
6  student's present program, it could be the annual
7  review, and it also could be the initial meeting
8  that is deciding eligibility of the student.
9  It's a team. At that time the school
10 psychologist or sometimes even physician or a
11 therapist can be present, but any decisions that are
12 made are team decisions, and IEPs are written. It's
13 a very powerful team in that it really can make
14 decisions about a student and his or her needs.
15 They're, you know, prescribed by law in terms of our
16 accountability, so it's pretty important.
17   Q.  By law you said that certain people are
18 required to attend. Who's required to attend a PPT
19 meeting?
20   A.  You need to have -- parents have to be
21 notified ahead of time to be sure that certain
22 rights are laid out for them at the beginning of
23 meeting. There has to be a special education
24 teacher present, and there has to be a classroom
25 teacher there, and then there's the person who's

Page 74

1  actually the administrator who would be running the
2  meeting, and doing the paperwork needs to be done.
3    Q.  Are tutors or instructional aides required
4  to attend a PPT meeting?
5    A.  No.
6    Q.  Are there any time requirements of when a
7  PPT meeting is to be held?
8    A.  According to law, it's to be held at a
9  mutually agreed upon time between the parents and
10 the school.
11   Q.  Prior to the reorganization, were there
12 any problems with how PPT meetings were being held?
13   A.  I remember one in particular where there
14 seemed to be some discussion. It was a Salem PPT
15 meeting, and the person running it was the special
16 ed person with the Salem schools, and there was a
17 discussion about whether or not a student could be
18 placed in a certain program unless Jerry Mistretta
19 had given permission for that student to be put
20 there.
21   Q.  Do you know when this took place?
22   A.  No, I can't remember exactly when that
23 was.
24   Q.  What was done, if anything, regarding
25 that?

Page 75

1    A.  I think it sort of -- I mean, I think that
2  the PPT team needs to make the decision based on
3  what they feel is in the best interest of the
4  student. I think in that particular case, it worked
5  out that we were able to place the student where he
6  needed to be placed, but I remember the reaction of
7  the special ed person from Salem being somewhat
8  surprised that the PPT wasn't making the decision
9  and it was being made initially for us by the
10 building principal.
11   Q.  How did the PPT meetings change following
12 the reorganization?
13   A.  Before the reorganization we had already
14 been told times when PPTs could be held.
15   Q.  When were you told that?
16   A.  In September of '98. The times were to be
17 from 1 to 2 and 2 to 3 Monday through Thursday.
18   MR. SZILAGYI:  I'm sorry. What were
19 the times again?
20   THE WITNESS:  1 to 2 and 2 to 3
21 only.
22   Q.  (By Mr. Brady) And this was by Mr.
23 Mistretta?
24   A.  Yes.
25   Q.  Were there any problems with meetings

Page 76

1  being held at that time?
2    A.  Yes. We had a backlog pretty quickly, and
3  then we were told we had to also hold them on Friday
4  from 2 to 3 as well.
5    Q.  What would you do as a result of backlogs?
6    A.  We just had PPTs every day, and the end of
7  the day when we had students still we were
8  constantly being called out to PPT meetings in the 1
9  to 2 time slot and then 2 to 3, of course, would be
10 under contracted time but went over.
11   Q.  Were those times mutually agreed upon by
12 the parent and the school at that time?
13   A.  I know of one instance where a parent
14 really fought it, and she was able to get the
15 meeting sometime during the day. She simply said
16 she wouldn't come at that time. But in most cases
17 parents agree.
18   MR. SZILAGYI:  What was the time
19 frame on that?
20   THE WITNESS:  That was from 1 to 2,
21 and that was before the reorganization,
22 starting in September of '98.
23   Q.  (By Mr. Brady) Do you know who that
24 parent was?
25   A.  I think it was Paretto (phonetic).

Page 77

1  Q.  Following the reorganization, were PPTs
2  conducted differently?
3  A.  Well, I remember one of the things in that
4  meeting that was stated was that we were going to go
5  back to having PPTs scheduled during the day again.
6  Q.  And were there any problems with that
7  reorganization plan for PPTs?
8  A.  No. That was better.
9  Q.  How many PPTs had to be done after
10 reorganization?
11 A.  As many as needed to be done, depending on
12 the case load.
13 Q.  Could you put a specific number on it, do
14 you know?
15 A.  No. I would have to know how many
16 students I had, and then also some kids I would have
17 more than one PPT a year, and then I'd also do
18 senior year, and then I did all of the freshman
19 incoming PPTs, too.
20 Q.  When was that?
21 A.  That would have been the year 2000/2001.
22 Q.  And you were responsible for all incoming
23 freshman PPTs?
24 MR. PARENTEAU:  You've got to let him
25 ask the question.

Page 78

1  Q.  (By Mr. Brady) In the year 2000, you were
2  responsible for all incoming freshman PPTs?
3  A.  That was my original assignment.
4  Q.  So if PPTs after the reorganization were
5  not being scheduled properly, were the special
6  education students harmed as a result of the
7  reorganization with respect to PPTs?
8  A.  Not with respect to PPTs.
9  Q.  Did Mr. Mistretta ever have a problem with
10 the number of students you carried on your case
11 load?
12 A.  He never had a problem with it.
13 Q.  Did Mr. Mistretta ever tell you that you
14 weren't carrying enough students as a full-time
15 special education teacher?
16 A.  I thought you meant before, when the
17 numbers were very high. Yes, he did have a problem
18 with my case load when I had my seniors after the
19 reorganization. He said I didn't have enough
20 students to be a full-time teacher.
21 MR. SZILAGYI:  What's the time
22 frame?
23 Q.  (By Mr. Brady) This is your twelfth grade
24 students?
25 A.  Yes. And that would have been 2000/2001.

