**EXHIBIT 5**

Epps vs. Mistretta

1/27/2003

Gerald Mistretta

Page 1

1           UNITED STATES DISTRICT COURT
2              DISTRICT OF CONNECTICUT

3    * * * * * * * * * * * * * * * *  *
                                      *
4    MAUREEN EPPS, DIANE CLAUSSEN,    *       **COPY**
     AND GERALDINE WRIGHT,            *
5                                     *
                                      *
6              PLAINTIFFS,            *
                                      *
7    VS.                              *
                                      *  C.A. NO. 3:01
                                      *  CV 2156(AVC)
8    GERALD MISTRETTA AND             *
     THE BOARD OF EDUCATION FOR THE   *
9    TOWN OF EAST LYME,               *
                                      *
10             DEFENDANTS.            *
                                      *
11   * * * * * * * * * * * * * * * *  *
12
13

     ---------------------------------------------------
14              DEPOSITION OF:  GERALD MISTRETTA
     ---------------------------------------------------
15
16
17

             Taken before Michele C. Clifford,
18      Licensed Shorthand Reporter, 00056, and Notary
        Public, in and for the State of Connecticut,
19      pursuant to Notice, at the law offices of
        Madsen, Prestley & Parenteau, 111 Huntington
20      Street, New London, Connecticut, on January 9,
        2003, commencing at 10:04 a.m.
21
22
23

        BRANDON SMITH REPORTING SERVICE, LLC
24              44 Capitol Avenue
                Hartford, CT  06106
25            Tel:  (860)549-1850

6d81b3a6-87ce-4534-abc4-7e2aa0715378

1/27/2003                          Epps vs. Mistretta

Gerald Mistretta

Page 13

```
 1   Q      They were your subordinate employees?

 2   A      They were part of the faculty.

 3   Q      They report to you?

 4   A      Yes.

 5   Q      As the principal, you have control over their

 6          work assignments?

 7   A      Correct.

 8   Q      You also have control over their room

 9          assignments?

10   A      Yes.

11   Q      Are you familiar with the term site-based

12          management?

13   A      Site-based management generally is management

14          decisions are made at the building site rather

15          than the central site.  In true site-based

16          management, budget and all aspects of the

17          operation of a high school or any school are

18          done at the site.

19   Q      Now, when I asked you about the Jack Reynolds

20          investigation of the allegations contained in

21          the statements of the plaintiffs, were you

22          present during any of the interviews that he

23          conducted?

24   A      No.

25   Q      In addition to being responsible for work
```

6d81b3a6-87ce-4534-abc4-7e2aa0715378

Epps vs. Mistretta

1/27/2003

Gerald Mistretta

Page 50

```
 1              with students who were nine through twelve,
 2              essentially without what I would call
 3              difficult students as a part of that program.
 4    Q    What do you mean by that?
 5    A    I mean that they wanted to keep a program
 6              where students who were discipline problems
 7              and L.D. would be kept in a separate program.
 8              They didn't want those kids to be interspersed
 9              throughout the rest of the programs.
10    Q    Just so I understand, they did not want to
11              have kids who were discipline problems to be
12              joined with, if they were learning disability
13              kids with disciplined problems, to be joined
14              with learning disability kids who did not have
15              discipline problems?
16    A    That's correct.
17    Q    Was there any other objection that was raised?
18    A    Their other objection was they felt that all
19              students should be grouped nine through twelve
20              so the younger students could learn from older
21              students and vice versa.
22    Q    And that, you said, was not in violation of
23              the law to group them that way?
24    A    No, it's not a violation.  It's not what I
25              would consider a best practice however.
```

6d81b3a6-87ce-4534-abc4-7e2aa0715378

Epps vs. Mistretta

1/27/2003

Gerald Mistretta

Page 51

1    Q    Why is that?

2    A    If we look at high school students, it doesn't

3         matter whether they're special ed or not

4         special ed, one of the most important things

5         is that they have connections with the

6         building and with the people who work in the

7         building.  The program that we have makes

8         those connections and keeps those connections

9         for all four years, so they're known

10        intimately by the special ed teachers,

11        assistant principal, the guidance counselor,

12        the school psychologist.  So they deal with

13        those same people for all four years and they

14        follow those kids from freshman year through

15        twelfth grade.

