UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 APR 23 P 2: 24

U.S. DISTRICT COURT
HARTFORD, CT.

MAUREEN EPPS,                           :
DIANE CLAUSSEN, and                     :
GERALDINE WRIGHT,                       :
   Plaintiffs,                          :
                                        :
VS.                                     :        Civil No. 3:01 CV2156(AVC)
                                        :
GERALD MISTRETTA and THE                :
BOARD OF EDUCATION FOR                  :
THE TOWN OF EAST LYME,                  :
   Defendants.                          :

## RULING ON THE DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

This is an action for damages alleging violations of the
United States Constitution.  It is brought pursuant to 42 U.S.C.
§ 1983 and Conn. Gen. Stat. § 31-51q.  The plaintiffs, Maureen
Epps, Diane Claussen, and Geraldine Wright, all teachers employed
by the town of East Lyme, allege that the defendants, Gerald
Mistretta, and the Board of Education for the Town of East Lyme
(the "board"), retaliated against them for exercising their
rights as secured by the First Amendment to the United States
Constitution.

The defendants now move for summary judgment pursuant to
Fed.R.Civ.P. Rule 56(c).  The issues presented are: 1) whether
the speech at issue is protected by the First Amendment; 2)
whether the board is entitled to governmental immunity with
respect to the cause of action brought pursuant to Conn. Gen.
Stat. § 31-51q; 3) whether Mistretta is entitled to qualified
immunity; and 4) whether the action is barred for failure to

exhaust administrative remedies.

For the reasons hereinafter set forth, the court concludes that: 1) Wright's and Claussen's speech is protected by the first amendment, but Epps' speech is not protected; 2) the board is not entitled to governmental immunity; 3) Mistretta is not entitled to qualified immunity; and, 4) the action is not barred for failure to exhaust administrative remedies.  The motion for summary judgment (document no. 37) is therefore GRANTED in part and DENIED in part.

### FACTS

Examination of the complaint, affidavits, declarations, pleadings, Rule 56(a) statements, and exhibits accompanying the motion for summary judgment, and the responses thereto, disclose the following undisputed material facts.

The plaintiffs, Maureen Epps, Geraldine Wright and Diane Claussen are current and/or former employees of the defendant, the Board of Education for the Town of East Lyme (the "board"). The plaintiffs were teachers at East Lyme High School (the "school"), and all belonged to the East Lyme Teachers Association union (the "union").  In 1983, Mistretta became principal of the school.  During his tenure as principal, Mistretta supervised the plaintiffs.

1.   Plaintiff Maureen Epps

In 1978, Epps began her employment at the school as a

2

Spanish teacher. During her employment as a teacher she also held two other supplemental positions at the school, including summer school director, and liaison of the foreign language department. This latter position became known as the curriculum instructional leader ("CIL") for the foreign language department.

On June 1, 1998, based on Mistretta's recommendation, superintendent John Reynolds appointed Epps to the supplemental position of director of the summer school program for 1998.

On March 8, 1999, Mistretta issued Epps a letter of reprimand for an incident where Epps allegedly encouraged students to sign up for language classes only to drop them later, in order to increase the number of foreign language classes offered. The letter from Mistretta stated:

> This type of fraudulent behavior is completely unacceptable and unprofessional. To instruct a student to lie about their intentions to increase foreign language sections will not be tolerated. If there is even another instance of this unethical and improper professional behavior on your part serious disciplinary actions will be taken.

On October 7, 1999, despite the previous reprimand and based on Mistretta's recommendation, Reynolds reappointed Epps as CIL for the foreign language department for the 1999-2000 school year.

In the Spring of 2000, on two different occasions, Epps asked Mistretta if she could take a personal day off from work. On both occasions, Mistretta denied Epps requests. After the

3

second denial, Epps filed a grievance with her union, because she
believed that she was entitled to the personal days.

In June 2000, only days after the grievance was filed,
Mistretta recommended the removal of Epps from the position of
CIL of the foreign language department.  At this point, Epps
remained a teacher in the foreign language department.