Page 79

1  Q.  Did Mr. Mistretta have a problem with your
2  case load for your eleven grade students?
3  A.  No, he did not.
4  MR. BRADY:  Mark this, please.
5
6  (Defendants' Exhibit B, 11/13/00
7  letter to Ms. Claussen from Gerald
8  Mistretta, marked for identification)
9
10 Q.  (By Mr. Brady) Showing you what's been
11 marked Defendants' B, do you recognize that
12 document?
13 A.  Yes, I do.
14 Q.  What is that?
15 A.  It is the response to a memo that I sent
16 him, and, obviously, he disagreed with what I said.
17 Q.  Is it a memo dated November 13, 2000, from
18 Gerald Mistretta to you?
19 A.  Uh-huh.
20 Q.  Does is state that he disagrees with your
21 conclusion that you carried a full load at the start
22 of the school year?
23 A.  Yes.
24 Q.  As of the school year 2000/2001?
25 A.  Yes.

Page 80

1  Q.  What grade level were you teaching?
2  A.  Twelfth graders.
3  Q.  How many students were you carrying at
4  that time?
5  A.  Eighteen.
6  Q.  What did Mr. Mistretta tell you at that
7  time regarding the number of your case load?
8  A.  At what time?
9  Q.  In November of 2000.
10 A.  I believe it was in October.
11 MR. BRADY:  Mark this Defendants' C,
12 please.
13
14 (Defendants' Exhibit C, 10/20/00 memo
15 to Mr. Mistretta from Ms. Claussen,
16 marked for identification)
17
18 THE WITNESS:  That's as a result of a
19 letter that was put in my file.
20 Q.  (By Mr. Brady) Showing you Defendants'
21 Exhibit C, do you recognize that document? Is that
22 a memo you sent to Mr. Mistretta dated October 20th?
23 A.  Uh-huh.
24 Q.  You state in the memo in the second
25 paragraph that "although you have slightly fewer

Page 81

1 students than some of your colleagues." The second
2 line up from the bottom of the second paragraph.
3  A. Uh-huh. I see what you're referring to.
4  Q. How many students did your colleagues have
5 at that time?
6  A. Well, at an October 13th meeting Mr.
7 Mistretta gave me some figures, and he was, in fact,
8 counting any students they saw every day as -- he
9 was counting them as extra students, so it was hard
10 to determine exactly how many students they had. In
11 other words, if they came in every day, he counted
12 them as a student, even though, historically, you
13 would count case loads by just the number of pupils
14 that you have, not the times they come in to you in
15 the resource room. So he was saying at this October
16 13th meeting that everyone had approximately 28
17 students apiece, according to his calculations.
18  Q. "And your students were less than that?
19  A. I had fewer students than that at that
20 time, yes. I had 18. But I'm not sure how many
21 students they had either is my point.
22  Q. Did you agree that you had fewer students
23 than some of your colleagues at that time?
24  A. The point is that it was really at that
25 point out of my control because we were assigned by

Page 82

1 grade level. With the reorganization you had as
2 many students as there were at that grade level, so
3 I had no control over the number of students that I
4 had versus another resource room.
5  Q. In your memo of October 20, 2000, did you
6 agree with Mr. Mistretta that you had fewer students
7 than some of your colleagues?
8  A. I think I did, yes. I think that I had
9 slightly fewer students, but I didn't have the
10 support staff they had either.
11  Q. What support staff did you have at that
12 time?
13  A. At the beginning of the year I had no
14 one. I was by myself.
15  Q. Previously you testified that 2000/2001
16 you had Holly Golart as a tutor.
17  A. Yes.
18  Q. When did she come on?
19  A. I want to say it was the very end of
20 September. I started the year with no one in my
21 room. I was by myself. And then she was part time
22 during that period.
23  Q. Do you know if Mr. Mistretta was actively
24 seeking support staff for you?
25  A. I know my CIL was.

Page 83

1  Q. Was Cheryl Race your CIL at that time?
2  A. No. Paul Christensen.
3  Q. Do you know whether Mr. Mistretta was
4 advertising for a tutor position for you during that
5 period?
6  A. Yes.
7  Q. And was he?
8  A. Yes.
9  Q. How long were you without a tutor during
10 that time?
11  A. A month approximately.
12  Q. Could you describe your assignments and
13 tests to the eleventh graders during that period?
14  A. In a department meeting the previous
15 spring we had talked about it as a department with
16 the reorganization. The eleventh grade teachers,
17 which I already experienced, had to do a lot more
18 testing of students because most of the junior
19 students needed to have triennials done, so they
20 needed to be completely reevaluated. So as a
21 department we decided to share the burden, and
22 everyone agreed that they would take a few of those
23 students and test them to help Allison out.
24  Q. That's Allison Moger?
25  A. Yes. And she was going to now be an

Page 84

1 eleventh grade resource room teacher. And that's
2 how it was left at the end of the previous school
3 year.
4  Q. Was there any other reason why your case
5 load would be a different size during that period
6 other than Mr. Mistretta, as you claim, counting
7 extra students?
8  A. No.
9  Q. Why was your work load of 18 students at
10 that time enough for a full-time teacher, in your
11 opinion?
12  A. Because that was my assignment. It had
13 nothing to do with how many student I was assigned.
14 It was dictated by how many students were at the
15 twelfth grade level. I was a twelfth grade resource
16 room teacher, so that was my assignment.
17  Q. And you believe that you were carrying a
18 full load of students at that time --
19  A. Yes.
20  Q. -- for a full-time teacher?
21  A. (Nod, yes).
22  Q. And you disagree with Mr. Mistretta's
23 assessment that you were not carrying a sufficient
24 number of students for a full-time teacher?
25  A. Yes. Other teachers had more students,

Page 85

1 and they had more support staff to deal with more
2 students. He says in his deposition that that was
3 the way the new -- with the reorganization that's
4 the way it worked. If you had more students per
5 grade level, then you just gave people more support
6 staff to deal with it. That's the way it was set
7 up. Previously, the resource room teachers would
8 divide pretty much evenly the case load. Geri
9 Wright and I would divide the number of students
10 equitably because it was possible to do that.
11 Q. And you didn't have a tutor -- strike
12 that.
13 Your lack of a tutor during that period
14 wasn't because you weren't carrying a full load of
15 students at that time; is that correct?
16 A. No. He just didn't have one hired yet.
17
18 (Defendants' Exhibit D, memo to Ms.
19 Claussen from Mr. Mistretta as a
20 result of 10/30/00 meeting, marked
21 for identification)
22
23 Q. (By Mr. Brady) Showing you what's been
24 marked Defendants' D for identification, do you
25 recognize that document?