16    Q    Why were the kids not having that sort of

17         connection in the way in which Claussen and

18         Wright were running the program?

19    A    What would happen is you would have varying

20         sizes of classes coming in, so kids were

21         constantly being switched from one teacher to

22         another teacher.  The other problem that would

23         take place in the old model is that they

24         really didn't have enough room to house

25         everyone.  Because what I did in the new model

6d81b3a6-87ce-4534-abc4-7e2aa0715378

Epps vs. Mistretta

Gerald Mistretta

Page 71

| | | |
|---|---|---|
| 1 | | support for their position rather than the |
| 2 | | position that the majority of the special ed |
| 3 | | teachers wanted to have. |
| 4 | Q | What teachers were they going to? |
| 5 | A | The rest of special ed department. |
| 6 | Q | They were lobbying the special ed department; |
| 7 | | is that it? |
| 8 | A | Yes. |
| 9 | Q | So it's your belief that they were going to |
| 10 | | continue to resist in the following year if |
| 11 | | they were teamed together? |
| 12 | A | It was my belief that they could best serve |
| 13 | | the kids by not being teamed together. |
| 14 | Q | Did you understand that the positions that |
| 15 | | they were taking in connection with this |
| 16 | | reorganization, that they were taking these |
| 17 | | positions because they felt it was in the best |
| 18 | | interest of the students? |
| 19 | A | Absolutely. |
| 20 | Q | The fact of the matter is that I read in here |
| 21 | | somewhere that these two individuals, Claussen |
| 22 | | and Wright, had put together a self-advocacy |
| 23 | | program or curriculum; you are aware of that? |
| 24 | A | That's not correct. |
| 25 | Q | That's not correct? |

6d81b3a6-87ce-4534-abc4-7e2aa0715378

Epps vs. Mistretta

1/27/2003

Gerald Mistretta

Page 129

```
 1   A    Yes.

 2   Q    He did.  Did you say in response to that to

 3        Mike Devanney, Well, she can go ahead, words

 4        to that effect?  She can go ahead and do that

 5        because she'll probably win, but she'll lose;

 6        did you say words to that effect?

 7   A    I think I said the first part of the

 8        statement.  And she'll probably win because I

 9        have to give her the personal days.

10   Q    But you didn't say the second part of it,

11        she'll lose?

12   A    Absolutely not.

13   Q    In the meeting that she had, let's see, Mike

14        Devanney came to see you on or about June 2nd

15        of 2000 with this complaint of Maureen Epps?

16   A    I don't remember the exact date.

17   Q    Do you remember it was within two or three

18        days of the date that you told Maureen Epps

19        you were going to remove her as the C.I.L. for

20        the foreign language department?

21   A    I told Maureen Epps I was going to remove her

22        midway through May, yes.

23   Q    In what way did you tell her that?

24   A    Midway through May I had a student come to me

25        to say that she had been brought to tears by
```

6d81b3a6-87ce-4534-abc4-7e2aa0715378

Epps vs. Mistretta

1/27/2003

Gerald Mistretta

Page 174

1                    CERTIFICATE OF REPORTER

2

3       I, Michele C. Clifford, Licensed Shorthand

4  Reporter, 00056, and Notary Public duly commissioned

5  and qualified in and for the State of Connecticut,

6  do hereby certify that pursuant to Notice, there

7  came before me the following named person, to wit:

8  GERALD MISTRETTA, who was by me duly sworn to

9  testify to the truth and nothing but the truth; that

10  he was thereupon carefully examined upon his oath

11  and his examination reduced to writing under my

12  supervision; that this deposition is a true record

13  of the testimony given by the witness.

14       I further certify that I am neither attorney

15  nor counsel for, nor related to, nor employed by

16  any of the parties to the action in which this

17  deposition is taken and further that I am not a

18  relative or employee of any attorney or counsel

19  employed by the parties hereto, or financially

20  interested in the action.

21       IN WITNESS THEREOF, I have hereunto set my

22  hand January 23, 2003.