On January 31, 2001, based on a recommendation by Mistretta,
Reynolds reappointed Epps to the director of the summer school
position for the 2000 - 2001 school year.

On February 8, 2001, Epps submitted her qualifications to
Mistretta, to be reconsidered for the position of CIL of the
foreign language department.  In March 2001, an alleged incident
occurred during the process of hiring a new CIL.  Epps allegedly,
without authorization, accessed a coworker's computer and read
confidential computer files.  The defendants provide an affidavit
of a former student-teacher who claims that Epps instructed her
to open a computer file and look for a document listing interview
questions for the CIL position.  The student-teacher also alleges
in the affidavit that Epps asked her to lie about the incident if
questioned by school officials.  Epps denies any wrongdoing
involving this incident.

On March 30, 2001, assistant principal Larry Roberts,
informed members of the foreign language department that a
committee recommended two finalists for the CIL position.  Epps

4

was not chosen as a finalist.  Shortly after this announcement, Epps wrote a memo to Roberts expressing concerns that the school conducted an unprofessional and inappropriate process.  On April 9, 2001, Roberts responded to Epps by memo and insisted that the process was appropriate and fair.

On June 14, 2001, Reynolds canceled Epps' supplemental position as a summer school instructor for "documented unprofessional activities."  On June 19, 2001, Mistretta recommended that Reynolds terminate Epps' employment as an employee of East Lyme High School based on a "series of serious unprofessional and unethical acts" and because she was "unfit to serve as a teacher in the East Lyme School District."  On June 27, 2001, Mistretta followed up the previous letter with a letter detailing conduct justifying the termination, including: (1) an alleged incident where she removed a letter not addressed to her; (2) an alleged incident where she copied confidential files from her coworker's computer; (3) her conduct in allegedly using confidential information to her advantage at a subsequent interview for the CIL position; and, (4) her conduct in allegedly asking a student-teacher to cover up the incident.

On July 3, 2001, Epps submitted a grievance to the union regarding her removal as summer school director at the school.  On August 8, 2001, Epps submitted a letter of resignation to the board.

2.    <u>Plaintiffs Geraldine Wright and Diane Claussen</u>

In 1985, Geraldine Wright began working at the school as a resource room teacher in the special education department.  On September 1, 1987, Diane Claussen began work at the school as a full-time learning disabilities teacher in the special education department.

In 1990, the board adopted a policy known as "site based management."  Under site based management, the board gave Mistretta, as principal, control over all aspects of the school, including the special education department.  Previously, the director of the department controlled the program.  Under site based management, Mistretta gradually implemented changes in the special education department.  While Mistretta controlled the school, budgets decreased, caseloads increased, and staff assignments changed.

During the 1996 - 1997 school year, Wright and Claussen expressed concerns to Mistretta about inadequate funding and staffing for the special education department.

In September of 1998, members of the special education department, including Wright and Claussen, expressed concerns to Mistretta about a lack of proper staffing for the department for the school year.  The department made a proposal to Mistretta that addressed problems they felt existed.  Mistretta rejected the proposal.

6

Beginning in September 1998, Wright and Claussen claim that Mistretta began to target them with retaliation for their complaints concerning the special education department. Allegedly, Mistretta began to place restrictions on special education department teachers, restrictions that included a requirement of obtaining approval for any modifications to teaching schedules, a requirement for teachers to check in personally when late, and restrictions concerning PPT meetings[1]. Allegedly, Mistretta did not place any of these conditions on other departments.

On January 27, 1999, assistant principal David Miko sent a memorandum to Wright regarding an incident involving missing SAT packages that surprisingly turned up in her classroom. In the memorandum, Miko stated: "[I]t is imperative that you check your room(s) more carefully upon being informed that such an important item is missing. Please note that if we had been unable to locate the SAT package, every student who took the SATs at East Lyme High School on Saturday, January 23, 1999, would have his/her examination voided."