Page 86

1 A. Yes.
2 Q. Is that a memo to you from Gerald
3 Mistretta as a result of a meeting on October 30,
4 2000?
5 A. Yes.
6 Q. Did you receive a copy of this memo?
7 A. Yes.
8 Q. The second paragraph says, "On August 25th
9 it was everyone's opinion that you did not have a
10 full load of students for your assignment this
11 year." Do you see that?
12 A. Uh-huh.
13 Q. When Mr. Mistretta refers to "everyone,"
14 do you know who he's referring to?
15 A. No, I don't.
16 Q. Was it indicated to you that it was not
17 only Mr. Mistretta's opinion, but others had the
18 opinion that you weren't carrying a full load of
19 students?
20 A. That's what it implies.
21 Q. Do you know what other individuals he's
22 referring to?
23 A. Paul Christensen, apparently, was one of
24 them because he mentions his name.
25 Q. Was it Paul Christensen's opinion that you

Page 87

1 weren't carrying a full load of students at that
2 time?
3 MR. PARENTEAU: Object to form.
4 MR. BRADY: What's the basis for
5 your objection?
6 MR. PARENTEAU: Lack of foundation.
7 Q. (By Mr. Brady) Did Paul Christensen ever
8 tell you that it was his opinion that you weren't
9 carrying a full load of students at that time?
10 A. No, he did not.
11 MR. SZILAGYI: Is this a good place
12 to break?
13 MR. BRADY: Why don't we take a
14 break.
15
16 (Lunch recess was taken at 1:02 p.m.)
17
18 * * * * *
19
20 (Back on the record at 2:07 p.m.)
21
22 Q. (By Mr. Brady) Ms. Claussen, in October
23 of 2000 did Paul Christensen explain to you that all
24 the other special education resource room teachers
25 had a full work load of approximately 30 students?

Page 88

1 A. No, he did not.
2
3 (Defendants' Exhibit E, 10/12/00 memo
4 to Ms. Claussen from Mr. Mistretta,
5 marked for identification)
6
7 Q. (By Mr. Brady) Showing you what's been
8 marked Defendants' Exhibit E for identification, can
9 tell me if you recognize that document?
10 A. I do.
11 Q. Is this a memo you received from Gerald
12 Mistretta dated October 12, 2000?
13 A. Yes.
14 Q. In the third full paragraph, second
15 sentence, it says, "Paul and I explained to you that
16 all other special education resource room teachers
17 had the full-time equivalent of approximately 30
18 students." Do you remember whether Paul Christensen
19 informed you of that?
20 A. No. Mr. Mistretta explained it to me at a
21 meeting.
22 Q. So you disagree with Mr. Mistretta that
23 Paul and Mr. Mistretta explained it to you at a
24 meeting?
25 A. Yes. Mr. Mistretta explained it to me at

Page 89

1  a meeting of October 12th.
2     Q.   Did Paul ever explain that to you?
3     A.   No, he did not.
4     MR. BRADY:   Mark this, please.
5
6     (Defendants' Exhibit F, 11/9/00 memo
7     to Mr. Mistretta from Ms. Claussen,
8     marked for identification)
9
10    Q.   (By Mr. Brady) Showing you Defendants'
11 Exhibit F, do you recognize that document?
12    A.   Yes.
13    Q.   Is that a memo to Mr. Mistretta from you
14 dated November 9, 2000?
15    A.   Yes.
16    Q.   Previously, you testified today that you
17 couldn't recall the number of students you had in
18 the 1999/2000 school year when you were teaching
19 eleventh grade. If you read the first line of the
20 second paragraph, does refresh your recollection?
21    A.   Yes, it does.
22    Q.   How many students did you have that year?
23    A.   15 to 17.
24    Q.   And at that time you were also a full-time
25 resource room teacher --

Page 90

1     A.   Yes, I was.
2     Q.   Let me finish the question, please.
3  During that period, do you know what the
4  other special education resource room teachers had
5  as their case load?
6     A.   You mean the previous year?
7     Q.   That year.
8     A.   No, I don't know.
9     Q.   In the academic year 2000/2001 were you
10 assigned any additional responsibilities after Mr.
11 Mistretta told you he believed you didn't have a
12 full-time case load?
13    A.   I was assigned additional responsibilities
14 before he told me I didn't have a full case load.
15    Q.   What were those eleventh grade -- were
16 those eleventh grade responsibilities?
17    A.   Yes.
18    Q.   Can you tell me about those?
19    A.   I was given a memo from Paul Christensen
20 after he had a meeting with Mr. Mistretta on
21 September 28th in which he was called into the
22 office and asked where I was in my testing of the
23 juniors, and Paul told him he didn't know, and at
24 that time he told Paul to tell me that my
25 responsibility was to test all the juniors, and so

Page 91

1  he then issued me a memo as per Jerry Mistretta.
2     Q.   And for how long were you given the
3  responsibility of testing the eleventh graders?
4     A.   I was given a schedule, and I believe I
5  had to finish all my students because I had students
6  that needed to be tested as well as an evaluation
7  that needed to be done by the end of November. Then
8  I was to have the juniors done, I believe, by the
9  middle of December. I had to write a self-advocacy
10 curriculum also in that time frame for grades nine
11 through twelve, and then it would be presented to my
12 department by January 15th.
13    Q.   Were you able to complete the testing of
14 your students at that time?
15    A.   Yes, I was.
16    Q.   Were you able to complete the testing of
17 the eleventh graders on time?
18    A.   Yes.
19    Q.   How about your self-advocacy program?
20    A.   Yes.
21    Q.   Referring to the complaint marked as
22 Exhibit A, paragraph 26, it says, "As Plaintiff
23 Claussen was done working with twelfth grade
24 students, it was clear that Defendant Mistretta was
25 retaliating against Plaintiff Claussen by assigning