23       _Michele C. Clifford_

24  Michele C. Clifford
     Notary Public, License No. 00056

25  My commission expires:  7-31-04

Brandon Smith Reporting Service

6d81b3a6-87ce-4534-abc4-7e2aa0715378

## EPPS -V- MISTRETTA - MAUREEN EPPS - 2/24/03

### Page 1 to Page 208

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY: NIZIANKIEWICZ & MILLER

*NIZIANKIEWICZ & MILLER*
*972 Tolland St.*
*East Hartford, CT    06108-1533*
*Phone:   860-291-9191*
*FAX:   860-528-1972*

Page 37

1   Q.   What is the document you're looking at?
2   A.   Do you want me to read it?
3   Q.   Is this the written warning you were
4   referring to?
5   A.   Yes.
6   Q.   And it's a memo from Gerald Mistretta to
7   you?
8   A.   Correct.
9   Q.   Dated March 8, 1999?
10  A.   Yes.
11  Q.   Why did you receive this written warning?
12  MR. PARENTEAU:   Object to the form.
13  Q.   (By Mr. Brady) Do you know why you
14  received this written warning?
15  A.   Do I know why he wrote it?
16  Q.   Do you know why you received it?
17  MR. PARENTEAU:   Do you know?
18  THE WITNESS:   Yes.
19  Q.   (By Mr. Brady) Why is that?
20  A.   Because a student went down to him and
21  told him that I was trying to have the kids sign up
22  to go into the next level.
23  Q.   Did Mr. Mistretta ever tell you that a
24  student came to him and said that you had requested
25  them to sign up for classes in advance that they

Page 38

1   would later intend to drop?
2   A.   No, no.
3   Q.   How did you know that a student had gone
4   to Mr. Mistretta related to that issue?
5   A.   He told me.
6   Q.   When did he tell you that?
7   A.   March 1999.
8   Q.   Do you know who the student was?
9   A.   I remember her first name.
10  Q.   What was her first name?
11  A.   Christine.
12  Q.   And what was Christine's claim, as
13  understood, from what Mr. Mistretta had told you?
14  A.   That I wanted her, because she was very
15  good in Spanish, to go on to the next level, as I
16  tried to tell all my students to go on to the next
17  level.
18  Q.   When you say "go on to the next level,"
19  what do you mean by that?
20  A.   This was a Spanish 3 student going on to
21  Spanish 4. I encourage all my students to continue
22  their study of Spanish, especially the exceptional
23  ones.
24  Q.   How many different levels of Spanish are
25  there at East Lyme High School?

Page 39

1   A.   Are there or were there?
2   Q.   How many different levels – during your
3   employment, how many different levels of Spanish
4   were there?
5   A.   Spanish 5 AP, Spanish 4 honors AB,
6   Spanish 3 honors AB, Spanish 2 honors AB, Spanish 1 honors
7   and A were one class, B and new level C.
8   Q.   Do you know how many students would be
9   required in advance to fill a particular section of
10  Spanish?
11  A.   That was up to Mr. Mistretta to decide.
12  Q.   Do you know how many were required?
13  A.   I believe he used to have a minimum of
14  ten. Sometimes that was waived, however.
15  Q.   How many students would you have in your
16  upper level honors courses approximately?
17  A.   Are we talking 4 or 5 AP?
18  Q.   Let's start with 5.
19  A.   The year I left it was AP. I had 18.
20  I've had 12. There may have been a 10 or an 11.
21  Q.   Would you ever have an advanced number of
22  students signing up for a class and later dropping
23  it once the school year started?
24  A.   That happens in all classes. This
25  particular one was for a level 4, not a level 5.

Page 40

1   Q.   Did you ever instruct a student to sign up
2   for an advanced level Spanish class and later drop
3   it?
4   A.   No.
5   Q.   What did you do when you received this
6   memo from Mr. Mistretta?
7   A.   I told him that that wasn't the whole
8   truth.
9   Q.   And what did you say to him in that
10  regard?
11  A.   I told him that per his speech at a CIL
12  meeting he told us to tell the students that they
13  had two weeks in which to drop a class. He was
14  upset that students would sign up for a class and
15  then arbitrarily drop a class. At a department
16  meeting I also let the teachers know to let their
17  students know that he was holding fast to the
18  two-week rule. I made a statement in all my
19  classes, per Mr. Mistretta, Mr. Mistretta's order at
20  the CIL meeting, to let them know that if they
21  decided to change a course, it had to be done in two
22  week's time so to think carefully about what they
23  wanted to take.
24  Q.   Now, when would they sign up for courses?
25  A.   I believe sometime in March or April.