In April 1999, Mistretta announced a plan for reorganization of the special education department. Previously, the school

---

[1] "PPT meetings" or Personal Placement Team meetings are mandatory annual meetings with the parents, student, special education teacher, school psychologist, a school administrator, and school teacher to discuss a plan to address each individual special education student's needs.

7

grouped special education students together in resource rooms according to their specific needs. Because of their specialized training, Wright and Claussen previously taught in the same resource room for learning disabled students. Mistretta and Reynolds maintain that the school changed the organization of the special education department in order to comply with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. 1400.

The new plan created a "team approach" by grouping special education students by grade level. The reorganization required changing teacher assignments. The new plan proposed placing Wright and Claussen on different teams where they no longer worked together.

Wright and Claussen were opposed to the reorganization plan. Wright and Claussen felt the school best served the students interests by assigning them to resource rooms grouped according to the students' needs. Wright and Claussen felt it best for them to continue working together solely with learning disability students rather than separately with students having different needs grouped by grade level.

After the announcement of the reorganization, the special education department held a meeting to consider ways to implement the reorganization of the department in a manner that would be as least disruptive as possible to the students. The members of the

department brought a proposal to Mistretta that included allowing Claussen and Wright to teach the juniors and seniors, respectively. This plan would have allowed Claussen and Wright to continue working together. Mistretta rejected the department members' proposal.

In May, 1999, Claussen personally met with Mistretta and again requested that she and Wright be allowed to teach the juniors and seniors. Claussen attempted, to no avail, to explain to Mistretta why the proposal made the best sense and why it best suited the students to have her and Wright remain working together with the juniors and seniors. Mistretta, again, rejected the proposal.

On June 26, 1999, Wright requested a medical leave of absence for the 1999-2000 school year. The letter requesting the leave stated: "[T]his past year has been difficult, health wise, as my doctor can document. Due to symptoms from Lyme disease, and complications from years of strong antibiotics, such as fatigue, migraines and a weakened immune system, my doctor advised me to take time off from work in order to fully recover." The letter listed no other reasons for requesting the leave of absence. However, Wright alleges that in addition to the reasons stated in the request, she also required the leave due to stress over the reorganization of the department caused by Mistretta. Wright alleges she did not state this in the request out of fear

9

of retaliation. On July 12, 1999, the board approved Wright's request for the medical leave for the 1999-2000 school year.

3.    <u>Wright's Assignment Upon Return From Leave</u>

On July 26, 2000, Wright wrote a letter to Mistretta expressing interest in returning to the school in a learning disability position.  On August 10, 2000, Wright wrote a letter to Mistretta indicating that she was "accepting [his] offer of the .5 grade 9 LD position."  Mistretta denies making this offer to Wright.  Mistretta instead claims that, at this time he offered Wright a different position in the therapeutic program, which she accepted.

On August 25, 2000, superintendent Reynolds sent a letter to Wright stating that he had reviewed her assignment with Mistretta and that he expected her to fulfill her obligations by teaching in the therapeutic program.  In August 2000, Wright returned to the school and worked in the therapeutic program.

In September 2000, Wright filed a grievance concerning the position to which Mistretta assigned her.  Wright alleged that, Mistretta did not follow proper posting requirements for filling the ".5 position" not offered to her, and that Mistretta gave the position to a less qualified teacher.

On September 13, 2000, during a meeting to resolve the grievance, the parties agreed that Wright would stay in her assigned position until the school hired additional staff, at

10

which point she would be allowed to transfer to a different
position.

On October 11, 2000, Wright sent a letter to the director of
special services, Lloyd Johnson, complaining that her assigned
resource room was inadequate, as it had no windows and only one
exit.  Johnson consulted Mistretta about the complaint and
discussed the issue with him.  Mistretta asked the fire marshal,
Richard Morris, to inspect the room.  Morris determined that the
room was adequate and appropriate for use as a resource room for
special education.  On October 16, 2000, Johnson wrote a reply
letter to Wright informing her that the room was adequate and
appropriate, and that in the future such issues should be
addressed directly to Mistretta.