Page 92

1  her a punitive work load." Is that what you're
2  referring to as a punitive work load?
3     A.   Yes, I am.
4     Q.   Were there any other assignments that you
5  believe contributed to a punitive work load for you
6  during this period?
7     A.   No.
8     Q.   Can you tell me why you believe those work
9  assignments were punitive?
10    A.   Well, the day before we had met with our
11 union representative and Mr. Mistretta's friends
12 with the union president who attended that union
13 meeting with us the day before.
14    Q.   Who was that?
15    A.   Mike Devenney.
16    Q.   Okay.
17    A.   He walks with Mike in the morning before
18 school. So the next morning at 7:15, he called Paul
19 Christensen into his office. Paul heard his name
20 over the intercom. He didn't know about the
21 meeting. He described to me later that Mr.
22 Mistretta seemed angry and was red in the face and
23 wanted to know where I was in the testing of the
24 eleventh grade students. So it seems more than
25 coincidental that we met with the union the day

Page 97

1  Q. How about '97 through '98?
2  A. Ricky Young.
3  Q. Any others?
4  A. I believe David Griffith. That's it.
5  Q. Do you know why Mr. Young dropped out?
6  A. He eventually went to another school and
7  committed suicide.
8  Q. How about David Griffith?
9  A. I don't know.
10 Q. How about '96 through '97; were any of
11 those your students?
12 A. No.
13 Q. How about '95 through '96?
14 A. Tommy Sullivan.
15 Q. And '94 to '95?
16 A. No.
17 Q. At some point did you have a meeting with
18 Dr. Reynolds regarding any of your issues?
19 A. Yes.
20 Q. Do you recall when that was?
21 A. I want to say it was -- I should know
22 this.
23 Q. Was it in January of 2001?
24 A. Yes.
25 Q. And who was present at that meeting?

Page 98

1  A. Myself, Geri Wright, Maureen Epps, Sherry
2  Meier, Debbie Elden, Tim Evers, Jack Penders, Linda
3  Johansen, Paul Smotus and Dr. Reynolds.
4  Q. And did you have an opportunity to raise
5  any of your issues with Dr. Reynolds at that
6  meeting?
7  A. Yes, I did.
8  Q. Do you know how long the meeting lasted?
9  A. Over two hours.
10 Q. Did Dr. Reynolds inform you that he would
11 investigate any of your claims raised at that
12 meeting?
13 A. I don't think he did at that meeting.
14 Q. Did he do so on any follow-up
15 correspondence to you?
16 A. Yes. I think there was a letter that
17 stated he would.
18 Q. Do you know if Dr. Reynolds conducted an
19 investigation regarding your claims?
20 A. Yes.
21 Q. Do you know what he did as part of the
22 investigation?
23 A. He interviewed people.
24 Q. Do you know who he interviewed?
25 A. I know some of them.

Page 99

1  Q. Who were the ones you know that he
2  interviewed?
3  A. Dave Sdao, S-D-A-O, Allison Moger, Paul
4  Christensen, Marie Shaw, I think Alice Pembrook.
5  That's all I can recall.
6  Q. Do you know what the outcome of Dr.
7  Reynolds' investigation was, if any?
8  A. He stated that Mr. Mistretta was, I
9  believe, an exemplary administrator and that he
10 didn't find any basis for the claims.
11 Q. I'd like to talk about the grievances you
12 filed, if any. Do you know if you filed a grievance
13 during your employment? Let's start with the last
14 ten years of your employment.
15 A. No.
16 Q. Did you ever file any grievances?
17 A. I filed a grievance with the State Labor
18 Board.
19 Q. When did you do that?
20 A. We finally met at the end of June 2002, so
21 I'm not exactly sure the date that I filed it, but
22 it was that year.
23 Q. Of 2002?
24 A. Uh-huh.
25 Q. And what was the basis of your grievance

Page 100

1  that you filed in 2002 with the State Labor Board?
2  A. That I believed that he increased my work
3  load by assigning me extra students to test and to
4  write the entire self-advocacy curriculum in
5  retaliation for my activities, and, subsequently, a
6  letter put in my folder saying that I wasn't a team
7  player and that if I wasn't happy at the high school
8  he would be happy to help me transfer to another
9  building. I think that was retaliation for my
10 speaking up.
11 Q. Any other claims raised in that grievance?
12 A. No.
13 Q. What is the status of that grievance, if
14 you know, at present?
15 A. It never was -- it's open, as far as I
16 know.
17 Q. You said Mr. Mistretta prevented you from
18 speaking out. Can you tell me on what subjects Mr.
19 Mistretta prevented you from speaking out?
20 A. I didn't say he prevented me from speaking
21 out.
22 Q. Didn't you just say that a few minutes
23 ago?
24 A. I said he retaliated for my --
25 Q. For speaking out.

### Page 93

1 before, and that very morning Mr. Mistretta assigned
2 me the entire eleventh grade students to test.
3   Q.   When was this meeting?
4   A.   September 28th. The meeting –
5   Q.   The meeting with your union.
6   A.   September 27th.
7   MR. SZILAGYI:   What year are we
8 talking about?
9   THE WITNESS:   2000.
10  Q.   (By Mr. Brady) And when do you claim that
11 Mr. Mistretta had a meeting with Mr. Devenney?
12  A.   In the morning before he met with Paul
13 Christensen, or possibly he told Mr. Mistretta
14 before that we were meeting.
15  Q.   Did the other department members of the
16 special education department have any additional
17 assignments?
18  A.   Not to my knowledge.
19  Q.   And what was the case load of the other
20 department members, the special education
21 department, at that time?
22  A.   I don't know.
23  Q.   Did they have approximately 30 students?
24  A.   I would say less than 30.
25  Q.   This meeting on September 27, 2000, with

### Page 94

1 your union, do you know who else was in attendance?
2   A.   Geri Wright, Maureen Epps, Jack Penders, I
3 believe Sherry Meier was at that meeting as well,
4 and Mike Devenney.
5   Q.   Anyone else?
6   A.   Not that I can remember.
7   Q.   Was Mr. Parenteau present?
8   A.   No, not at that meeting.
9   Q.   What was the purpose of this meeting?
10  A.   It was to discuss with the – I don't
11 know. I don't know. Our concerns about what had
12 been going on for the last year.
13  Q.   Do you know who initiated the meeting?
14  A.   We did.
15  Q.   When you say "we," who are you referring
16 to?
17  A.   Geri Wright and Sherry Meier, Maureen Epps
18 and myself.
19  Q.   Did you come away from the meeting with
20 any plan or any action that you were going to take?
21  A.   At this point I think we were hoping that
22 the union would help us in trying to decide what to
23 do next.
24  Q.   What did you decide to do next?
25  A.   I can't remember at that particular