**Page 41**

1   Q.   And they would have two weeks from that
2 period?
3   A.   No. Two weeks – no. Two weeks from the
4 school year when it started in September – or
5 August. We start in August.
6   Q.   Did Mr. Mistretta ever tell you if there
7 were any other students besides Christine that
8 informed him that you instructed him to –
9   A.   No.
10   Q.   Let me finish the question. – that you
11 instructed them to sign up for a class and then
12 later drop it?
13   A.   Did he ever tell me?
14   Q.   Yes. .
15   A.   No, he did not.
16   Q.   Did you ever see this student, Christine,
17 after you received this memo?
18   A.   She was in my class.
19   Q.   Did you ever ask her about this memo or –
20 did you ever ask her about the memo?
21   A.   I don't believe I did, no.
22   Q.   Did you ever ask her about her meeting
23 with Mr. Mistretta where she told him about that?
24   A.   I remember walking in the office and she
25 was talking to him at the counter as to, "Did you

**Page 42**

1 tell Ms. Epps?"
2   Q.   What did she say?
3   A.   She saw me come in and she stopped
4 talking.
5   Q.   So later when she was in your class, did
6 you ever have any discussion with her about that
7 issue?
8   A.   I don't believe I did, no.
9   Q.   Did you speak to anyone else other than
10 Mr. Mistretta about this memorandum, Defendants' A?
11   A.   Such as another teacher or my husband or
12 anybody?
13   Q.   Did you ever speak to David Miko about the
14 letter?
15   A.   I don't remember.
16   Q.   Did you ever speak to Larry Roberts about
17 the memo?
18   A.   I don't believe I did, no.
19   Q.   So what did you say to Mr. Mistretta after
20 he present you with this memo?
21   A.   What I just told you, that I was following
22 his orders and that I encourage all my students to
23 go to the next level. If I remember correctly, she
24 was an A-student.
25   Q.   Can you say approximately how many

**Page 43**

1 students would drop your class in the fall after
2 signing up for it?
3   A.   Not many. This was for a 4 honors class.
4   Q.   Would any students ever sign up for your
5 class and drop the class, going below the number
6 that Mr. Mistretta had required for the requisite
7 amount of students in the class?
8   A.   Not in my classes, no. In this particular
9 class for honors there would be two sections of
10 maybe 20 kids per class.
11   Q.   Did you ever have less than ten students
12 per class?
13   MR. PARENTEAU:   Objection to the
14 form.
15   Q.   (By Mr. Brady) You can answer if you
16 know.
17   A.   Not that I can remember, no
18   Q.   Did you ever file any grievances during
19 your employment as a Spanish teacher for East Lyme
20 High School?
21   A.   Yes.
22   Q.   Do you know how many?
23   A.   Two grievances and one at a labor board.
24   Q.   Do you know when you filed your first
25 grievance?

**Page 44**

1   A.   I believe it was September.
2   Q.   Of what year?
3   A.   Was it 2000?
4   Q.   What was the substance of your first
5 grievance?
6   A.   The first grievance was about personal
7 days.
8   Q.   Why did you file your first grievance?
9   A.   Because according to the contract that we
10 have, we're allowed to take five personal days as
11 long as they are not the day before a vacation, the
12 day after a vacation, to look for other employment
13 or to go shopping.
14   Q.   So why did you file a grievance based on
15 that?
16   A.   Because he refused. It was on the second
17 refusal of a personal day.
18   Q.   Do you have to obtain advance permission
19 before you use a personal day?
20   A.   Three days, yes.
21   Q.   Who do you retain that permission from?
22   A.   Mr. Mistretta.
23   Q.   Anybody else?
24   A.   No.
25   Q.   Under the Collective Bargaining Agreement,