On October 18, 2000, Mistretta held a meeting with Wright to
discuss her concerns about the resource room, the disposition of
her grievance, or any other concerns that she had.  On October
19, 2000, following the meeting, Wright wrote a letter to
Mistretta in which she said she was "glad" about the fire
marshal's inspection, but she also expressed concerns about
organization and room assignments of the special education
department.  She especially noted that school plans labeled the
rooms a janitor's closet.

On October 30, 2000, Mistretta replied by letter to Wright's
concerns.  Mistretta pointed out that he, the vice-principal, the

superintendent, the school psychologist, and most special
education teachers supported the organizational model in place at
the school for special education students.  Mistretta also noted
that all school blue prints and plans designated Wright's class
room as a special education room, not a janitor's closet.

On December 4, 2000, Wright sent a memo to Mistretta
declining his offer of a .5 position in the alternative education
program.  In September 2001, Wright voluntarily transferred to
the elementary school to perform diagnostic testing.  She
currently remains employed at the elementary school.

4.    Claussen's 2000-2001 School Year Assignment

On October 10, 2000, Paul Christensen, CIL of the special
education department, sent a memo to Claussen assigning her
testing responsibilities for the eleventh grade in addition to
her other responsibilities.  The memo explained that Mistretta
had assigned the additional responsibility to her because her
work load was lighter than others in the department.  Claussen
alleges that Mistretta assigned her the greater work load after
she spoke out during a union meeting expressing displeasure with
the reorganization of the special education department.

On October 12, 2000, Claussen met with Christensen and
Mistretta to complain about the additional work load that she
felt was punitive.  After the meeting, Mistretta reduced her work
load.

In 2003, Mistretta retired from the school.  Presently, Claussen remains a teacher in the special education department.

### STANDARD

On a motion for summary judgment, the moving party must show that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Fed.R.Civ.P. Rule 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Aldrich v. Randolph Cent. Sch. Dist, 963 F.2d 520, 523 (2nd Cir. 1992)(quoting Anderson, 477 U.S. at 248).

The court resolves "all ambiguities and draw[s] all inferences in favor of the non-moving party in order to determine how a reasonable jury would decide."  Aldrich, 963 F.2d at 523. Thus, "only when reasonable minds could not differ as to the import of the evidence is summary judgment proper."  Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).

In opposing a motion for summary judgment, the "adverse party may not rest upon the mere allegations or denials of [its] pleading," but must "set forth specific facts showing that there is a genuine issue for trial."  Fed.R.Civ.P. Rule 56; see D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998).  "If the adverse party does not so respond, summary judgment, if

13

appropriate, shall be entered against the adverse party."
Fed.R.Civ.P.56(d).  "[T]he mere verification by affidavit of
one's own conclusory allegations is not sufficient to oppose a
motion for summary judgment."  <u>Zigmund v. Foster</u>, 106 F.Supp.2d
352, 356 (D.Conn. 2000)(citations and quotation marks omitted).

Furthermore, "[t]he mere existence of a scintilla of
evidence in support of the [non-moving party's] position will be
insufficient [to avoid the entry of summary judgment against the
non-moving]; there must be evidence on which the jury could
reasonably find for the [non-moving] party."  <u>Anderson v. Liberty
Lobby</u>, 477 U.S. 242, 252 (1986).

**<u>DISCUSSION</u>**

The complaint alleges that Mistretta, the principal of a
public high school, retaliated against several subordinate
teachers for speaking out on matters of public concern in
violation of the First Amendment to the United States
Constitution.  It is brought pursuant to 42 U.S.C. § 1983[2] and

---

[2]42 U.S.C. § 1983 provides in relevant part:
Every person who, under color of any statute, ordinance,
regulation, custom or usage, of any State of Territory or the
District of Columbia, subjects or causes to be subjected, any
citizen of the United States or any other person within the
jurisdiction thereof to the deprivation of any rights,
privileges, or immunities secured by the Constitution and laws,
shall be liable to the party injured in an action at law, suit in
equity, or other proper proceeding for redress...