### Page 95

1 meeting. We had so many. I'm not sure where we
2 were at that point.
3   Q.   Turning to paragraph 29F, it
4 says, "Defendant Mistretta informed a special
5 education teacher she would not be considered for an
6 opening." Do you remember who you were referring to
7 in that paragraph?
8   A.   No, I'm not sure.
9   Q.   How about paragraph 29G, referring to a
10 counselor with 25 years of experience; do you know
11 who that is?
12  A.   That would be Tim Evers.
13  Q.   Do you know anything about the incident
14 alleged in paragraph 29G?
15  A.   Not the specifics. It had something to do
16 with a recommendation that he didn't write for
17 someone. That's all I know.
18  Q.   Were you present when –
19  A.   No.
20  Q.   Were you present when any of the events
21 occurred in paragraph 29G?
22  A.   No.
23
24 (Defendants' Exhibit G, list of
25 dropouts from 1995 to 1999, marked

### Page 96

1 for identification)
2   Q.   (By Mr. Brady) Showing you what's been
3 marked Defendants' Exhibit G, what's been previously
4 disclosed at EL0098, do you recognize that document?
5   A.   Yes.
6   Q.   What is that?
7   A.   It's a list of dropouts from 1995 to 1999.
8   Q.   Does it indicate that special ed students
9 are indicated with a black dot?
10  A.   Yes.
11  Q.   Looking at '98 through '99, do you
12 recognize any of the names of any special ed
13 students with a block dot?
14  A.   One.
15  Q.   Which one?
16  A.   Spencer Jenkins.
17  Q.   Was Mr. Jenkins one of your students?
18  A.   Briefly.
19  Q.   Do you know why Mr. Jenkins dropped out?
20  A.   No. He was moved to another program.
21  Q.   Are any of the students in '98 through '99
22 any of your students?
23  A.   That's what I just looked at.
24  Q.   Just that one?
25  A.   Just that one.

## Page 113

1  Q. How about the population? Put aside the
2  percentage for a moment. Just the number of special
3  ed students, has that number grown since 1998?
4  A. I couldn't give you an accurate answer.
5  Q. You're not sure?
6  A. I'm not sure.
7  Q. If you could tell us, Mr. Otto was
8  director of special ed; is that correct?
9  A. Dr. Otto, yes.
10 Q. When did Dr. Otto cease being director of
11 special ed?
12 A. I think two years ago he retired.
13 Q. What school year would that be?
14 A. I'm trying to think. He was there
15 in '98/'99.
16 Q. That was his last year?
17 A. I think so.
18 Q. So for '99/2000 who was the director of
19 special ed?
20 A. He may still have been, but now Lloyd
21 Johnson has been for the last year.
22 Q. Who was that?
23 A. Dr. Lloyd Johnson.
24 Q. Paul Christensen is CIL for special ed?
25 A. Yes.

## Page 114

1  Q. How long has he been CIL?
2  A. He must have started '99 to the present.
3  The school year '99 to 2000 is when he began.
4  Q. Cheryl Race was CIL prior to that?
5  A. Prior to –
6  Q. The '98/'99.
7  A. The middle of '99. And Larry Roberts from
8  the end of the year of '99.
9  Q. The '98/'99 school year she finished up as
10 CIL in –
11 A. Right.
12 Q. – we'll call it the spring semester?
13 A. Yes.
14 Q. Right?
15 A. Yes.
16 Q. In the '98/'99 school year, were you aware
17 of meetings that were taking place to discuss the
18 reorganization of the special ed program?
19 A. No, I was not.
20 Q. Did there come a point in time when you
21 became aware of it?
22 A. The day he announced the restructuring.
23 Q. That was on which day?
24 A. That was in April of '99, the day he
25 announced the restructuring to us.

## Page 115

1  Q. That's the first time you became aware of
2  it?
3  A. Yes.
4  Q. And when did you first voice your concern
5  about the restructuring?
6  A. In May, probably within the next few
7  weeks.
8  Q. Who in the special ed department supported
9  your position concerning the reorganization?
10 A. Geri Wright.
11 Q. Anyone else?
12 A. I think we had a meeting of our
13 department, and, initially, I think Allison Moger –
14 we as a department discussed other alternatives in
15 terms of how to re-configure, like, who might take
16 each grade level, for example.
17 Q. You were talking about assignments that
18 might be made in connection with the reorganization?
19 A. In terms of the teachers that would take
20 different grade levels, yes.
21 Q. Which teachers would be assigned to which
22 grade levels?
23 A. Yes. And we were discussing how we could
24 do that with a minium of disruption to the kids'
25 program.

## Page 116

1  Q. My question was a little bit different.
2  My question to you was, who supported the position
3  that you took in May of 1999 as it pertained to the
4  reorganization of the special ed department, and you
5  told me Geri Wright did, and you told me that
6  Allison Moger did at first, or initially, I believe
7  is what you said, right?
8  A. Uh-huh.
9  Q. Anybody else?
10 A. I guess what I said was the department did
11 meet as a whole, so at that point in time we were
12 working together to try and – so my position – I
13 guess I'm not sure what you mean by my position.
14 Q. Well, you disagreed with the position
15 taken by Mr. Mistretta, didn't you?
16 A. I disagreed at that point with making such
17 a drastic change by reassigning teachers to all
18 these different grade levels.
19 Q. So your disagreement with Mr. Mistretta
20 concerned the assignment of teachers to different
21 grade levels; is that correct? If that's not
22 correct, tell me exactly what your disagreement with
23 him was.
24 A. My disagreement was that noncategorical
25 resource rooms had some things about it that would

Page 117

1 be not as good for the kid.
2  Q. Can you tell me what those things are?
3  A. One thing would be that you would mix kids
4 together and make it much more of a generic resource
5 room, so you would have maybe even kids who were
6 retarded from the special needs program to kids who
7 were much more acting out behaviors and behavior
8 issues were their primarily.
9  Q. What's the problem with that?
10  A. The problem with that is you had learning
11 disabled students as well. The problem with mixing
12 them all together and then mixing all the teachers
13 up is that you now have teachers who aren't as
14 qualified working with learning disabled students
15 even though they may be more qualified to work with
16 kids with emotional issues.
17  Q. Are you aware of anything in the academic
18 literature that supports your position?
19  A. I guess my position is from years of
20 experience of working with primarily learning
21 disabled students.
22  Q. Maybe I didn't make my question clear. My
23 question was whether or not you're aware of anything
24 in the academic literature that supports your
25 position.