Conn. Gen. Stat. § 31-51q.[3]

1.  <u>First Amendment Protection</u>

The defendants first assert that they are entitled to
summary judgment because the speech at issue does not relate to
matters of public concern and, therefore, is not protected by the
First Amendment.  Specifically, the defendants maintain that the
speech at issue relates to personal concerns regarding requests
for personal time, available part-time positions, requests for
information in a personnel file, suitable office space, the
ability to work with specific colleagues, assignments of part-
time positions to less qualified teachers, and the sharing of
office space, -- all of which relate to private, unprotected
conduct.

Claussen and Wright respond that they engaged in protected
speech by expressing concerns about the quality of the education
in the special education department.  Epps responds that she

------------------------------------------

[3] Conn. Gen. Stat. § 31-51q provides:
Any employer, including the state and any instrumentality or
political subdivision thereof, who subjects any employee to
discipline or discharge on account of the exercise by such
employee of rights guaranteed by the first amendment to the
United States Constitution or section 3, 4 or 14 of the article
first of the Constitution of the state, provided such activity
does not materially interfere with the employee's bona fide job
performance or the working relationship between the employee and
the employer, shall be liable to such employee for damages caused
by such discipline or discharge, including punitive damages, and
for reasonable attorney's fees as part of costs of any such
action for damages.  If the court determines that such action for
damages was brought without substantial justification, the court
may award costs and reasonable attorney's fees to the employer.

engaged in protected speech when she filed a grievance with the union.

In the typical case where a public employee claims to have been discharged or disciplined for exercising his or her First Amendment right to free expression, the employee must establish, among other things, that the conduct at issue is protected speech. Ezekwo v. New York City Health and Hospitals Corp., 940 F.2d 775, 780-81 (2d Cir. 1991). "[W]hen a public employee speaks out on a matter of public concern, that speech is entitled First Amendment protection." Bernheim v. Litt, 79 F.3d 318, 324 (2d Cir. 1996). However, "when a public employee speaks . . . upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." Connick v. Myers, 461 U.S. 138, 147 (1983). The court decides as a matter of law whether speech relates to a matter of public concern. Connick v. Myers, 461 U.S. 138, 148 n.7 (1983).[4]

A.  Plaintiff Epps' Speech

The defendants contend that Epps' speech related to personal

_____

[4]  For purposes of analyzing whether the plaintiffs' speech related to matters of public concern under 42 U.S.C. § 1983, the analysis is the same for causes of action brought pursuant Conn. Gen. Stat. § 31-51q. See Daley v. Aetna Life & Casualty Co., 249 Conn. 766, 778-83 (1999)(applying same analysis as Connick v. Meyers, 461 U.S. 138 (1983)).

16

matters about using personal days and her desired employment as CIL and summer school director, which are not matters of public concern. Epps claims that Mistretta retaliated against her for exercising her right to file a grievance and for expressing displeasure with the hiring process for the CIL of the foreign language department.

In <u>Sussman v. New York City Health and Hospitals Corp.</u>, No. 94CV.8461, 1997 WL 334964, *10 (S.D.N.Y. June 16, 1997), a public employee claimed that his employer retaliated against him after he filed a grievance with his union alleging that he was unfairly treated when the employer refused to release him from his employment contract based on his desire to work elsewhere. The court held that this did not satisfy the public concern requirement for establishing a valid first amendment claim, because it was private in nature. <u>Id.</u>

As in <u>Sussman</u>, the court concludes that the grievances at issue do not address a matter of public concern. Epps' grievances relate to a denial of personal days, and the school's choice for CIL of the foreign language department. These matters are personal to Epps and hence, not protected by the First Amendment. Therefore, the defendant's motion for summary judgment on Epps' claim of a First Amendment violation is granted.