Page 118

1  A. No.
2  Q. What other disagreements did you have with
3 the position taken by Mr. Mistretta as it pertained
4 to the reorganization of the special ed department?
5  A. I felt that mentoring by older students to
6 the younger students was a very important component
7 of having mixed grade levels, and that was no longer
8 going to happen.
9  Q. Are you aware of any support in the
10 academic literature that supports your position with
11 regard to the mentoring issue you just described for
12 me?
13  A. Yes, I do.
14  Q. Tell me where I can find that.
15  A. No, I can't tell you where I can find it,
16 but I've read that it is definitely beneficial to
17 have mixed ages and mentoring taking place.
18  Q. In special ed?
19  A. In special ed.
20  Q. But you can't tell me where you read it?
21  A. No, I can't.
22  Q. Can you tell me when you read it?
23  A. No.
24  Q. Anything else you disagreed with?
25  A. I disagreed with the fact that the change

Page 119

1 was made after the PPTs had been held for most of
2 the kids at the high school level and that parents
3 would assume that the same program and same teacher
4 would be in place for their student the following
5 year and that somehow the parent should be notified
6 of that change.
7  Q. Did anybody in the special ed department
8 agree with you as far as that position was
9 concerned?
10  A. I don't remember.
11  Q. Did anybody in the special ed department
12 agree with your position concerning the mentoring of
13 younger students by older students?
14  A. Well, the only other person would have
15 been Geri Wright because we were the only ones that
16 were actually using the self-advocacy curriculum
17 with that component.
18  Q. Did you make the other members of the
19 special ed department aware of your position
20 concerning the mentoring of younger students by
21 older students at meetings that you had with members
22 of the special ed department?
23  A. I don't remember specially doing that
24 before that time, no.
25  Q. At any time.

Page 120

1  A. Well, we were talking about before the
2 restructuring, correct?
3  Q. Who in the special ed department supported
4 your position concerning the -- bear with me one
5 moment. Withdraw the question.
6 Who else in the special ed department
7 supported your position concerning the change to --
8 how did you describe it? -- noncategorical
9 assignment of the special ed students as part of the
10 reorganization? Am I stating that correctly?
11  A. Uh-huh.
12  Q. Is that a yes?
13  A. You asked me who else in the department.
14  Q. I asked if I stated it correctly first.
15  A. Yes.
16  Q. And you gave "uh-huh."
17  A. Geri Wright and I were the only people who
18 taught the learning disabled students one time.
19 Allison Moger and I had just come on board as new LD
20 teachers. The only other program that would have
21 become noncategorical was Dave Sdao's program, which
22 was primarily for students who had more emotional
23 that was a presenting problem. He had a fewer
24 numbers of students, and they were in his program
25 more, and he had a different approach. We were the

### Page 121

1 only ones that — he was the only other person
2 really that that would have affected at that time.
3    Q.   So other than Geri Wright and Allison
4 Moger —
5    A.   — and myself, exactly.
6    Q.   Just the three of you?
7    A.   So the issue of noncategorical, Sdao was
8 the only other person that really it would have
9 affected at that point.
10    Q.   When the reorganization was put into
11 place, I take it that would have been for the school
12 year '99/2000; is that correct?
13    A.   Yes.
14    Q.   Are you aware of any students that were
15 negatively impacted by the change?
16    A.   I know specifically of one special needs
17 student who was distraught over having to go to Mr.
18 Sdao's room.
19    Q.   Who was that?
20    A.   I don't know her name.
21    Q.   Then how do you know she was distraught?
22    A.   Because they found her in the hall crying,
23 and she eventually had to be put with an aide
24 one-to-one because she would not work in his room.
25 She had been in the special needs program.

### Page 122

1    Q.   Did you have an opportunity to speak with
2 her when she was crying in the hallway?
3    A.   I didn't. I was told about it.
4    Q.   How did you become aware of it?
5    A.   I was told — I'm trying to think who told
6 me about it. Paul Christensen.
7    Q.   Paul Christensen told you?
8    A.   It was a student that he had had before.
9    Q.   Was this student crying on more than one
10 occasion?
11    A.   Apparently, yes.
12    Q.   Do you know how many times?
13    A.   I don't know how many, no.
14    Q.   Do you know why the student was crying?
15    A.   She did not want to be changed to a new
16 teacher. She felt very uncomfortable in the new
17 program, and so she eventually was put with a
18 one-to-one aide that she knew and worked with her in
19 another setting.
20    Q.   Are you aware of that kind of behavior
21 exhibited by students other than special needs
22 students?
23    A.   No.
24    Q.   You told us that you spoke out on three
25 occasions where you were retaliated against; is that

### Page 123

1 correct?
2    A.   Yes.
3    Q.   The first time you told us pertained to a
4 grievance that you had filed, right?
5    A.   Well, it wasn't the first time, no.
6    Q.   What was the first time?
7    A.   The first one was when I met with Mr.
8 Mistretta and spoke to him about my concerns, and he
9 told me I would be insubordinate if I spoke with any
10 parents.
11    Q.   That was the October 2000 meeting?
12    A.   No. That was back when the restructuring
13 took place, so that would have been May of 1999.
14    Q.   And how did he retaliate against you on
15 that occasion?
16    A.   I felt that he retaliated against both Ms.
17 Wright and myself by not allowing us to transition
18 the students for a year, working together, having
19 eleventh and twelfth grade students, so that that
20 would minimize the impact on the greatest number of
21 students.
22    Q.   How did that retaliation result in any
23 harm to you?
24    A.   Well, I guess if you put it that way,
25 there wasn't any harm to me, per se.