17

B.    Plaintiffs Wright's and Claussen's Speech

The defendants contend that Wright's and Claussen's speech related to personal matters about teaching assignments, room assignments, office space, and assignments of part-time positions, which are not matters of public concern.  Wright and Claussen respond that their speech related to the quality of education provided to special education students, which is a matter of public concern.

Speech related to the quality of education in public schools is a matter of public concern.  Bernheim v. Litt, 79 F.3d 318, 325 (2d Cir. 1996).  In Bernheim, an elementary school principal allegedly retaliated against a teacher when the teacher spoke out on the quality of education provided by the school.  Id.  The court held that the plaintiff's speech related to matters of public concern because the improvement or deterioration of the quality of education is an issue of serious interest to the community.  Id.; see also Jeffries v. Harleston, 21 F.3d 1238, 1245-46 (2d Cir. 1994) vacated on other grounds, 513 U.S. 996 (1994)(teacher's speech criticizing school curriculum found to be related to matters of public concern).

Here, the speech at issue concerned the organization, funding, and staffing levels of the special education department.  Speech relating to the quality of education for special education students touches on matters of public concern and is protected.

18

The defendants' motion for summary judgment is therefore denied with respect to the First Amendment claims asserted by Wright and Claussen.

2.   Governmental Immunity and Conn. Gen. Stat. § 31-51q

In connection with the claim under Conn. Gen. Stat. § 31-51q, the defendants next assert that the board is entitled to governmental immunity arising out of Mistretta's conduct, because Mistretta exercised a discretionary public function in the reorganization of the special education department.

The plaintiffs respond that the state of Connecticut has specifically waived governmental immunity for its political subdivisions for employer conduct that violates an employee's first amendment rights in causes of action brought pursuant to Conn. Gen. Stat. § 31-51q.[5]

Generally, governments and their agents are immune from liability for acts conducted in performance of their official duty.  See Conn. Gen. Stat. § 52-557n.[6]  There is a recognized

_____

[5]The plaintiffs maintain in their brief that they do not seek to hold the board liable under 42 U.S.C. § 1983. Accordingly, to the extent that the complaint may be read to state a cause of action against the board pursuant to § 1983, it is hereby dismissed.

[6]Conn. Gen. Stat. § 52-557n(a) provides in relevant part: "(2) Except as otherwise provided by law, a political subdivision of the state shall not be liable for damages to person or property caused by: (A) Acts or omissions of any employee, officer or agent which constitute criminal conduct, fraud, actual malice or wilful misconduct; or (B) negligent acts or omissions which require the exercise of judgment or discretion as an

19

exception for the performance of discretionary acts by a

municipal employee where a statute specifically provides for a

cause of action against a municipality or municipal official.

See Evon v. Andrews, 211 Conn. 501, 505 (1989).  In this regard,

Conn. Gen. Stat. § 31-51q specifically provides:

> Any employer, including the state and any
> instrumentality or political subdivision thereof,
> who subjects any employee to discipline or
> discharge on account of the exercise by such
> employee of rights guaranteed by the first
> amendment to the United States Constitution ...
> shall be liable to such employee for damages

With the enactment of § 31-51q, the bar was removed in suits

against a municipality for acts taken against an employee due to

the employee's exercise of his or her first amendment rights.

Skinner v. Angliker, 211 Conn. 370, 377 (1989).  Because § 31-51q

specifically creates a cause of action available against a

municipality, the court concludes that the board may not assert

the defense of governmental immunity.  The defendants motion for

summary judgment on this issue is therefore denied.

3.    Qualified Immunity

The defendants next assert that, Mistretta is entitled to

qualified immunity for any claims brought by the plaintiffs

against him, because Mistretta took objectively reasonable

actions in reorganizing the special education department and

---

official function of the authority expressly or impliedly granted
by law."

20

making teaching assignments.

The plaintiffs respond that, there are material issues of fact as to Mistretta's motives in reorganizing the special education department and in making teacher assignments and therefore, summary judgment is inappropriate.