### Page 124

1    Q.   What was the second occasion where you
2 were retaliated against for speaking out?
3    A.   When I was assigned all the juniors to
4 test the morning after my union meeting.
5    Q.   That was after — when were you given that
6 assignment, the date, please?
7    A.   September 28, 2000.
8    Q.   That was after your union meeting, right?
9    A.   Yes. The day before.
10    Q.   What, specifically, did you — what
11 subject did you speak out on sometime around
12 September 27th or 28th of 2000?
13    A.   I didn't speak out about anything. I was
14 at a union meeting, which is a protected activity.
15    Q.   You were being — your claim is that you
16 were being retaliated against for attending a union
17 meeting; is that correct?
18    A.   Yes, absolutely.
19    Q.   Was anybody else retaliated against that
20 attended that union meeting?
21    A.   Not to my knowledge.
22    Q.   Do you have any idea why you were singled
23 out, in your mind?
24    A.   I was handy. I mean, Ms. Wright wasn't
25 there anymore.

Case 3:01-cv-02156-AVC    Document 46-6    Filed 11/26/2003    Page 17 of 19
BSA
S -V- MISTRETTA - DIANE CLAUSSEN    /25/03
XMAX(32/32)

Page 125

1  Q. How about Dave Sdao?
2  A. He wasn't at the union meeting.
3  Q. Who was at the union meeting?
4  A. Maureen Epps.
5  Q. Was she retaliated against?
6  A. She would have to speak to that.
7  Q. Well, do you know if she was?
8  A. I don't know after that date.
9  Q. Who else was there?
10 A. Geri Wright.
11 Q. Was she retaliated against?
12 A. She wasn't even working -- no. Wait. She
13 was. Again, you would have to ask her.
14 Q. Well, I'm asking you if you know.
15 A. I don't know specifically related to that
16 incident, no.
17 Q. Who else was there?
18 A. Sherry Meier.
19 Q. Was Sherry Meier retaliated against?
20 A. No.
21 Q. Not to your knowledge?
22 A. Based on that meeting, no.
23 Q. Who else was there?
24 A. Mike Devenney, the union president.
25 Q. Where did Mike Devenney work in school?

Page 126

1  A. He's a math teacher.
2  Q. I take it he wasn't retaliated against.
3  A. No. He's the union president and his
4  friend.
5  Q. So you think the union president served up
6  the union members to the principal?
7  A. I do.
8  Q. Did you take any action --
9  A. I asked him, and he told me he did.
10 Q. Did you take any action against the union
11 president for that?
12 A. Eventually, we had him not come to anymore
13 more union meetings.
14 Q. Was there any formal action taken
15 against him?
16 A. No.
17 Q. Did you take any formal action against
18 him?
19 A. No.
20 Q. Why not?
21 A. I don't know. Good question.
22 Q. I'm sorry. I may have ask this, but I
23 just want to make I'm sure clear in my mind: In
24 what manner is it that you were retaliated against
25 for attending the September 27, 2000, union meeting?

Page 127

1  A. I feel that he was angry about me
2  attending that meeting and he increased the number
3  of students and assigned them all to me when, in
4  fact, the entire department was supposed to share
5  that burden of testing.
6  Q. How many students were you asked to test?
7  A. Initially?
8  Q. Yes.
9  A. Like, six.
10 Q. And then after -- initially you were asked
11 to test six?
12 A. Yes.
13 Q. Were those your students?
14 A. No, they were not my students.
15 Q. How many were you asked to test in
16 connection with the retaliation that we were talking
17 about?
18 A. That's what I'm talking about.
19 Q. You were asked to test six more?
20 A. Yes.
21 Q. And how many were you supposed to test --
22 if you took those six away, how many were you
23 supposed to test?
24 A. I don't know. When it was first
25 discussed, it was just said we would talk about it,

Page 128

1  and whenever Allison needed to do the testing, we
2  would share it, divvy it up amongst all of the
3  special ed teachers.
4  Q. How many students did Allison have?
5  A. I don't know.
6  Q. Did she have more than six?
7  A. She had -- no, no, no. You mean to test?
8  Q. Yes.
9  A. No. I was given all of them.
10 Q. Six was all of them?
11 A. Yes. I was given the entire eleventh
12 grade. She wasn't going to test any of them.
13 Q. All right. So the entire eleventh grade
14 consisted of six students?
15 A. I think so, yes.
16 Q. And you had twelfth graders?
17 A. Yes.
18 Q. How many twelfth graders did you have
19 then?
20 A. I had 19 at that point.
21 Q. And that's at the time you were being
22 criticized for having less than a full work load; is
23 that correct?
24 A. Yes.
25 Q. Do you disagree that you had fewer

Page 129

1 students than the others in your special ed
2 department?
3    A.   That year maybe I did, yes.
4    Q.   Do you know how many fewer student you had
5 than your colleagues in the special ed department?
6    A.   No.
7    Q.   Is part of your job to test the students
8 that you have?
9    A.   Yes.
10    Q.   What's the testing consist of?
11    A.   If it's a triennial review, it would be
12 administering a full battery of Woodcock Johnson 3,
13 and then write the report. It usually takes
14 about – a new one is more comprehensive, so it
15 could take between four and five hours.
16    Q.   Is that the test that was in place in the
17 fall of 2000?
18    A.   Yes.
19    Q.   Did you end up administering –
20    A.   I take that back. Then it was Woodcock
21 Johnson R.
22    Q.   That was a different test?
23    A.   It's a different version. It's now been
24 updated.
25    Q.   But it still takes the same amount of

Page 130

1 time?
2    A.   A little bit less, but I would say four
3 hours.
4    Q.   Did you end up administering that test in
5 the fall of 2000 or sometime thereafter to those six
6 eleventh graders that Allison Moger had in her
7 class?
8    A.   No.
9    Q.   Why not?
10    A.   Because he refused it.
11    Q.   Who's "he"?
12    A.   Mr. Mistretta.
13    Q.   Why did he refuse it?
14 MR. PARENTEAU:   Object to the form.
15    Q.   (By Mr. Szilagyi) Do you know why he
16 refused it?
17    A.   No.
18    Q.   How many did you end up testing of those
19 eleventh graders?
20    A.   Three.
21    Q.   Who tested the other three, if you know?
22    A.   I don't know if Allison did.
23    Q.   How was the fact that you were to test
24 only three and not the six eleventh graders
25 communicated to you?