"The doctrine of qualified immunity entitles public officials to freedom from [§ 1983] suits for acts undertaken in their official capacity if: (1) their conduct does not violate clearly established constitutional rights; or (2) it was objectively reasonable for them to believe their acts did not violate those rights." Martinez v. Simonetti, 202 F.3d 625, 633-34 (2d Cir. 2000)(quotation marks omitted, citations omitted).

A government employee's right to engage in protected speech is a clearly established right under the First Amendment to the Constitution. See Connick v. Myers, 461 U.S. 138 (1983). Consequently, Mistretta may prevail on his qualified immunity defense only if it was "objectively reasonable for him to believe that his conduct did not violate [Claussen's and Wright's] rights." Johnson v. Ganim, 342 F.3d 105, 116 (2d Cir. 2003) (internal quotation marks and brackets omitted).

Applying these principles the court concludes that there are factual issues with regard to whether Mistretta's actions were objectively reasonable given the circumstances confronting him. Reviewing the facts in a light most favorable to the plaintiffs,

a trier of fact could find Mistretta reorganized the special
education department and gave Claussen and Wright room and
teaching assignments in retaliation for their expressing concerns
about inadequate staffing and funding for the special needs
department.  Accordingly, summary judgment is denied on this
issue.

4.    <u>Failure to Exhaust Administrative Process</u>

     The defendants next assert that, the plaintiffs failed to
exhaust administrative remedies under the collective bargaining
agreement between the parties.  The plaintiffs respond that
exhaustion of administrative remedies is not a prerequisite to
maintaining an action brought pursuant to 42 U.S.C. § 1983, nor
is it required for actions brought pursuant to Conn. Gen. Stat. §
31-51q.

     The exhaustion of administrative remedies does not preclude
a plaintiff from bringing an action pursuant to 42 U.S.C. § 1983.
<u>Patsy v. Board of Regents of State of Fla.</u>, 457 U.S. 496, 516
(1982); <u>see</u> <u>also</u> <u>Nussle v. Willete</u>, 224 F.3d 95, 98 (2d Cir.
2000).

     Pursuant to Conn. Gen. Stat. § 31-51bb[7], there is no

-----

[7]Conn. Gen. Stat. § 31-51bb states:
"No employee shall be denied the right to pursue, in a court of
competent jurisdiction, a cause of action arising under the state
or federal constitution or under a state statute solely because
the employee is covered by a collective bargaining agreement.
Nothing in this section shall be construed to give an employee
the right to pursue a cause of action in a court of competent

requirement that plaintiffs exhaust administrative remedies before bringing a cause of action under Conn. Gen. Stat. § 31-51q.  The Connecticut Supreme Court has stated:

> Section 31-51bb provides that a cause of action arising under the state or federal constitution or a <u>state statute</u> cannot be lost solely because the employee is covered by a collective bargaining agreement.  Plainly, therefore, an employee who does *not* exhaust the grievance procedures established by a collective bargaining agreement may pursue a cause of action in the Superior Court if the cause of action is premised on an independent statutory claim.  To hold otherwise would be to deny such an employee the right to pursue a statutory action solely because the existence of a collective bargaining agreement.

<u>Genovese v. Gallo Wine Merchants, Inc.</u>, 226 Conn. 475, 481-82 (1993)(emphasis supplied).

The court therefore concludes the action is not barred on account of the plaintiff's failure to exhaust administrative remedies.  The defendants motion for summary judgment on this issue is therefore denied.

---

jurisdiction for breach of any provision of a collective bargaining agreement or other claims dependent upon the provisions of a collective bargaining agreement."

**CONCLUSION**

For the foregoing reasons, the defendants' joint motion for summary judgment (document no. 37) is GRANTED in part and DENIED in part.

It is so ordered this 23rd day of April 2004, at Hartford, Connecticut.

_____
Alfred V. Covello
United States District Judge