Page 131

1    A.   At the meeting that I had with him on
2 October 12th.
3    Q.   What did he say at that meeting about the
4 testing of these eleventh graders?
5    A.   He said he would reduce it.
6    Q.   Were you satisfied with that?
7    A.   I had to be, sort of.
8    Q.   Did you continue to feel that you were
9 being retaliated against?
10    A.   I did when I got this letter.
11    Q.   Which letter?
12    A.   After the meeting on October 12th.
13    Q.   Talking about Defendants' Exhibit E for
14 identification?
15    A.   Yes.
16    Q.   Can you tell me – withdrawn.
17 So it's your claim that part of the
18 retaliation consisted of you receiving Defendants'
19 Exhibit E for identification; is that correct?
20    A.   Yes.
21    Q.   Can you tell me how you were harmed by
22 receiving that letter that we've marked Defendants'
23 E?
24    A.   I don't think by speaking up about my
25 concerns about having all freshman together was

Page 132

1 dissatisfaction with the teaming philosophy or not
2 being a team player. He implies that I was not
3 being a team player by disagreeing with his teaming
4 philosophy. He did not like the fact that I did not
5 agree with everything about the restructuring.
6    Q.   Did you like the fact that he didn't agree
7 with you?
8    A.   I think what I objected to was the
9 suggestion that I was so unhappy that I would be
10 better off maybe going to another school.
11    Q.   And I understand that, but my question to
12 you was whether you were –
13 MR. SZILAGYI:   Can you read back my
14 question, please?
15
16    (Question was read)
17
18    Q.   (By Mr. Szilagyi) Do you understand?
19    A.   I felt like because I didn't – because I
20 questioned anything in my professional opinion – I
21 think he took a pretty extreme reaction to that. In
22 other words –
23    Q.   How were you harmed by the fact that this
24 letter, Defendants' Exhibit E, was placed in your
25 folder, as you say?

Page 161
1 that the program changed and the name on the PPT
2 minutes doesn't list a specific person, so he was
3 covered by law.
4    Q.    Had the PPT meetings by and large already
5 taken place for that year?
6    A.    In the high school, yes.
7    Q.    So was it, therefore, unlikely that
8 parents would be notified of change through PPT
9 meetings?
10   A.    Yes.
11   Q.    And when he threatened you with
12 insubordination if you were to communicate with
13 parents about the change, did you feel that that
14 infringed on your right to speak up?
15   MR. BRADY:    Object to the form.
16   MR. SZILAGYI:    Object to the form.
17   THE WITNESS:    Yes, I did.
18   Q.    (By Mr. Parenteau) And did his threat of
19 accusing you of insubordination, did that mean to
20 you that you would then be subjected to disciplinary
21 action if he found you insubordinate?
22   MR. SZILAGYI:    Object to the form.
23   MR. BRADY:    Object to the form.
24   THE WITNESS:    I felt that if I
25 disagreed with him, I would be threatened

Page 162
1 with insubordination whenever I spoke up,
2 and I felt I did it in an appropriate
3 forum. I would speak to him often with
4 another person in the room with me, and I
5 felt I was professional in my concerns and
6 how I presented them, and, yet, I can't
7 help it. I felt -- and I think others did
8 too -- that if we spoke up and it was
9 against what he had already planned and
10 what he wanted, then we ran the risk of
11 retaliation.
12   Q.    (By Mr. Parenteau) In your experience,
13 what happens to teachers at the East Lyme High
14 School who Mr. Mistretta found to insubordinate?
15   A.    He got rid of them.
16   Q.    How did he get rid of them?
17   A.    Sometimes they were moved to the middle
18 school. I know one -- two instances -- three
19 instances where people were, I think, recommended to
20 the superintendent that they not be rehired.
21   Q.    And so you took the threat of being
22 considered insubordinate as a real threat to your
23 continued employment?
24   MR. SZILAGYI:    Object to the form.
25   MR. BRADY:    Objection.

Page 163
1   THE WITNESS:    Yes.
2   Q.    (By Mr. Parenteau) With respect to the --
3 moving ahead to the situation where you were
4 assigned with six students closely following the
5 meeting with the union, do you understand what I'm
6 talking about?
7   A.    Yes.
8   Q.    Now, how did you feel when you were
9 informed by Mr. Mistretta -- actually, by Mr.
10 Christensen, right?
11   A.    Yes.
12   Q.    -- by Christensen that you were now going
13 to have six additional students, how did you feel
14 with respect to your work at the East Lyme High
15 School?
16   A.    Initially, I couldn't believe it. I mean,
17 he said to me, "What did you do wrong?"
18   Q.    Who is "he"?
19   A.    Christensen when he told me about the
20 assignment because he was surprised as well that I
21 had been given this assignment.
22 Then I felt pretty stressed when I got the
23 memo saying that I had to have all of these things
24 done by within a pretty tight time frame. I kept a
25 calendar of those three months, and I had to every

Page 164
1 single day discipline myself on who I was going to
2 be testing just to keep barely ahead of schedule.
3   Q.    Now, the time frame of -- so did you feel
4 that -- strike that.
5 When you were faced with -- strike that.
6 You felt that the addition of six students
7 to your work load was punitive in nature?
8   MR. SZILAGYI:    Objection to the form.
9   MR. BRADY:    Objection.
10   THE WITNESS:    Yes, I did, absolutely.
11   Q.    (By Mr. Parenteau) And feeling that you
12 had been punished for meeting with your union
13 members and the union authorities there, how did
14 that make you feel about wanting to meet with union
15 members in the future?
16   MR. SZILAGYI:    Object to the form.
17   MR. BRADY:    Same objection.
18   THE WITNESS:    It made me feel even
19 more wary all the time of everything I did
20 and not wanting to -- I mean, feeling
21 almost like you had to do things in secret
22 and that I would get caught and that I was
23 being watched. It was very
24 anxiety-provoking. It really was.
25   Q.    (By Mr. Parenteau) So would you say that